

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### **UNDER SEAL**

In the Matter of the Search of:

Case Number:   18 CR 611

The two cellular phones, further described in
Attachment A

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Andrew K. McKay, a Special Agent of the Federal Bureau of Investigation, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

### See Attachment A

located in the Northern District of Illinois, there is now concealed:

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is evidence, instrumentalities, and fruits.

The search is related to a violations of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 951(a) | acting as an agent of a foreign government without notice to the Attorney General |
| Title 18, United States Code, Section 1001(a)(2) | making material false statements in a matter within the jurisdiction of the executive branch |
| Title 18, United States Code, Section 1546(a) | visa fraud |

The application is based on these facts:

### See Attached Affidavit,

Continued on the attached sheet.

FILED

OCT 01 2018

M. DAVID WEISMAN
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

_____
*Applicant's Signature*

ANDREW K. MCKAY, Special Agent,
Federal Bureau of Investigation
*Printed name and title*

Sworn to before me and signed in my presence.

Date: October 1, 2018

_____
*Judge's signature*

City and State: Chicago, Illinois

M. DAVID WEISMAN, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT    )
                                )
NORTHERN DISTRICT OF ILLINOIS   )

## **AFFIDAVIT**

I, Andrew K. McKay, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately August 2014.

2.      As part of my duties as an FBI Special Agent, I investigate criminal violations relating to espionage offenses, including the gathering or delivery defense information to aid a foreign government or agent, in violation of Title 18, United States Code, Section 794(a), and individuals that act as a foreign agent without notice to the Attorney General, in violation of Title 18, United States Code, Section 951(a). I have conducted investigations involving the use of the Internet, email, and social media to further criminal activity. I have participated in the execution of multiple federal search warrants.

3.      This affidavit is made in support of an application for a warrant to search: a ZTE flip phone, bearing International Mobile Equipment Identity ("IMEI") 861961033447013 ("**Subject Phone 1**") and an Apple iPhone Model A1660 ("**Subject Phone 2**"),[1] both seized during the arrest of JI CHAOQUN and currently in the custody of the FBI (collectively, the "**Subject Phones**"), for evidence,

---

[1] Agents are unable to learn the IMEI of the Apple iPhone because that information is stored electronically rather than physically stamped on the accessible portions of the physical device.

instrumentalities, and fruits described further in Attachment B, concerning violations of Title 18, United States Code, Sections 951(a) (acting as an agent of a foreign government without notice to the Attorney General), 1001(a)(2) (making material false statements in a matter within the jurisdiction of the executive branch), and 1546(a) (visa fraud) (the "**Subject Offenses**").

4.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence, instrumentalities, and fruits of violations of the **Subject Offenses**, are located in the **Subject Phone**.

## I.     BACKGROUND INFORMATION

### A.     People's Republic of China Ministry of State Security

5.     Based upon my training and experience, and information obtained from publicly available sources, the Ministry of State Security ("MSS") for the People's Republic of China handles civilian intelligence collection and is responsible for counter-intelligence and foreign intelligence, as well as political security. The MSS consists of its primary central office, provincial departments, and a number of local and municipal bureaus. For example, the Jiangsu Province Ministry of State Security

("JSSD") is a provincial department of the MSS. These state and local bureaus report to both their national ministries and state and local governments and party committees. The MSS has maintained both a clandestine and overt human source collection capability through a network of defense attachés, academics, and spies operating in and out of China. The MSS's purview and intelligence collection capability has evolved over time, incorporating new missions as technology allows.

6.     Based upon my training and experience, and information obtained from publicly available sources, I am aware that Chinese intelligence services conduct extensive overt, covert, and clandestine intelligence collection operations against U.S. national security entities, including private U.S. defense companies, through a network of agents within and outside of China.[2]

**B.     The U.S. Visa Program**

7.     The following information was obtained from the following U.S. Department of State website: travel.state.gov/content/travel/en/us-visas and the U.S. Citizenship and Immigration Services website: www.uscis.gov.

a.     A citizen of a foreign country (a foreign national) who seeks to enter the United States generally must first obtain a U.S. visa, which is placed in the traveler's passport, a travel document issued by the traveler's country of citizenship.

---

[2] Based upon my training and experience, and information obtained from publicly available sources, I am also aware that Chinese intelligence services typically recruit and employ agents to collect a wide range of information, including U.S. national security secrets. Chinese intelligence typically focus their efforts on recruiting ethnic Chinese, primarily because of cultural and language affinity.

b. An F-1 visa permits a foreign national to study in the United States at university, college, high school, elementary school, seminary, conservatory, or other academic institution. Before applying for an F-1 visa, students must first be accepted by a Student and Exchange Visitor Program (SEVP) approved school. After the SEVP-approved school accepts a foreign national as a student, the student will be registered in the Student and Exchange Visitor Information System (SEVIS). The SEVP-approved school will issue the student a Form I-20 "Certificate of Eligibility for Nonimmigrant Student Status – For Academic and Language Students."  After the student receives the Form I-20 and registers in SEVIS, the student may apply at a U.S. Embassy or Consulate for a student (F or M) visa. The student must present the Form I-20 to the consular officer during the visa interview.

8. The Optional Practical Training (OPT) is temporary employment that is directly related to an F-1 student's major area of study. An F-1 student could be authorized to receive up to a total of 12 months of practical training either before and/or after completion of studies. The post-completion OPT must be directly related to the student's major area of study. F-1 students who receive science, technology, engineering, and mathematics (STEM) degrees included on the STEM Designated Degree Program List, are employed by employers enrolled in E-Verify, and who have received an initial grant of post-completion OPT related to such a degree, may apply for a 24-month extension. A student must submit a Form I-983 Training Plan for STEM OPT Students in order to apply for the post-completion STEM OPT.

## II. FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES

### *JI CHAOQUN*

9. According to the Department of State, JI CHAOQUN was born in China and arrived in the U.S. from Beijing, China on or about August 28, 2013, on a 12-month F-1 Visa, for the purpose of studying in the U.S. at the Illinois Institute of Technology in Chicago (IIT). On or about January 30, 2015, JI was issued his second 12-month F-1 visa for continued study at IIT. JI submitted the requisite I-20 Forms in support of each F-1 visa. He received his Master's Degree in Electrical Engineering at the Illinois Institute of Technology in Chicago in December 2015.

10. In anticipation of his graduation in December 2015, on or about October 20, 2015, JI submitted an I-20 Form seeking authorization to pursue post-completion Optional Practical Training (OPT) for the time period of February 17, 2016 through February 16, 2017.

11. According to IIT, on or about November 28, 2016, JI submitted a Form I-983 Training Plan for STEM OPT Students for the timeframe of February 17, 2017, through February 16, 2019, some of which information is detailed as follows:

 a. In Section 2, JI certified under penalty of perjury the accuracy of the statements contained in the Form I-983.

 b. In Section 3, JI listed his employer as Findream, LLC, with an address at 800 W El Camino Real, Suite 180, Mountain View, CA, and a website address of www.findream.us. JI listed his start date as November 14, 2016, that he

5

was scheduled to work 25 hours per week, and that his salary was $20 per hour, to be paid on a monthly basis.

       c.     In Section 4, the Director of Human Resources certified on behalf of Findream under penalty of perjury that JI was an employee of Findream and that JI and Findream would comply with the requirements of the STEM OPT program.

       d.     In Section 5, JI listed his employment at Findream's Chicago Office at 55 East Monroe Street, Suite 3800. Under the "Student Role" portion of Section 5, the following is an excerpt of what is written: "This student works as a software engineer in our company, her job duties includes but not limited to the following, write well designed, testable, efficient code by using best software development practices. . ."

       e.     In Section 6, the Director of Human Resources again certified on behalf of Findream under penalty of perjury that the information contained in this STEM OPT Training Plan was true and correct.

       f.     On or about February 19, 2018, JI and the Director of Human Resources certified under penalty of perjury an evaluation of JI's progress to date.

    12.     According to the Department of State, on or about January 9, 2017, JI executed another I-20 Form, in which he stated that he began Post-Completion OPT employment at Findream, LLC on April 25, 2016, and was authorized for STEM OPT employment at Findream, LLC until February 17, 2019.

13.     On or about May 1, 2018, agents visited the Findream Chicago office, purportedly located at 55 East Monroe Street, Suite 3800. The security guard/receptionist for the building was unfamiliar with any company named "Findream." The security guard stated that Suite 3800 contained a Regus office location. At the Regus office at Suite 3800, a Regus receptionist also stated that she was unfamiliar with any company named "Findream." The receptionist stated she knew most of her clients at that location and never heard of "Findream", she also conducted internal database checks and could find no records for "Findream" for the Regus office at 55 E. Monroe St., Suite 3800.

14.     According to JI's Chase bank records, JI paid Findream LLC $900 on or about November 17, 2016, which I believe was payment for the verifications of employment contained on JI's OPT forms. A review of JI's bank account records at Chase, Citibank, and Bank of America revealed no income from Findream. The investigation to date has revealed that JI holds accounts at only these three U.S.-based banks.

### *Findream, LLC*

15.     According to the California Secretary of State, Findream, LLC was incorporated on August 30, 2013, with a listed address of 800 W. El Camino Real, Suite 180, Mountain View, California.

16.     According to information obtained from open source databases, the address 800 W. El Camino Real, Suite 180, Mountain View, California is associated

with a Regus office space for rent. According to an FBI agent who conducted surveillance at this address on or about August 1, 2018, he discovered no business by the name of Findream, LLC at the suite of the offices located at this listed address after walking around the entire suite of offices. In addition, he reviewed the directory of businesses located on the lobby wall, and in the electronic directory accessible in the lobby, and did not find any reference to Findream LLC.

17. When agents visited the website www.findream.us, they observed the following webpage (last visited on June 15, 2018):



18. Under the "About" tab on the homepage, agents observed the following under a header entitled "Our Team"



19.     When agents did a Google "reverse image search"[3] for each of the photographic images contained under "Our Team," on the Findream website, they discovered that each of the four images was a "stock image,"[4] associated with a range of miscellaneous websites. In other words, the images did not appear to be images of the persons Findream purported them to be on its website. The following is an example of the reverse lookup search performed for the image purporting to be "Apple Wong, HR."

---

[3] Based on my training and experience, I know that a "reverse image search" is a search engine technology that takes an image file as an input query and returns results related to the image. Search engines that offer reverse image capability include Google.

[4] Based on my training and experience, I know that a "stock image," is an image that is commercially available or otherwise available on the internet and may be licensed for use.



20.     A "whois" search for the Findream website revealed that the domain was

created on or about April 26, 2014 with GoDaddy as the registrar.[5] The Registrant

listed the same 800 W. El Camino Real address in California, a phone number of 650-

288-1224, and email address info@findreamllc.com.

21.     When agents performed a Google search of the phone number 650-288-

1224, the Findream website was the third listed result, while the first listed result

was for the website www.chineselookingforjob.com.

---

[5] Based on my training and experience, I know that a "whois" search provides publicly
available information as to which entity is responsible for a particular IP address. A whois
record for a particular IP address will list a range of IP addresses which that IP address falls
within and the entity responsible for that IP address range. For example, a whois record for
the IP address 10.147.53.25 might list an IP address range of 10.147.53.0 - 10.147.53.255 and
list Company ABC as the responsible entity. In this example, Company ABC would be
responsible for the IP addresses 10.147.53.0 through 10.147.53.255.

10

22. When agents visited the website www.chineselookingforjob.com, they discovered the website is predominately in the Chinese language. The following excerpts from the website www.chineselookingforjob.com are based upon draft—not final—English translations of the Chinese writing on the website completed by interpreters employed by the FBI:

## FAQ regarding OPT affiliation (key points!)

**Q: What are included in the first year OPT affiliation?**
A: We charge one time membership fee of $200, which includes *Offer*, employee admission procedure and follow up *Background Check* . . .

**Q: Are you a legal entity?**
A: Our company headquarters is located in New York, with branch offices in Silicon Valley, Chicago and Los Angeles. Our business is IT consultation. We maintain good tax reporting records, is Everify. We possess H1B for employees, green card (generally, some so-called affiliation companies are unable to do all these). Our customers are all over China and the U.S., [they] need large amount of workers to complete tasks. While helping students resolve status issues, we also provide qualified students work, both Paid and Unpaid, in CS, statistics and math.

**Q: What is OPT affiliation?**
A: The theory behind affiliation is finding a company, become an employee, and then send the company's information to the school, which will then enter your information to your SEVIS system. When you receive I20, [you] will see that this company is on I20. By doing so, USCIS will think your status is legal.

**Q: Do I need affiliation?**
A: Under the new 2016 policy, the school and USCIS have strict regulations for graduates. Students not working 90 days after EAD card is issued will have difficulty applying for H1B or OPT-Extension might be rejected. For security reasons, we suggest all graduates wishing to stay in the U.S. find companies to affiliate to prevent future risks.

11

**Q: What are the benefits of affiliation?**
A: Since affiliation is "pretend" work, inexperienced students usually do not write as work experience in resumes. If this part is well prepared, it will look real. We have seen some students doing so and they found satisfying job after all.

**Q: Able to provide OPT Extension affiliation?**
A: Yes, but number is limited. Please send resume to customer service Email: optguakaoca@gmail.com.

**Our Main Goal**
Chineselookingforjob.com is a branch office that mainly provides consultation to job seekers in the U.S. The company has "North American jobseekers" WeChat subscription number, media and training services. The goal is to help overseas Chinese find jobs after graduation. We have large Mentor networks in all major companies in the U.S. to provide suggestions and service to graduating Chinese students. In the past two years, CLFJ has helped more than 200 students with job related issues. We will continue providing the best service to overseas Chinese in the future.

**Get Involved**
Contact Us
optguakaoca@gmail.com
WeChat subscription number: (North American jobseekers)
Phone number: 650-288-1224

23. Based upon the draft translation of the website, it appears that the entire purpose of chineselookingforjob.com is to provide false verifications of employment for Chinese nationals who are F-1 visa holders seeking to continue their stay in the U.S. via the OPT program. Indeed, the website characterizes OPT affiliation as "pretend" employment, and specifically indicates the intent to convince the United States Citizenship and Immigration Services (USCIS) that the individual's status is "legal."

24. Based on my training and experience and above-described information, I believe that JI falsely listed Findream as his employer on his OPT forms in order to fraudulently continue his stay in the U.S.

### *Southern District of Ohio Investigation*

25. On or about October 16, 2017, a search warrant was executed on an email account (the "Email Account") in connection with an investigation in the Southern District of Ohio. Emails obtained pursuant to the search warrant showed the user of the account communicating, coordinating and directing an individual in the United States ("Individual A") to provide technical information from a U.S.-based Company (the "Company") without authorization, and providing the information as a benefit to the Chinese government. Individual A was employed at the Company as an engineer beginning in or around 2007 through in or around late 2017.

26. According to the Company, and publicly available information about the Company, the Company is among the world's top aircraft engine suppliers for both commercial and military aircraft and undertakes a significant amount of aviation research for U.S. military aircraft. The Company is a cleared defense contractor and maintains a U.S. Department of Defense security clearance; however, Individual A did not have a security clearance while employed at the Company.

27. The search warrant returns from the Email Account obtained in connection with the ongoing investigation in the Southern District of Ohio revealed

that the user of the Email Account established an iCloud account. In fact, the Apple ID was the same as the individual's email address.

28. On or about December 8, 2017, a search warrant issued in the Southern District of Ohio was executed on the Apple iCloud account related to the same Apple ID. The contents of the iCloud account included a "Cadre Approval/Removal Appointment Application Form" for an individual known to law enforcement ("Intelligence Officer A"). This form identified Intelligence Officer A as currently holding the position of a Deputy Division Director of the JSSD and having held positions with the MSS since June 2003.

29. On or about November 1, 2017, a search warrant was executed at the residence of Individual A in the Southern District of Ohio. During that search, agents seized a business card for an individual purportedly employed by an Association for Science and Technology, located in China. The search warrant return for the iCloud account contained a text message conversation from December 2013 in which Intelligence Officer A wrote in sum and substance, "the customer does not know our identity. I approached him with the identity of the Deputy Secretary-General employed by an Association for Science and Technology."[6] Based on this message, my

---

[6] Certain email and text message communications have been quoted or summarized in this Affidavit (the "communications"). The communications are based upon draft—not final— English translations of Chinese communications completed by interpreters employed by the FBI. The summaries do not include all statements or topics covered during the course of the communications.

At various points in the Affidavit I have included my interpretation of words and phrases used in the communications. My interpretations are based on the contents and context of the

training and experience, as well as conversations with other law enforcement agents familiar with the investigation in the Southern District of Ohio, I believe that Intelligence Officer A uses aliases and false claims of employment when Intelligence Officer A does not want to disclose an affiliation to the JSSD.

### *JI CHAOQUN and Intelligence Officer A*

30.     According to immigration records, JI CHAOQUN was born in China and arrived in the U.S. from Beijing, China on or about August 28, 2013, on an F1 Visa, for the purpose of studying in the U.S. He received his Master's Degree in Electrical Engineering at the Illinois Institute of Technology in Chicago in 2015. In his F1 Visa Application, JI listed his primary phone number as "152XXXXXX87" (the "JI Phone").[7]

31.     Certain text messages from the SMS database from the Apple iCloud account referenced above suggest that JI was introduced to Intelligence Officer A by Intelligence Officer B.[8] On or about November 29, 2013, Intelligence Officer B asked

---

communications, events occurring before and after the communications, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

[7] The complete phone number is redacted because this is a public filing.

[8] The search warrant return for the iCloud account included an entry for Intelligence Officer B in Intelligence Officer A's contact list. The iCloud account also included a database of SMS text messages. Intelligence Officer A's messages with Intelligence Officer B, from the SMS database for Intelligence Officer A's Apple iCloud Account, show that in or around January through April 2014, Intelligence Officer B referred to Intelligence Officer A as "Section Chief" and that Intelligence Officer B provided passwords to Intelligence Officer A. Intelligence Officer B is therefore believed to be a colleague of Intelligence Officer A's in the JSSD.

Intelligence Officer A "Can Little JI use his/her real name to fill out forms?" On or about December 18, 2013, Intelligence Officer B provided the following information to Intelligence Officer A, "[the JI Phone], JI Chaoqun" and informed Intelligence Officer A that JI would be on High Speed Rail G203 arriving at Nanjing South Station at 22:37. Intelligence Officer A replied to Intelligence Officer B, "Got it. Tell him that I'm a professor at Nanjing University of Aeronautics and Astronautics."

32. The Apple iCloud SMS database included approximately 36 messages between Intelligence Officer A and JI, from on or about December 19, 2013 to July 9, 2015.

33. According to his travel records, JI traveled to and from China on three occasions since his arrival in the U.S. JI traveled to Beijing on or about December 9, 2013, and returned to Chicago on or about January 15, 2014. JI again traveled to Beijing on or about May 19, 2014, and returned to Chicago on or about July 6, 2014. JI's last trip to China was when he traveled to Beijing on or about December 22, 2014, and returned to Chicago on or about February, 3, 2015.

34. According to the Apple iCloud records, on or about December 18, 2013, JI sent the following message to Intelligence Officer A, stating, "Hi Big Brother, I'm JI Chaoqun. I'm taking the G203 [train] and will arrive at Nanjing South Station at 22:37." JI and Intelligence Officer A then exchanged several more messages in which Intelligence Officer A appeared to arrange to meet JI for the first time.

35.	According to text messages from the SMS Database, on or about January 3, 2014, Intelligence Officer A asked JI if he could meet the following week. On or about January 10, 2014, JI informed Intelligence Officer A that he was on the subway. Intelligence Officer A then instructed JI where to get off the subway. Approximately five hours after this conversation, Intelligence Officer A informed his wife via text message that he had a suite in a hotel and asked her if she would like to stay. Based upon these communications and my training and experience, Intelligence Officer A and JI's second meeting likely occurred in a hotel room. Based upon my training and experience, conducting meetings in hotel rooms is an indication of intelligence officer tradecraft because meetings in hotel rooms provide a discreet, private place for the intelligence officer to recruit or debrief his/her intelligence asset.

36.	According to text messages from the SMS Database, on or about January 11, 2014, JI asked Intelligence Officer A to order him a train ticket leaving Nanjing traveling to Beijing for the following day. Intelligence Officer A instructed JI to send the train ticket back to Intelligence Officer A when JI returned home. On or about January 12, 2014, Intelligence Officer A instructed JI to send the tickets to Intelligence Officer A at an address in Nanjing City, China. Based upon my training and experience, Chinese intelligence agencies often require intelligence officers to produce itemized receipts for expenditures related to intelligence assets.

37. Open source research on the Nanjing City address revealed multiple images identifying the address as the location for the Jiangsu State Security Department.

38. Additional text messages obtained from Intelligence Officer A's Apple iCloud SMS database revealed that on or about June 11, 2014, Intelligence Officer A and JI coordinated a third meeting in China.

39. Based upon my training and experience, MSS officers often use aliases or alternate identities when initially meeting potential intelligence assets. Intelligence Officer A employed this tradecraft by initially using an alias with Individual A and assuming the identity of a professor with JI. While JI was initially told that Intelligence Officer A was a professor, it appears that JI learned of Intelligence Officer A's affiliation with the JSSD because Intelligence Officer A told JI to send items to the JSSD address, which is listed on public Chinese-language websites. As explained below, JI later acknowledged in a meeting with an undercover agent that he believed Intelligence Officer A was part of a "confidential unit" with Intelligence Officer B, and that Intelligence Officer B told him stories about espionage.

40. On or about March 29, 2018, Magistrate Judge Daniel G. Martin issued a search warrant for the email account pricebid001@gmail.com ("Subject Account 1"). According to the search warrant return, on or about August 30, 2015, an email was sent from JI, using Subject Account 1, to an email address hosted by "qq.com,"

stating, "eight sets of the midterm test questions for the last three years," which email was forwarded from Subject Account 1 to Intelligence Officer A.[9] The subject line for the email was "Midterm test questions." Eight separate pdf documents were attached to the email. The eight separate pdf documents are background reports on eight U.S.-based individuals generated by U.S.-based companies Intelius, Inc., Instant Checkmate, and Spokeo.[10]

41.     According to JI's Discover credit card statements obtained via subpoena, on or about August 30, 2015, JI's credit card authorized charges in the total amount of $34.85 from Spokeo. On the same date, JI's credit card authorized charges totaling $277.35 from Intelius, Inc. According to the JP Morgan Chase records for JI's debit card obtained via subpoena, JI made multiple purchases totaling $84.82 on or about August 30, 2015; and one purchase totaling $19.95 on or about September 18, 2015, from Instant Checkmate. According to Spokeo records obtained via subpoena, Subject Account 1 was the email account associated with JI's Spokeo account.

---

[9] According to its website, QQ is an email and instant messaging service developed and maintained by China-based company Tencent Holding, Ltd.

[10] According to their websites, Intelius, Instant Checkmate, and Spokeo are each U.S.-based companies that offer, among other services, online services for consumers to purchase background reports about any individual. According to a representative from Intelius, and its Terms and Conditions, Intelius's services are intended only for U.S.-based consumers, and it utilizes a tool that restricts access to the Intelius website from China, among other locatiosn outside the U.S. According to a representative from Instant Checkmate, and its Terms of Use, purchases from outside the U.S. are strictly prohibited. According to a representative from Spokeo, and its Terms and Conditions, Spokeo's services are intended only for U.S.-based consumers, and Spokeo only accepts payment from U.S.-based credit cards with valid U.S. billing zip codes.

42.     According to the IP records associated with JI's account registrations with the background check companies obtained via subpoena, JI registered his accounts at Spokeo, Instant Checkmate and Intelius on August 30, 2015, from IP address 73.51.23.94, which, according to Comcast, is a US-based Comcast IP.

43.     In addition, JI's financial and travel records also indicate JI was in the United States in August and September 2015, when he purchased and sent the above-referenced background check reports. According to JI's Discover and JP Morgan records, his accounts are maintained in the U.S. According to the JP Morgan Chase records, JI made a debit card purchase at Chicago Ventra on or about August 25, 2015, five days prior to his August 30, 2015 purchases from Instant Checkmate. On or about September 9, 2015, JI made a debit card purchase at the Potsticker House in Chicago, Illinois, nine days prior to his September 18, 2015 purchase from Instant Checkmate. According to JI's Treasury Enforcement Communications System (TECS) records, JI's last international travel was the trip from Chicago to Beijing from December 22, 2014 to February, 3, 2015, noted above.

44.     According to information obtained from law enforcement databases, all eight individuals referenced in the background check documents were naturalized U.S. citizens born in Taiwan or China now living in the United States. All eight individuals either currently worked in or were recently retired from a career in the science and technology industry, including several individuals specializing in aerospace fields. Open source research indicated that as of approximately January

2018, at least seven of the eight individuals worked for, or had recently retired from, cleared U.S. defense contractors.

45. Based upon my training and experience, it appears that JI was tasked by Intelligence Officer A to provide him with biographical information on eight individuals for possible recruitment by the JSSD. JI attempted to cover up the work he was doing on behalf of Intelligence Officer A by misrepresenting the contents of the attachments calling them "Midterm Test Questions" rather than stating the true contents of the email – background checks on ethnic Chinese working for cleared U.S. defense contractors. In my training and experience, it is typical tradecraft for Chinese intelligence officers to instruct their U.S. assets to conceal information they are providing to their handlers in China in order to protect that information, the asset, and the intelligence officer.

### *Undercover Meetings with JI CHOAQUN*

46. On or about April 25, 2018, JI met with an individual who, unbeknownst to JI, was an FBI Special Agent working undercover (the "UC"). During the audio and video recorded first meeting between JI and the UC, the UC introduced himself to JI as someone directed to meet with JI by Intelligence Officer C in light of Intelligence Officer A's arrest.[11]

---

[11] Based upon the review of the SMS database text messages, agents believe that Intelligence Officer C is the direct supervisor of Intelligence Officer A at the JSSD. More specifically, in the majority of messages in which Intelligence Officer A either communicates directly with or references Intelligence Officer C, he uses Intelligence Officer C's formal title.

47. On or about May 17, 2018, JI met with the UC a second time. During the audio and video recorded meeting, JI made multiple statements that corroborated the information revealed during the course of the investigation and detailed above.

48. For example, JI explained that he was first introduced to Intelligence Officers A and B via Intelligence Officer C, who he met during a recruitment fair while in school in China. He stated he believed Intelligence Officers A, B, and C were in the same "confidential unit" and further explained as follows:

> Initially when I met [Intelligence Officer C], it was during a recruitment fair in the IM [phonetic] school. There was not much advertising. They were asking if anyone was interested in joining the organization. They said it was a confidential unit but they did not elaborate. Therefore, I went there and met [Intelligence Officer C]. Afterwards, [Intelligence Officer C] asked [Intelligence Officer B] to contact me in Beijing because [Intelligence Officer B] was in Beijing during that period of time. It was during my Nanjing trip that I met [Intelligence Officer A] for the first time when he was together with [Intelligence Officer C]. . . It was when I was in Beijing I contacted [Intelligence Officer B] for a few times. I often dined with him. He told me stories such as Long-Tan-San-Jie the three covert CCP agents inside KMT. Afterwards, I went to Nanjing to look for and meet [Intelligence Officer A]. Afterwards, when I first left China, it was [Intelligence Officer B] who contacted me using my undergraduate name and my newly registered email address.[12]

---

Based on my training and experience, using the formal title is a sign of respect and indicates that Intelligence Officer C holds a higher rank than Intelligence Officer A.

[12] Based on my training and experience, and information obtained from publicly available sources, "Long Tan San Jie" verbatim translates to "three heroes of the dragon's lair," but is colloquially a reference to a Chinese intelligence operation conducted in the late 1920s. Considered one of the earliest modern examples of a Chinese "seeding operation," the Chinese Communist Party (CCP) directed three spies to infiltrate the CCP's main rival political party, the Kuomintang (KMT). The three spies successfully gained employment with and access to sensitive KMT information and provided crucial warning to the CCP during the peak of the KMT's violent suppression of the CCP in 1931.

49.    JI further explained that he had more contact with Intelligence Officer B at first because he went to undergraduate school in Beijing, which is where he understood Intelligence Officer B was based. He began communicating with Intelligence Officer A because, according to Intelligence Officer A, Intelligence Officer B was transferred to a different department.

50.    JI further explained that Intelligence Officer A asked him to purchase background checks on a few people from the internet. He explained that "they just wanted me to purchase some documents on their behalf. Their reason was just because it was inconvenient for them to make payments from China." Based on my training and experience, I believe that Intelligence Officer A tasked JI with purchasing these background check reports because Intelligence Officer A was (a) using operational security tradecraft by not generating a subscriber and payment trail in China with the U.S.-based background check companies; and (b) was testing JI's skills as a potential asset by tasking him to purchase these background check reports.

51.    JI further explained that the "people search website would tell you the price of a report per person," which appeared to be a reference to the background check reports JI purchased from Intelius, Instant Checkmate, and Spokeo. JI stated that he "purchased the documents after [he] came to the U.S," and that he paid approximately $700 for the reports. He further stated that Intelligence Officer A asked how he could send the money to JI after JI purchased the background check

documents, and JI provided Intelligence Officer A with an account number. He further stated that sometime thereafter he was reimbursed approximately $1,000.

52.     JI further stated that he labeled the file containing the reports "Mid Term Quiz Questions," and sent the reports to both Intelligence Officers A and B via email, which is consistent with the emails discovered in Subject Account 1.

53.     According to records checks conducted by the Department of Justice Foreign Agents Registration Unit, as of June 14, 2018, JI did not provide notice to the Attorney General of the United States of his actions or intentions to act as an agent of a foreign government or foreign official.

54.     Based on the foregoing, I believe that JI acted as an agent of the Chinese government by agreeing to taskings from Chinese intelligence officers, and in particular, by obtaining background checks in the United States on ethnic Chinese individuals working for cleared U.S. defense contractors in the United States at the request of Intelligence Officers A, B, and C. By collecting this information for an arm of the Chinese government while in the United States, JI knowingly and unlawfully acted as an agent of a foreign power.

### *JI CHAOQUN and the MAVNI Program*

55.     In May 2016, JI enlisted in the U.S. Army Reserves as an E4/Specialist under the Military Accessions Vital to the National Interest program ("MAVNI") program.[13]

56.     On or about June 6, 2016, as part of the process for his application to participate in the MAVNI program, JI electronically submitted Standard Form 86 ("SF-86"), a Security Clearance Application.

57.     In Section 20B of the SF-86, JI answered "No" to the following question:

> Have you or any member of your immediate family in the past seven years had any contact with a foreign government, its establishment (such as embassy, consulate agency, military service or security service, etc.) or its representatives, whether inside or outside the U.S.? (Answer 'No' if the contact was routine visa applications and border crossings related to either official U.S. Government travel or foreign travel on a U.S. passport.)

58.     On or about December 6, 2017, also as part of the process for his MAVNI application, JI underwent a Single Scope Background Investigation ("SSBI") interview with a U.S. Army officer. As part of the interview, the officer reviewed JI's

---

[13] The MAVNI program authorizes the U.S. Armed Forces to recruit certain legal aliens whose skills are considered to be vital to the national interest. Individuals such as physicians, nurses, and experts in certain languages with associated cultural background become eligible if they meet the following requirements: candidates must be in the country legally, must have been in valid status for at least two years immediately prior to the enlistment date, and applicants who may be eligible on the basis of a nonimmigrant status category must not have any single absence from the United States of more than 90 days during the two-year period immediately preceding the date of enlistment. Once the immigrant enlistees complete the 10-week Basic Combat Training, their citizenship application will be expedited without first obtaining lawful permanent residence.

responses in the SF-86 with JI. During the interview, JI again failed to disclose his relationship and contacts with Intelligence Officers A, B, or C. At the conclusion of the interview, JI signed a Department of the Army Form 2823, which is a sworn statement affirming to the truthfulness of the information JI provided during his interview.

59.     Based upon the above-described contacts between JI and Intelligence Officer A in China and via e-mail, JI's responses to the SF-86 Section 20B question and during his SSBI interview were materially false representations.

### The Subject Phones

60.     On or about September 21, 2018, Magistrate Judge Michael T. Mason issued a complaint and arrest warrant, charging JI with acting as an agent of a foreign government, in violation of Title 18, United States Code, Section 951.

61.     On or about September 25, 2018, agents executed the warrant and arrested JI after JI met with the UC. During the arrest, agents seized the **Subject Phones** from JI, which they found in the pockets of his pants.

62.     Based upon my training and experience, and JI's use of text messages and other electronic communications in furtherance of the **Subject Offenses** referenced above, I believe items relevant to those offenses will be found on the **Subject Phones**.

## III. SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

63. Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b. Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed

27

to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

64.     In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

65.     In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

## IV.     PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

66.     Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the copying of electronically stored information found in the **Subject Phones** described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

67.     The review of the **Subject Phones** may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.      examination of all the data contained in the **Subject Phones** to determine whether that data falls within the items to be seized as set forth in Attachment B;

b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.      surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d.      opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

## V. CONCLUSION

68. Based on the above information, I respectfully submit that there is probable cause to believe that violations of Title 18, United States Code, Sections 951(a) (acting as an agent of a foreign government without notice to the Attorney General), 1001(a)(2) (making material false statements in a matter within the jurisdiction of the executive branch), and 1546(a) (visa fraud), have been committed, and that evidence, instrumentalities, and fruits relating to this criminal conduct, as further described in Attachment B, will be found in the **Subject Phones**, as further described in Attachment A. I therefore respectfully request that this Court issue a search warrant for the **Subject Phones**, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B.

FURTHER AFFIANT SAYETH NOT.

Andrew K. McKay
Special Agent
Federal Bureau of Investigation

Subscribed and sworn
before me this 1st day of October, 2018

M. DAVID WEISMAN
United States Magistrate Judge

## **ATTACHMENT A**

The cellular telephones are identified as follows:

- A silver and black ZTE Flip Phone cellular telephone bearing International Mobile Equipment Identity ("IMEI") number 861961033447013, and utilizing telephone number (312) 532-8617 ("**Subject Phone 1**").

- A silver and white Apple iPhone Model A1660 cellular telephone, utilizing telephone number (312) 683-6385 ("**Subject Phone 2**"). Agents are unable to learn the IMEI of the Apple iPhone because that information is stored electronically rather than physically stamped on the accessible portions of the physical device.

# **ATTACHMENT B**

## **LIST OF ITEMS TO BE SEIZED**

Evidence, instrumentalities, and fruits concerning violations of Title 18, United States Code, Section 951(a), 1001(a)(2), and 1546(a), as follows:

1. Items relating to travel to or from the People's Republic of China.

2. Items relating to the Ministry of State Security for the People's Republic of China (the "MSS"), including the Jiangsu Province Ministry of State Security (the "JSSD").

3. Items relating to the Military Accessions Vital to the National Interest ("MAVNI") program.

4. Items relating to the U.S. Army.

5. Items relating to non-immigrant visa applications for stays in the U.S., including F-1 visa applications, the OPT program, and all related applications such as Forms I-20 and I-983.

6. Items relating to Findream, LLC.

7. Items relating to chineselookingforjob.com.

8. Items relating to financial transactions involving the MSS, JSSD, MAVNI, the U.S. Army, Findream, or other employment.

9. Items relating to the identities, contact information, employment, and physical location of coconspirators.

10.     Items relating to the timing of communications among coconspirators and other individuals.

11.     Items relating to the methods and techniques used to commit violations of Title 18, United States Code, Sections 951(a), 1001(a)(2), and 1546(a).



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### **UNDER SEAL**

In the Matter of the Search of:

Case Number: 18 CR 611

The two cellular phones, further described in
Attachment A

## **SEARCH AND SEIZURE WARRANT**

To: Andrew K. McKay and any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of Illinois:

### **See Attachment A**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

### **See Attachment B**

**YOU ARE HEREBY COMMANDED** to execute this warrant on or before <u>October 15, 2018</u> in the daytime (6:00 a.m. to 10:00 p.m.).

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the issuing United States Magistrate Judge.

Date and time issued: <u>October 1, 2018</u>   *2:16 p.m.*

_____
*Judge's signature*

City and State: <u>Chicago, Illinois</u>

<u>M. DAVID WEISMAN, U.S. Magistrate Judge</u>
*Printed name and title*

## Return

| Case No: | Date and Time Warrant Executed: | Copy of Warrant and Inventory Left With: |
|---|---|---|
| | | |

Inventory made in the presence of:

Inventory of the property taken and name of any person(s) seized:

## Certification

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## **ATTACHMENT A**

The cellular telephones are identified as follows:

- A silver and black ZTE Flip Phone cellular telephone bearing International Mobile Equipment Identity ("IMEI") number 861961033447013, and utilizing telephone number (312) 532-8617 ("**Subject Phone 1**").

- A silver and white Apple iPhone Model A1660 cellular telephone, utilizing telephone number (312) 683-6385 ("**Subject Phone 2**"). Agents are unable to learn the IMEI of the Apple iPhone because that information is stored electronically rather than physically stamped on the accessible portions of the physical device.

# ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

Evidence, instrumentalities, and fruits concerning violations of Title 18, United States Code, Section 951(a), 1001(a)(2), and 1546(a), as follows:

1. Items relating to travel to or from the People's Republic of China.

2. Items relating to the Ministry of State Security for the People's Republic of China (the "MSS"), including the Jiangsu Province Ministry of State Security (the "JSSD").

3. Items relating to the Military Accessions Vital to the National Interest ("MAVNI") program.

4. Items relating to the U.S. Army.

5. Items relating to non-immigrant visa applications for stays in the U.S., including F-1 visa applications, the OPT program, and all related applications such as Forms I-20 and I-983.

6. Items relating to Findream, LLC.

7. Items relating to chineselookingforjob.com.

8. Items relating to financial transactions involving the MSS, JSSD, MAVNI, the U.S. Army, Findream, or other employment.

9. Items relating to the identities, contact information, employment, and physical location of coconspirators.

10. Items relating to the timing of communications among coconspirators and other individuals.

11. Items relating to the methods and techniques used to commit violations of Title 18, United States Code, Sections 951(a), 1001(a)(2), and 1546(a).