UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> JI CHAOQUN | Case No. 20 CV 1792 <br> (Underlying case no. 18 CR 611) <br><br> Emergency Judge Pallmeyer <br> (Assigned Judge Ronald A. Guzman) |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR RELEASE**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits this response to defendant JI CHAOQUN's motion for pretrial release. Dkt. No. 91.

There is no compelling reason to release defendant, who remains a risk of flight and danger to the community based on his role as a spy for the People's Republic of China ("PRC"). Defendant proposes certain conditions of release, which as detailed below will not ensure his appearance in court as required and will not otherwise ensure the safety of the public. Defendant's motion for release is also based in part on speculative assertions of an alleged risk of a COVID-19 outbreak at the Metropolitan Correctional Center ("MCC"), but he does not assert that he personally is at any heightened risk of exposure. As detailed in this response, the MCC has implemented a comprehensive set of protocols to prevent transmission of COVID-19 into and within the facility. In light of the extensive measures being taken to prevent, contain, and treat COVID-19, and given the medical resources to which defendant has access at MCC, the Court should deny defendant's motion for release on grounds that defendant's continued detention is necessary to ensure his appearance in court as required and to protect the public.

## I. BACKGROUND

Defendant has been in federal custody since his arrest on September 25, 2018. Dkt. No. 9. Defendant was initially charged by criminal complaint with acting as an agent of a foreign government, namely the People's Republic of China ("PRC"), without notice to the Attorney General, in violation of Title 18, United States Code, Section 951(a). Dkt. No. 1. Defendant waived his right to a bond hearing and Magistrate Judge Mason remanded defendant into federal custody. Dkt. No. 9.

On January 24, 2019, a grand jury returned an indictment charging defendant with one count of conspiracy to violate 18 U.S.C. § 951(a), in violation of Title 18, United States Code, Section 371 (Count One); one count of acting as an agent of a foreign government without notice to the Attorney General, in violation of Title 18, United States Code, Section 951(a) (Count Two); three counts of wire fraud, in violation of Title 18, United States Code, Section 1343 (Counts Three through Five); and one count of making a material false statement in a matter within the jurisdiction of the executive branch, in violation of Title 18, United States Code, Section 1001(a)(2) (Count Six). Dkt. No. 32.

On or about December 6, 2019, defendant filed a motion to dismiss Counts One through Five of the indictment and a motion for a bill of particulars. Dkt. Nos. 67-72. After the motions were fully briefed, on or about April 7, 2020, the Court issued a Memorandum and Opinion denying both motions. Dkt. No. 90.

This case has not yet been set for trial.

## II. ARGUMENT

### A. The Section 3142(g) Factors Weigh Heavily in Favor of Detention

Defendant's request for release largely ignores the factors a court must consider in determining whether a defendant is a serious risk of flight or poses a danger to the community. These factors include: "(1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

In this case, an examination of the § 3142(g) factors demonstrates that the detention order should remain in place.

#### 1. The Nature and Circumstances of the Offenses

Beginning no later than on or about August 28, 2013, and continuing until on or about September 25, 2018, defendant conspired with others, including an intelligence officer working for the PRC Ministry of State Security, to knowingly act in the United States as an agent of the PRC without prior notification to the Attorney General of the United States as required by law.

Defendant was born in the PRC and came to the United States on an F-1 student visa in August 2013 in order to attend the Illinois Institute of Technology in Chicago. He graduated from IIT in or around December 2015 with a master's degree in electrical engineering. In May 2016, he signed an enlistment contract with the U.S. Army Reserve MAVNI program, which provided foreign nationals a fast-track to

3

U.S. citizenship if they served in the U.S. armed forces for at least 5 years. He began working as an Army Reservist in or around May 2016, in exchange for payment.

Since his arrival in the United States, defendant was a spy for the PRC. He communicated with his intelligence officer handlers regularly via email and text message, and returned to China on multiple occasions for in-person meetings. He boasted about his ability to obtain sensitive U.S. Army information, including anticipating having access to classified material when he became an active member of the U.S. Army. In August and September 2015, at the direction of his intelligence officer handler, defendant purchased background check reports for 9 individuals from U.S.-based companies and emailed those reports to his handler under the ruse that they were in reference to his midterm exams. The reports detailed background information concerning nine U.S. nationals of Chinese or Taiwanese descent, with histories of employment in science and technology, including cleared defense contractors in the aerospace and defense industry.

Notably, defendant's intelligence officer handler is currently pending prosecution in the United States for charges related to economic espionage, including his efforts to recruit an employee of a U.S.-based aviation company in order to steal their trade secrets. Consistent with that history, the intelligence officer directed defendant to obtain information concerning other potential economic espionage assets and targets. The PRC financially compensated defendant for obtaining these background check reports.

In order to stay in the United States after he obtained his degree, defendant obtained an extension on his F-1 student visa via the Optional Practical Training

("OPT") program by reporting his work as a software developer at Findream, which he reported was an information technology consultant. However, Findream was a fraudulent front that provided employment on paper only for foreign national students to fraudulently extend their F-1 student visas via the OPT program. In fact, the founder and operator of Findream pled guilty to this visa fraud scheme and is pending sentencing in *United States v. Weiyun Huang*, 19 CR 275 (Durkin, J.). Defendant never worked for Findream, but reported the employment in order to fraudulently extend his F-1 visa. In doing so, he also committed fraud on the U.S. Army by falsely claiming he was legally in the United States while his application to the U.S. Army Reserves MAVNI Program was pending. He further lied to the U.S. Army when he failed to report any of his contact with PRC government officials during the Army's background investigation of defendant.

In short, the nature and circumstances of the charged offenses are extremely serious and weigh in favor of defendant's continued detention.

### 2. Weight of the Evidence

The evidence against defendant is very strong. In summary, the government acquired a significant amount of audio and video recordings and documentary evidence of defendant's crimes. For example, defendant admitted to acting as an agent of the PRC during the course of three audio and video recorded meetings with an undercover agent, who defendant believed was an intelligence officer with the PRC, including his purchase of the nine background check reports at the direction of his intelligence officer handler. The email, text message, and travel records are corroborating evidence of defendant's communications and meetings with his

intelligence officer handler. With respect to the fraud scheme, defendant submitted various immigration forms fraudulently listing his employment at Findream, including a detailed training plan fraudulently expounding upon defendant's purported work as a software developer at Findream, which he signed under penalty of perjury. Defendant also submitted a Form-1099 tax form to the IRS for income from Findream which, according to his U.S.-based bank accounts, he never received. The evidence that Findream was operated solely for the purpose of providing fraudulent employment is overwhelming, which led to founder Weiyun Huang's guilty plea. The evidence includes in summary that Findream did not exist at any of its listed addresses in the U.S., its U.S.-based website advertised Findream leadership using internet stock photos of individuals unrelated to Findream, its PRC-based website and WeChat account advertised Findream as "pretend" employment, and the testimony of at least five other Findream customers who admitted that they paid to falsely list Findream as their employer in order to fraudulently extend their stay in the United States. Defendant used his fraudulent F-1 visa OPT program extension to lie about his immigration status in his application to the U.S. Army Reserve MAVNI Program. As a result of his lies to the U.S. Army, he received payment for his work as a reservist, as evidenced by the Army's payment records and defendant's bank records. Finally, defendant lied to the U.S. Army about his contact with PRC government officials, including his intelligence officer handler, during an audio and video recorded background investigation interview.

The weight of evidence against defendant as to all six charges is significant and weighs in favor of defendant's continued detention.

### 3. History and Characteristics of the Person

Defendant was born and raised in the PRC, thus the government is unable to obtain any records concerning any criminal history he may have acquired while in the PRC. While he has no history of arrests since he arrived in the United States in August 2013, his alleged offense conduct spans his entire time in the United States. As a result, defendant's history and characteristics provide little assistance in assessing the propriety of defendant's release.

### 4. The Nature and Seriousness of the Offense of the Danger to the Community

Defendant is charged with being a spy for the PRC, defrauding the U.S. Army, and lying. These are serious offenses which proposed real national security risks to the United States, particularly in light of, among other things, defendant's assistance in identifying potential economic espionage assets and targets for the PRC, and his intent to steal classified U.S. military information for the PRC. He lied, over and over, in order to achieve this goal, including committing fraud on the United States by fraudulently extending his F-1 student visa, committing fraud on the U.S. Army in order to be accepted into the U.S. Army Reserves and obtain a fast-track to U.S. citizenship via the MAVNI program, lying to the U.S. Army about his contact with PRC officials during the Army background investigation, and lying to federal agents during multiple audio and video recorded post-arrest interviews.

The nature and seriousness of the offense of the danger to the community also weighs heavily in favor of defendant's continued detention.

### B. Defendant's Proposed Conditions of Release Will Not Be Sufficient to Ensure his Appearance or the Safety of the Community

Defendant's proposed conditions of release will not be sufficient to ensure his appearance in court or the safety of the community. Defendant proposes that he be released on home confinement with electronic monitoring to an apartment near the federal courthouse, and that his family will pay for the apartment and for a security firm to act as a third-party custodian. Dkt. 91 ¶¶ 11-12. As the Court indicated, defendant has not identified with any specificity the location of the proposed apartment or the identity of the proposed security firm he suggests could act as a third party custodian. Dkt. No. 92. As a result, Pretrial Services cannot assess the viability of these proposals. *Id.* Nevertheless, defendant's proposed conditions are not sufficient.

First, defendant suggests that he will not be a risk of flight because he will surrender his passport. Dkt. No. 91 ¶ 10. However, defendant is accused of being a spy for the PRC. As a result, the PRC has incentive to assist defendant in fleeing the jurisdiction in order to minimize the risk that the details of a PRC intelligence operation could be revealed. To that end, the PRC could issue a new passport to defendant at the PRC Consulate in Chicago. Indeed, since his arrest, defendant has regularly been visited by members of the PRC Consulate at the MCC, indicating he has already developed the requisite relationship necessary to effectuate his flight. Even if defendant is not currently able to return to the PRC due to the COVID-19 pandemic, the PRC could ensure defendant is able to flee the United States to any other non-extradition country of their choosing.

Second, defendant does not propose to post any funds or property to secure his release. Instead, he proposes that his family will fund the local apartment and the security firm acting as a third-party custodian. As a result, defendant has even less motivation to stay in the United States as he will be giving up no money or property, and his family will benefit from no longer having to pay for his apartment or the security firm.

Third, defendant has no legal status in the United States, and in fact has not had legal status since he graduated from IIT in December 2015. As a result, there is currently an immigration detainer on defendant. If defendant is released from federal custody, defendant will likely be immediately transferred into custody by immigration officials. Because the government is not currently deporting individuals to the PRC, defendant will be held in United States immigration custody, defeating defendant's purpose in filing this bond motion.

Defendant's proposed conditions of release will also not be sufficient to ensure the safety of the public. Even if defendant chooses to face the charges and not flee the United States, there is a significant risk to national security that he will continue to work as a spy for the PRC. While he no longer has access to military secrets, his intelligence officer handlers can nevertheless utilize defendant's presence in the United States to continue researching potential espionage assets and targets, and otherwise assisting the PRC intelligence gathering and espionage mission in the United States.

### C. Officials Have Established Comprehensive Health Measures at the MCC to Avoid a COVID-19 Outbreak

Defendant's motion also falls short by failing to provide any specific evidence that the MCC is unable to prevent him from being infected by COVID-19. While it may be true as a general matter that prisons can be trouble spots for the transmission of viruses, that has not been the case at the MCC with respect to COVID-19.

Based on the most recent information from MCC administrators, fifteen staff members and twelve inmates have tested positive for COVID-19 to date. The job responsibilities of the known staff members, and last contact with inmates, are as follows:

- One of the fifteen staff members who tested positive had limited exposure to inmates and had not been in the MCC for several weeks.

- The second has likewise not been in the MCC for at least 14 days, and also had limited exposure to inmates.

- The third staff member last came to work on March 25, 2020, but had no fever. The staff member also had limited exposure to inmates.

- The fourth was on a temporary duty assignment and had virtually no contact with inmates.

- The remaining eleven staff members had limited recent interaction with inmates given the restrictions and modifications now in effect at the MCC– that is, inmates are mostly confined to their cells, and will continued to be for the near future.

With respect to inmates, ten of the confirmed positive cases are inmates who are currently confined to three floors at the MCC. Those inmates are in isolation and have been since before being tested. There also are two cases involving former MCC inmates who are currently hospitalized, and who will not return to the MCC until

they receive medical clearance to do so. All told, these twelve positive inmates represent less than 1% of the total population of 643 inmates at the MCC.

Despite the positive cases at the MCC, it remains a safe place for the defendant to be housed. Consistent with the Federal Bureau of Prisons COVID-19 Action Plan, the MCC has established a comprehensive set of precautionary measures to limit the risk of COVID-19 transmission inside the MCC. The MCC has taken extraordinary steps to combat this virus and remains committed to providing all necessary precautionary measures and supportive therapies to avoid an outbreak of COVID-19, including taking all of the preventative actions advised by the Centers for Disease Control and Prevention (CDC) and the Illinois Department of Public Health regarding the disease.

MCC officials have substantial experience ensuring that viral outbreaks do not occur at their facilities. They recognize the unique threat posed by the transmission of viruses inside a jail. That said, health and prison officials recognize that COVID-19 carries an increased risk of transmission, carries a higher fatality rate than many other viruses, and has resulted in a state of emergency nationwide. Accordingly, consistent with Phase Two of the Bureau of Prisons COVID-19 Action Plan implemented on March 13, 2020,[1] the MCC has employed the following measures:

- **Social Visitation**. The MCC has placed a temporary hold on all social visits, such as visits from friends and family, as well as all outside programming, to limit the number of people entering the MCC and interacting with detainees. Attorney visits are occurring on a case-by-case basis when approved by the warden.

---

[1] https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited Apr. 16, 2020).

11

- **Detainees Entering the Facility**. As of March 13, 2020, the MCC and BOP suspended inmate movement between facilities for 30 days, at which time the suspension will be reevaluated. The MCC will make exceptions for special cases such as writs for prosecution on pending charges, Interstate Agreements on Detainers, medical or mental health reasons, RRC placements, and judicial proceedings (which are evaluated on a case-by-case basis). The MCC will also continue to process and admit new inmates, who are being screened for COVID-19 exposure risk factors and symptoms, including having their temperature taken.

- **Screening Procedures**. When a new detainee enters the MCC, medical professionals will screen the inmate for coronavirus symptoms and exposure risk factors, including having the inmate's temperature taken.

- **Sanitation and Hygiene**. Signs and hand sanitizer have been posted throughout the MCC, educating detainees and correctional officers about proper hygiene. In addition, the MCC is increasing daily cleaning of surfaces.

- **Quarantine**. Asymptomatic inmates with exposure risk factors are being quarantined. Symptomatic inmates with exposure risk factors are being isolated and tested for COVID-19 per local health authority protocols.

- **Correctional Officers**. Enhanced health screening of MCC staff will be implemented in areas with "sustained community transmission," as determined by the CDC. Such screening includes self-reporting and temperature checks for the 30 days following March 13, at which time the process will be reevaluated.

Over the past several weeks, the BOP announced the immediate implementation of additional phases of its COVID-19 Action Plan. Pursuant to Phase 4, on March 26, 2020, the BOP updated its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check, and to require asymptomatic inmates be placed in quarantine for a minimum of 14 days

or until cleared by medical staff.[2] Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

On April 1, 2020, the BOP announced the immediate implementation of Phase 5 of its COVID-19 Action Plan, which includes the following measures:[3]

- For a 14-day period, inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus. This modification to our action plan is based on health concerns, not disruptive inmate behavior.

- During this time, to the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.

- In addition, the Bureau is coordinating with the United States Marshals Service to significantly decrease incoming movement during this time.

- After 14 days, this decision will be reevaluated and a decision made as to whether or not to return to modified operations.

- Limited group gathering will be afforded to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System access.

- As of April 10, 2020, all staff members and inmates at the MCC are wearing face masks for further protection.

And most recently, as of April 13, 2020, the BOP implemented Phase Six of its Action Plan. Phase Six extends until May 18, 2020 the previously-adopted limitations on inmate movement, the suspension of social and legal visits, and the requirement

---

[2] *See* https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited Apr. 16, 2020).
[3] *See* https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited Apr. 16, 2020).

13

of a 14-day quarantine for all new intakes, detainees, writ returns, parole violators, and hospital returns (even if asymptomatic), in addition to any close contacts of a confirmed or suspected case of COVID-19.[4] Phase Six also provides that any inmate with COVID-19 symptoms or a fever shall be isolated in a single cell with specific test-based and symptom-based strategies for release from isolation; that all staff and contractors must wear personal protective equipment; and that all staff and inmates should wear face coverings. As a result of these provisions, in addition to inmates who have displayed symptoms of COVID-19 or who have tested positive for COVID-19 being placed in isolation, the units in which these inmates were housed have been quarantined.

In short, by following the BOP's COVID-19 Action Plan, the MCC has implemented comprehensive measures to protect its detainees and staff from COVID-19. Given these comprehensive measures, defendant's pre-sentencing release is unwarranted. *See, e.g.*, *United States v. Ayala-Calderon*, 2020 WL 1812587, at *3 (E.D. Tex. Apr. 8, 2020) (denying release because "[d]efendant has not presented any countervailing argument or evidence that adequate precautions are not being taken in the Bowie County Correctional Center"); *United States v. Neadeau*, 2020 WL 1694853, at *3 (D. Minn. Apr. 7, 2020) ("[T]he Court cannot conclude that release is appropriate when the Sherburne County Jail has taken appropriate measures to prevent an outbreak."); *cf. United States v. Wesson*, 2020 WL 1814153, at *2 (N.D.

---

[4] *See* https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf (last visited Apr. 16, 2020); https://prisonology.com/wp-content/uploads/2020/04/COVID-19-Phase-6-Plan-2020-04-13.pdf (last visited Apr. 16, 2020).

Ohio Apr. 9, 2020) (denying post-conviction release under § 3145(c) because the "U.S. Marshals Service has taken extraordinary measures to limit the threat posed by COVID-19," meaning that "speculation about future conditions does not constitute a 'compelling reason' for temporary release.").

What's more, in addition to implementing the various phases of this Action Plan, the MCC also has doctors and nurses who monitor and provide care onsite to detainees like defendant. They continue to make daily rounds should defendant decide to seek medical assistance for whatever reason. If defendant should need intensive treatment that cannot be provided inside the MCC, detainees are transported to community hospitals in the event of an emergency. And in the unlikely event that defendant becomes infected with COVID-19, he would be quarantined, monitored, and receive any needed treatment, consistent with the Center for Disease Control's guidelines. This too militates against his release. *See, e.g.*, *United States v. Molina*, 2020 WL 1640182, at *1 (N.D. Ala. Apr. 2, 2020) (denying post-conviction release under § 3145(c) in part because defendant's jail "has 24-hour medical staff available").

Faced with these facts and cases, defendant fails to provide any specific evidence to support his assertion that his detention at the MCC places him in "exceptional danger." Dkt. No. 91 at 8. Indeed, defendant's argument focuses on circumstances in other prison facilities, including the Cook County Jail, but provides no argument grounded in facts relevant to the MCC specifically.

The bottom line is that defendant is in a detention facility where social contact with the outside world has been suspended, where new entrants (staff and inmates)

to the facility are screened, and where measures to isolate high-risk individuals are in progress, and at which his exposure to COVID-19 is limited. Thus, there is nothing exceptional about the COVID-19 pandemic that warrants defendant's immediate release from the MCC.

### D. Releasing Defendants Like Defendant Would Place An Undue Burden on the Pretrial Services Office and the Courts

Defendant asks to be released to an unspecified residence on electronic monitoring, with a security firm as a third party custodian, without any other specific conditions proposed. Dkt. No. 91 ¶ 11-12. For the reasons discussed above, there are no release conditions that would ensure defendant's appearance in court and protect the public from defendant. In addition, awarding such relief would place a substantial and unwarranted burden on Pretrial Services.

For example, whenever the Court orders electronic monitoring, a location monitoring specialist is appointed to oversee a defendant's pretrial release. To be sure, one case, by itself, would not strain the system. Yet if the Court released defendant, there undoubtedly would be an avalanche of defendants would also seek release, endangering the community and also stretching the bandwidth of Pretrial Services.[5] The speculative prospect of a COVID-19 outbreak at the MCC does not diminish the public interest in ensuring defendant appear in court and the safety of the community. In light of the protective measures now in place at the MCC, the

---

[5] Before a defendant is placed on release, a Pretrial Services Officer also must vet the proposed residence and meet the proposed third-party custodian and other residents who live there. A flood of release orders would force these Officers to conduct a substantial amount of *in-person*, *in-home* meetings, exposing them to a heightened risk of infection.

specter of a COVID-19 outbreak is not a fire alarm that defendants can pull because they wish to get out of jail. The continued detention of defendant is necessary to ensure public safety and does not endanger public health.

## III. CONCLUSION

For the foregoing reasons, the Court should deny defendant's motion and order his continued detention pending trial.

                Respectfully submitted,

                JOHN R. LAUSCH, JR.
                United States Attorney

By:   /s/ *Shoba Pillay*
       SHOBA PILLAY
       BARRY JONAS
       Assistant U.S. Attorneys
       219 South Dearborn St., Rm. 500
       Chicago, Illinois 60604
       (312) 353-5300

Dated: April 17, 2020