IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | 18 CR 611 |
| | ) | Judge Ronald A. Guzman |
| v. | ) | |
| | ) | |
| JI CHAOQUN | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO SUPPRESS STATEMENTS
<u>MADE TO AN UNDERCOVER AGENT</u>

## TABLE OF CONTENTS

I.   Background ................................................................................................... 2-8

II.  Discussion ................................................................................................... 8-17

     A.  Legal Standard ................................................................................. 8-13

     B.  Mr. Ji's Statements to the Undercover Agent Were Involuntary ................. 13-17

III. Request for an Evidentiary Hearing ....................................................... 17

IV.  Conclusion ................................................................................................. 18

## TABLE OF AUTHORITIES

**Amendments**

U.S. Const. amend. V ............................................................................................ 1, 5

U.S. Const. amend. VI ............................................................................................. 1

**Cases**

*Alexander v. United States*, 390 F.2d 101 (5th Cir. 1968)

............................................................................................ 10

*Beckwith v. United States*, 425 U.S. 341 (1976)

............................................................................................ 12

*Blackburn v. Alabama*, 361 U.S. 199 (1960)

............................................................................................ 9

*Brown v. Mississippi*, 297 U.S. 278 (1936)

............................................................................................ 8

*Culombe v. Connecticut*, 367 U.S. 568 (1961)

............................................................................................ 12

*Dickerson v. United States*, 530 U.S. 428 (2000)

............................................................................................ 8, 9

*Frazier v. Cupp*, 394 U.S. 731 (1969)

............................................................................................ 10

*Garrity v. New Jersey,* 385 U.S. 493 (1967)

............................................................................................ 12

*Holland v. McGinnis*, 963 F.2d 1044 (7th Cir. 1992)

............................................................................................ 11-12

*Jackson v. Denno*, 378 U.S. 368 (1964)

............................................................................................ 8

*Lucero v. Kerby*, 133 F.3d 1299 (10th Cir. 1998)

............................................................................................ 10

*Lynum v. Illinois*, 372 U.S. 528 (1959)

........................................................................................................................11

*Malinski v. New York*, 324 U.S. 401 (1945)

........................................................................................................................9

*Moran v. Burbine*, 475 U.S. 412 (1986)

........................................................................................................................8

*Pharr v. Gudmanson*, 951 F.2d 117 (7th Cir. 1991)

........................................................................................................................13

*Pierce v. United States*, 160 U.S. 355 (1896)

........................................................................................................................9

*Reck v. Pate*, 367 U.S. 433 (1961)

........................................................................................................................9

*Rodgers v. Richmond*, 365 U.S. 534 (1961)

........................................................................................................................12

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)

........................................................................................................................9

*United States v. Anderson*, 929 F.2d 96 (2d Cir. 1991)

........................................................................................................................11

*United States v. Byrum*, 145 F.3d 405 (1st Cir. 1998)

........................................................................................................................11

*United States v. Carter*, 910 F.2d 1524 (7th Cir. 1990)

........................................................................................................................8

*United States v. Dillon*, 150 F.3d 754 (7th Cir. 1998)

........................................................................................................................8

*United States v. Edgeworth*, 889 F.3d 350 (7th Cir. 2018)

........................................................................................................................17

*United States v. Graham*, 2014 WL 2922388 (N.D. Ga. 2014)

........................................................................................................................11

*United States v. Haddon*, 927 F.2d 942 (7th Cir. 1991)

........................................................................................................................12

iv

*United States v. Jacobs*, 431 F.3d 99 (3rd Cir. 2009)
.................................................................................................................10

*United States v Khomutov*, 2020 WL 1304834 (N.D. Ill. 2020)
..............................................................................................................12-13

*United States v. LaForgia*, 2012 WL 1869035 (S.D. Ala. 2012)
.................................................................................................................11

*United States v. Locklear*, 829 F.2d 1314 (4th Cir. 1987)
.................................................................................................................12

*United States v. Menesses*, 962 F.2d 420 (5th Cir. 1992)
.................................................................................................................10

*United States v. Montes-Reyes*, 547 F. Supp. 2d 281 (S.D.N.Y. 2008)
.................................................................................................................10

*United States v. Montgomery*, 14 F.3d 1189 (7th Cir. 1994)
..................................................................................................................8

*United States v. Oliver*, 142 F. Supp. 2d 1047 (N.D. Ill. 2001)
.................................................................................................................13

*United States v. Parson*, 599 F. Supp. 2d 592 (W.D. Pa. 2009)
.................................................................................................................11

*United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014)
.................................................................................................................12

*United States v. Rutherford*, 555 F.3d 190 (6th Cir. 2009)
.................................................................................................................12

*United States v. Rutledge*, 900 F.2d 1127 (7th Cir. 1990)
.................................................................................................................10

*United States v. Shabaz*, 579 F.3d 815 (7th Cir. 2009)
.................................................................................................................13

*United States v. Unser*, 165 F.3d 755 (10th Cir. 1999)
.................................................................................................................10

*United States v. Yanez*, 1987 WL 25926 (E.D.N.Y. 1987)
.................................................................................................................11

*Vollins v. Gaetz*, 612 F.3d 574 (7th Cir. 2010)
.................................................................................................13

*Wilson v. United States*, 162 U.S. 613 (1896)
.................................................................................................9

**Rules**

Fed. R. Crim. P. 12 ..........................................................................1

**Statutes**

18 U.S.C. § 371 ...............................................................................7

18 U.S.C. § 951 ...........................................................................2, 7

18 U.S.C. § 1001 .............................................................................1

18 U.S.C. § 1343 .............................................................................7

**Other Authorities**

Criminal Procedure Code of the People's Republic of China (2012)
.................................................................................................15

Liza Lin & Yoko Kubota, Wall Street Journal, U.S. Tech Firms Spooked by China's
Arcane Cybersecurity Law .....................................................17

Murray Scot Tanner, Beijing's New National Intelligence Law: From Defense
to Offense. Lawfare.................................................................16

National Intelligence Law of the People's Republic of China (2017)
.................................................................................................15

O'Brien, Robert C. (Editor), Trump on China: Putting America First
........................................................................................... 1, 14

Reuters, China passes tough new intelligence law
.................................................................................................17

Sui-Lee Wee, New York Times, China's New Cyber Security Law Leaves Foreign
Firms Guessing ......................................................................17

State Security Law of the People's Republic of China (2015)
.................................................................................................................15

Yi-Zheng Lian, Where Spying Is the Law, New York Times
.................................................................................................................16

Yuan Yang, Is Huawei compelled by Chinese law to help with espionage?,
Financial Times......................................................................................16

## DEFENDANT'S MOTION TO SUPPRESS STATEMENTS
## <u>MADE TO AN UNDERCOVER AGENT</u>

Defendant, **Ji Chaoqun**, by and through his attorneys, **the Law Office of Damon M. Cheronis**, pursuant to the Due Process, Self-Incrimination, and Effective Assistance of Counsel provisions of the Fifth and Sixth Amendment to the Constitution of the United States, Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure, as well as the other principles and authority cited herein, respectfully moves this Court to suppress any and all statements made during the course of his meetings and involvement with an undercover agent, including meetings that occurred on April 25, 2018, May 17, 2018, and September 25, 2018.

The United States government, in a FBI-led "false flag" or "role player" operation, sent an undercover agent to engage Mr. Ji by posing as a long-term overseas asset of the Ministry of State Security ("MSS"), the intelligence, security, and secret police agency of the People's Republic of China ("PRC")—a country that high ranking U.S. officials have publicly denounced as a grossly authoritarian, oppressive, and abusive government on many occasions.[1] On three separate occasions, through the ruse of acting on behalf of Chinese intelligence, the undercover agent recorded conversations with Mr. Ji that the government will seek to admit as evidence during the trial.

The government turned to this tactic only after a long, thorough, and years' long investigation from multiple federal agencies produced no evidence of Mr. Ji engaging in a qualifying criminal "act" as an unregistered foreign agent, or any other crime for that matter, in the approximate five year period he resided in the United States from 2013 to 2018. Nonetheless, and

---

[1] *See, e.g.,* O'Brien, Robert C. (Editor), Trump on China: Putting America First, *available at* https://trumpwhitehouse.archives.gov/wp-content/uploads/2020/11/Trump-on-China-Putting-America-First.pdf (last accessed February 18, 2021) (collecting speeches denouncing the PRC government by Michael C. Pence, Matthew F. Pottinger, Donald J. Trump, Robert C. O'Brien, Christopher A. Wray, William P. Barr, and Michael R. Pompeo throughout the 2020 calendar year).

undeterred, to elicit the statements contained on the recordings, the undercover agent utilized the imprimatur of the Chinese government and tacitly if not explicitly relied on Chinese legal doctrines requiring Mr. Ji to speak to members of the Chinese government. Chinese law is clear that when questioned by representatives of its government, its citizens, regardless of territorial location, are required to answer questions without exception. This is true, *a fortiori,* when the subject matter of questioning is the successful culmination of an international plan by one of its chief rivals to lure an alleged high-ranking intelligence official into Belgium and have him extradited to face criminal charges; that is, one carrying international significance of the highest order.

As captured on the challenged recordings, the undercover agent used a number of techniques—subtle perhaps but clear in implication—to threaten, intimidate, and ensure that Mr. Ji would respond to questioning. Undoubtedly, in such a situation, an individual like Mr. Ji as a Chinese citizen does not have the right to voluntarily refuse questioning as the United States Constitution guarantees. By employing this ruse and utilizing the imprimatur of a government it publicly condemns as brutal and authoritarian in an attempt to extract information from Mr. Ji, and by directing veiled threats at Mr. Ji, it deprived him of the right to voluntarily refuse to answer questions and thus his rights as guaranteed by Due Process. Suppression of these statements will therefore be required.

In support of this motion, Mr. Ji, through counsel, submits the following:

## I.    Background

1.    On September 21, 2018, a criminal complaint was filed in this district alleging that from on or about August 28, 2013 to on or about September 21, 2018, Ji Chaoqun committed a

violation of 18 U.S.C. § 951 in that he did knowingly act in the United States as an agent of a foreign government without providing prior notification to the Attorney General. Dkt. # 1.

2.     On April 25, 2018, around 3:15 p.m. in the afternoon, an undercover FBI agent approached Ji Chaoqun ("Mr. Ji") outside of his apartment in Chicago. This encounter was intentional and the culmination of a long-planned FBI-led and United States Army supported operation internally referred to as a "role player" or "false flag" operation. Having never met before, the undercover agent, who was posing as Jian Chen ("Mr. Chen" or "undercover agent"), asked Mr. Ji out of the blue if it was convenient to talk? After Mr. Ji responded, "I beg your pardon?" the undercover agent was more direct: "I need to talk to you." He then indicated that he was sent by Mr. Ji's "Nanjing friend." After relocating to Mr. Chen's vehicle, Mr. Chen told Mr. Ji, "I am not sure whether you are aware that the Nanjing friend was caught." Mr. Ji responded, "I don't know," and the undercover agent then asked, "[d]o you know whom I am referring to?" Mr. Ji stated, "I am not sure because I know quite a few people in Nanjing."

3.     After unsuccessfully attempting to clarify whom he was referring to, Mr. Chen took out his smart phone and showed Mr. Ji a foreign language news article. This article, originally written in French, was translated using the Google Translate feature, and indicated that Xu Yanjun, a "Chinese Spy," was recently arrested in Brussels, Belgium, by the United States based on allegations of economic espionage and that he was currently fighting extradition.[2] Mr. Ji indicated to Mr. Chen that he had heard of Mr. Xu's name, was not aware of his arrest, and does not communicate with him. Mr. Chen—who again had indicated he was affiliated with Mr. Xu, and now (according to the

---

[2] Xu Yanjun is alleged by the government to be the Deputy Division Director of the Sixth Bureau of Jiangsu Province, Ministry of State Security of the People's Republic of China. He is currently facing charges pertaining to allegations of espionage in the Southern District of Ohio in *United States v. Xu*, 18 CR 43, pending before Judge Timothy S. Black.

ruse) certainly a member or representative of the People's Republic of China's Ministry of State Security, if not the Jiangsu State Security Department—then became more direct: "this is a serious matter. I came here yesterday. I would like to talk to you about it. They asked me to do it." "They" in this statement is unmistakably a reference to the PRC government and more specifically the Ministry of State Security.

4.      Mr. Ji attempted to postpone the meeting until later that evening due to prior obligations. Nonetheless, based on the undercover agent's persistence, the two made arrangements for Mr. Chen to drive Mr. Ji to a nearby hotel in order to have a discussion. They arrived there at approximately 3:54 p.m., and remained until approximately 4:50 p.m., at which time Mr. Chen drove Mr. Ji back to his apartment and the two parted ways. Relevant to this motion is the fact that during this meeting, Mr. Chen repeatedly asked Mr. Ji about his contacts with Mr. Xu and others in a purported effort to determine who was responsible for Mr. Xu's arrest.

5.      Specifically, after making small talk and turning to business, Mr. Chen again showed Mr. Ji the news article chronicling Mr. Xu's arrest in Europe. Mr. Chen indicated he was sent by Mr. Xu's superior, the division director of the MSS Jiangsu Province State Security Department ("JSSD"). After explaining the charges against Mr. Xu, Mr. Chen stated:

> [w]e are not sure whether the problem lies with your communication with them. Why the U.S. targeted Mr. Xu? That's why I was asked to let you know that you should stop contacting them for now . . . because we do not know which communication caused it, whether it was the telephone calls or email messages or what. He told us that you contacted them before. That's why I want to find out what caused the problem. Do you think the problem lies with your contacting them?

In other words, Mr. Chen was making clear that he was sent by MSS brass out of concerns that Mr. Ji was culpable in the international arrest of one of its high ranking officials, and that Mr. Chen was there on a fact-finding mission. As he put it later, "[t]hey want to find out which area caused the

4

problem and caused the U.S. to target him. . . . That's what I want to find out." Later still, he continued to press Mr. Ji: "[c]ould this be because you are with the U.S. Army and roused the American's suspicions?" He asked about the U.S. Army's background investigation into Mr. Ji's Chinese contacts and the reasons the PRC government/MSS trust that he is a safe contact for Mr. Ji. Mr. Chen then admonished Mr. Ji once more:

> Please think about it again. What caused the problem? Did you overlook something and caused the problem? Did you send any material to him and caused him to be targeted by the U.S. government?

Mr. Chen persisted as if the point was not clear enough: "they asked me to reach out to you. Because I need to report . . . that the problem is not you . . . [b]ecause you have met [the Jiangsu Province MSS division director] several times already." "You still do not think it was you? The problem was not caused by you?" He again pulled out the news article and inquired, "[p]lease try to recall whether [the division director] asked you to do something for them and you did and then the problem occurred." "When you were in China or Jiangsu, did they ask you to do something and you did it in the U.S. and it was exposed?"

6.      Mr. Chen also gave specific instructions to Mr. Ji about what to do and what not to do going forward, including providing him with a cell phone that he was directed to maintain and exclusively utilize to contact Mr. Chen. After additional conversation—including Mr. Chen again noting that this "is a very serious matter . . . [r]ight now, I know that you are not the problem. I have no problem. But they want me to find out where the problem originated"—Mr. Ji was then driven back to his apartment.

7.      Between May 16, 2018 and May 17, 2018, Mr. Chen placed multiple telephone calls to Mr. Ji in an attempt to set up a second in-person meeting. That meeting occurred on the afternoon of May 17, 2018. At approximately 3:10 p.m., Mr. Chen—continuing to pose as a MSS operative—

picked up Mr. Ji at his residence and drove him to the same hotel, where the two spoke for about an hour before Mr. Chen dropped Mr. Ji off back at his apartment. Relevant to this motion is the fact that during this meeting, Mr. Chen inquired into the Army's background investigation into Mr. Ji in an apparent effort to further assess whether or not Mr. Ji was the "leak" that led to Mr. Xu's arrest. He asked for specifics regarding Mr. Ji's communications with Mr. Xu as well as other purported MSS personnel.

8.      In particular, Mr. Chen told Mr. Ji that Mr. Xu kept a log of their communications and that the Jiangsu Province MSS Division Director tasked Mr. Chen to verify all of the communications Mr. Ji had with Mr. Xu. He asked numerous questions about the steps Mr. Ji took to maintain the privacy of those communications in a manner that, at a minimum, bordered on accusatory. Mr. Chen even asked directly whether Mr. Ji spoke to Mr. Xu about anything "special" or "sensitive" while in the United States—to which Mr. Ji answered in the negative, indicating only that he fulfilled a request to obtain American cosmetics for Mr. Xu's colleague's sister.

9.      Between June 20, 2018 and June 25, 2018, Mr. Chen placed at least six outgoing calls to Mr. Ji in an attempt to contact him, which further included leaving Mr. Ji voicemails in addition to sending him text messages. On June 25, 2018, Mr. Ji returned a call to Mr. Chen using a cell phone that Mr. Chen had previously given to Mr. Ji. Mr. Chen indicated that Mr. Ji should exclusively use this phone to contact him. Mr. Ji apologized to Mr. Chen for missing and not returning his previous calls, and Mr. Chen informed Mr. Ji, *inter alia*, that there is no update on Mr. Xu's extradition.

10.     After exchanging additional text messages over August and September of 2018— which included inquiries into Mr. Ji's maintenance of the cell phone provided to him during the

first meeting and updates on Mr. Xu's extradition—Mr. Chen arranged to meet with Mr. Ji on September 25, 2018. This was a day Mr. Ji returned from a vacation on a flight from Denver that arrived back in Chicago at approximately 6:00 a.m. By around 9:53 a.m., Mr. Chen was at Mr. Ji's apartment, and again picked him up and drove him to the same hotel for further conversation.

11.     Upon beginning their conversation in the car before even arriving at the hotel, Mr. Chen immediately relayed an express concern of the MSS/PRC government: "they have found, they said, they want to ask if you have used, any device you used when you communicate with them, like USB, computer or cell phone?" He claimed they "want you to give [the devices] to me" and continued by asking Mr. Ji about his various electronics—USBs, email storage, computers, etc. At the hotel, Mr. Chen asked about the progress of the Army's background investigation into Mr. Ji based upon a direct request he reportedly received from the Jiangsu Province MSS division director. He continued to ask extensively about the manner and means of Mr. Ji's communications with Mr. Xu and others in the purported ongoing attempt to assess fault for Mr. Xu's arrest to protect the MSS going forward. After further conversation, Mr. Chen again brought up the status of the Army's background investigation: "[the MSS Jiangsu Province Division Director] is interested, he is asking about your Army update."

12.     Around 11:00 a.m., armed and uniformed FBI agents raided the room, arrested Mr. Ji, and pretended to arrest Mr. Chen. Agents then proceeded to attempt a post-arrest interview of Mr. Ji. Any statements attributed to Mr. Ji after his arrest are subject to a separately filed motion to suppress.

13.     On January 24, 2019, the grand jury returned a six count indictment charging Mr. Ji with one count of engaging in a conspiracy to violate the laws of the United States in violation of

18 U.S.C. § 371, one count of failing to register as a foreign agent in violation of 18 U.S.C. § 951(a), three counts of wire fraud in violation of 18 U.S.C. § 1343, and one count of making a false statement in violation of 18 U.S.C. § 1001(a)(2). Dkt. # 32.

14.     The government may seek to introduce statements made by Mr. Ji to "Mr. Chen" during the course of trial.

## II.     Discussion

### A.  Legal Standard

15.     The Due Process Clause of the Fifth Amendment guarantees that the government shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. V.

16.     In conformity with this clause, as well as the Fifth Amendment privilege against self-incrimination, the government may not use an involuntary statement for any purpose at trial. *See Dickerson v. United States*, 530 U.S. 428, 432 (2000) (citing *Brown v. Mississippi*, 297 U.S. 278 (1936)). Whether the confession or statements are true, false, corroborated by other evidence, or lack corroboration is irrelevant. *Jackson v. Denno*, 378 U.S. 368, 376 (1964); *see also Rogers v. Richmond*, 365 U.S. 534, 540-41 (1961). A confession is voluntary only if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998) (a confession is voluntary only if "the confession is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will"). The government bears the burden of establishing voluntariness by a preponderance of the evidence. *United States v. Carter*, 910 F.2d 1524, 1529 (7th Cir. 1990); *see also*

*United States v. Montgomery*, 14 F.3d 1189, 1194 (7th Cir. 1994) ("[a] confession will be adjudged 'voluntary' if the government demonstrates that under the totality of the circumstances and by a preponderance of the evidence that it was not secured through psychological or physical intimidation but rather was the 'product of a rational intellect and free will'") (internal citations omitted).

17. The Due Process "voluntariness" test for the admissibility of a suspect's confession or statement has ancient roots in both American and English common law, and has long recognized the principle that coerced or compelled confessions are inherently untrustworthy. *See id.* (internal citations omitted); *see also Pierce v. United States*, 160 U.S. 355, 357 (1896) ("[c]onfessions are not rendered inadmissible by the fact that the parties are in custody, provided that such confessions are not extorted by inducements or threats"); *Wilson v. United States*, 162 U.S. 613, 622 (1896) (recognizing the need to exclude statements based on "inducements, threats, or promises" where not "negatived by the . . . circumstances under which it was made").

18. Over time, this test has been "refined . . . into an inquiry that examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson*, 530 U.S. at 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). This test considers "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* (internal quotations and citations omitted); *Reck v. Pate*, 367 U.S. 433, 440 (1961) ("all the circumstances attendant upon the confession must be taken into account"); *Malinski v. New York*, 324 U.S. 401, 404 (1945) ("[i]f all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant"); *Cf. Blackburn v. Alabama*, 361 U.S. 199, 206 (1960) ("[a] number of cases have demonstrated, if

9

demonstration were needed, that the efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of 'persuasion'").

19. The use of a ruse, artifice, or trick by law enforcement—at times troubling though far from unheard of—presents a unique situation in so far as Due Process and application of its "voluntariness" test is concerned. As Judge Denise Cote has described, in such a situation, "the fundamental question remains whether or not consent [or a statement] was voluntary in light of all the attendant facts and circumstances." *United States v. Montes-Reyes*, 547 F. Supp. 2d 281, 286 (S.D.N.Y. 2008); *see also Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (interrogator's misrepresentation to a suspect that his accomplice had already confessed did not render the suspect's confession coerced); *United States v. Rutledge*, 900 F.2d 1127, 1132 (7th Cir. 1990) (Posner, J.) (acknowledging that a hypothetical promise not to use a statement against defendant would present a strong case for involuntariness); *United States v. Jacobs*, 431 F.3d 99, 113 (3rd Cir. 2009) (former informant's non-custodial statements after being summoned to meeting by prior handler were involuntary); *United States v. Unser*, 165 F.3d 755, 766-67 (10th Cir. 1999) (agents employed a "measure of subterfuge" by inducing defendant to return to their offices when defendant did not know he was the target of a criminal investigation, and defendant believed officers merely wanted to help him retrieve his snowmobiles; nonetheless, defendant's will was not overborne and statements were admissible); *Lucero v. Kerby*, 133 F.3d 1299, 1311 (10th Cir. 1998) (defendant's inculpatory statements were admissible even though officer falsely told defendant that his fingerprints had been found at the crime scene); *United States v. Menesses*, 962 F.2d 420, 428 (5th Cir. 1992) (holding that a confession "induced by an assurance that there will be no prosecution is not voluntary"); *Alexander v. United States*, 390 F.2d 101, 110 (5th Cir. 1968) ("[i]ntimidation and deceit are not the norms of

voluntarism. In order for the response to be free, the stimulus must be devoid of mendacity. We do not hesitate to undo fraudulently induced contracts. Are the disabilities here less maleficent?"); *United States v. Parson*, 599 F. Supp. 2d 592 (W.D. Pa. 2009) (agents' use of a ruse that a child pornography suspect may be the victim of identity theft rendered consent involuntary); *United States v. Yanez*, 1987 WL 25926, * 2 (E.D.N.Y. 1987) (where law enforcement deploys "relative minor trickery" in order to obtain an "otherwise voluntary statement," there is "no constitutional impediment" to the subsequent use of that statement).

20.     In *United States v. Byrum*, 145 F.3d 405, 408 (1st Cir. 1998), the First Circuit explained that "police trickery can entail coercion," "[b]ut trickery is not automatically coercion." It gave the example of a police threat to take away a child (citing *Lynum v. Illinois*, 372 U.S. 528, 534 (1959)) as exemplary of a threat rendering a confession involuntary, and on the other hand, cited the Seventh Circuit case, *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992), which held that a police fabrication regarding the strength of the evidence against the defendant does not render a confession involuntary: "the issue is not causation, but the degree of improper coercion." *Id.*

21.     In *Holland* itself, the Seventh Circuit contrasted *Lynum*, *supra*, and *United States v. Anderson*, 929 F.2d 96, 100 (2d Cir. 1991) (confession coerced when police told suspect that he could either have an attorney present during questioning or cooperate with the government), in discussing the facts before it. In doing so, it implicitly noted that a ruse that "distort[s] the suspect's rational choice . . . by introducing a completely extrinsic consideration" to the decision to confess (e.g. "an empty but plausible threat") is one that tends to render a confession involuntary. *Id.* at 1051-52; *see also United States v. Graham*, 2014 WL 2922388, *9 (N.D. Ga. 2014) (citing *United States v. LaForgia*, 2012 WL 1869035, *4 (S.D. Ala. 2012) (acknowledging that trickery requiring a defendant to answer

questions generally makes statements involuntary). The Seventh Circuit further observed that even less coercive tactics, if carried out "over an extended period of time," can "transmute [the] tactic into a more coercive one." *Id.* at 1552.

21. The Supreme Court, too, has long recognized "that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.'" *Beckwith v. United States*, 425 U.S. 341, 348 (1976) (quoting *Rodgers v. Richmond*, 365 U.S. 534, 544 (1961)); *see also Culombe v. Connecticut*, 367 U.S. 568, 602 (1961) (the question of voluntariness is whether a defendant's free will was overborne by virtue of the interrogative conduct of the agents); *Garrity v. New Jersey*, 385 U.S. 493 (1967) (forcing individual to make potentially incriminating statement or risk losing his or her job renders the statement involuntary, even in non-custodial setting).

22. In the final analysis, if the statement was the product of a ruse or some other stimulus or motivation, regardless if made in a custodial or non-custodial setting, the question remains the same: whether the statement was voluntary in light of the attendant circumstances. *See, e.g., United States v. Preston*, 751 F.3d 1008, 1020 (9th Cir. 2014) (en banc) (38-minute noncustodial interview of an eighteen-year old with an IQ of 65 was coercive and rendered his confession involuntary); *United States v. Haddon*, 927 F.2d 942, 946-45 (7th Cir. 1991) (considering question of voluntariness for out-of-custody statements); *United States v. Rutherford*, 555 F.3d 190, 195 (6th Cir. 2009) (recognizing that the elicitation of an involuntary *non*-custodial statement violates due process); *United States v. Locklear*, 829 F.2d 1314, 1317 (4th Cir. 1987) (implying that if government agent made threat to defendant that failure to cooperate would result in car dealership license,

noncustodial statements would be involuntary); *United States v Khomutov*, 2020 WL 1304834, *6 (N.D. Ill. 2020) (Chang, J.) ("statements made in non-custodial interrogations must still be suppressed if they were involuntary"); *United States v. Oliver*, 142 F. Supp. 2d 1047, 1052 n. 1 (N.D. Ill. 2001) (Kennelly, J.) ("a non-custodial statement can be involuntary in appropriate circumstances").

23.     Consideration of the totality of circumstances also requires an examination of the subjective characteristics of the defendant. Those characteristics include "the age of the defendant, his lack of education or low intelligence, the lack of any advice to him of his constitutional rights, the length of his detention, the repeated and prolonged nature of the questioning, and the use of physical punishment." *Pharr v. Gudmanson*, 951 F.2d 117, 120 (7th Cir. 1991). The Seventh Circuit has more generally described relevant considerations to include "the defendant's background and conduct, the duration and conditions of the interview and detention, the physical and mental condition of the defendant, the attitude of the law enforcement officials, and whether law enforcement officers used coercive techniques." *United States v. Shabaz*, 579 F.3d 815, 820 (7th Cir. 2009). A defendant's ability to understand English, while a low bar, is also a relevant consideration. *Cf. Vollins v. Gaetz*, 612 F.3d 574, 588 (7th Cir. 2010).

**B.  Mr. Ji's Statements to the Undercover Agent Were Involuntary.**

24.     This case presents a unique situation. Far from "minor trickery," the FBI sent in an undercover agent to pose as a high-level operative of one of the world's most powerful intelligence agencies—the People's Republic of China's Ministry of State Security. Armed with inside information concerning the recent arrest of one of the agencies' own alleged intelligence officers— an arrest that involved an international plot to lure Mr. Xu out of the relative-safety of the PRC and

into an extraditable location—the undercover agent impressed upon Mr. Ji how "serious" of a matter this was, and further, repeatedly emphasized and discussed the fact that the MSS was purportedly concerned that Mr. Ji was responsible for Mr. Xu's arrest. In other words, the United States government utilized a ruse where its agent posed as a Chinese intelligence agent conducting a covert investigation to determine the "leak" responsible for an international embarrassment in which Mr. Ji was considered a prime suspect.

25.     Suffice to say, this is not a situation where anyone—and certainly not Mr. Ji—would feel anything other than compelled by "extrinsic considerations" to answer any and all questions posed by the undercover agent. Mr. Ji was a Chinese citizen lawfully present in the United States on a temporary visa. All of his family reside in China, and sooner or later he too will have to return to China. When the MSS purportedly sends a representative to stop him on the street out of the blue, halfway across the world on a non-descript afternoon as he is entering his apartment, informs him of a "very serious" international incident, and seeks to question him regarding whether or not he is the "leak" giving rise to the pending crisis, the ramifications of refusing such a request to both his safety and comfort as well as that of his family is obvious and supportable in black letter Chinese law.[3] Moreover, the undercover agent did not seek to question Mr. Ji on one occasion alone; rather, the undercover agent gave him a purportedly "unattributable phone" through which he was supposed to maintain contact, told him not to have contact with anyone else, and the undercover agent in fact continued to contact Mr. Ji repeatedly over the course of the coming weeks and months,

---

[3] Counsel will seek to adduce evidence on this point at hearing. Informative now is the same collection of speeches from numerous high-level U.S. government officials previously referenced, including President Trump, Vice President Pence, Attorney General Barr, among others, denouncing the PRC government as grossly authoritarian, oppressive, and abusive. *See* O'Brien, Robert C., *Trump on China Putting America First*, *supra*.

ultimately having two additional face-to-face meetings, the last of which occurred only a couple of hours after Mr. Ji's early morning return from a west coast vacation and precipitated his arrest. The government purposefully created a coercive environment that deprived Mr. Ji of any possibility of refusing to speak to the undercover agent. No one in this situation—and again, certainly not Mr. Ji—could have voluntarily refused such a request.

25. Equally important as to the practical ramifications of refusing such a request for information purportedly from Chinese intelligence are the requirements of black letter PRC law, which, as a Chinese citizen, are applicable to Mr. Ji. On July 1, 2015, the National People's Congress of China passed the State Security Law of the People's Republic of China, effective the same date. Chapter One, Article 13 of that law specifically provides for criminal punishment should an individual violate that law. Chapter Six sets forth the duties and rights of citizens, including truthfully providing known evidence involving activities that endanger national security and providing necessary support and assistance to national security organs, public security organs, and military organs. *Id.* at Art. 77. The Criminal Procedure Code of the People's Republic of China, as amended March 14, 2012, provides specific obligations for citizens either suspected of a crime or of being a witness to one to answer relevant questions truthfully when requested. *See, e.g., id.* at Art. 118, 123. And more recently, the National People's Congress passed the National Intelligence Law of the People's Republic of China on June 27, 2017. This provision specifically demands that citizens shall support, assist, and cooperate with the state intelligence work in accordance with the law, and keep the secrets of the national intelligence work known to the public.

26. The reality of the rapidly changing state of the PRC's national security laws has, as expected, garnered widespread international media attention, American media included. As noted

in the Financial Times, "[a] number of Chinese laws state that Chinese individuals and organizations must, if asked, co-operate with intelligence work."[4] And as the article noted, there is no operative territorial limitations to the law's applications:

> "I think the territoriality issue is a red herring," said Paul Haswell, a partner at Pinsent Masons in Hong Kong. "Regardless of what any law says, if the state asks you to do something, you'll face consequences if you don't, be they legal or more sinister. The [Communist] party is supreme and has the final say on everything." *Id.*

27.     The same principles were noted in Lawfare, which described:

> [T]he Intelligence Law's drafters are trying to shift the balance of these legal obligations from intelligence "defense" to "offense"—that is, by creating affirmative legal responsibilities for Chinese and, in some cases, foreign citizens, companies, or organizations operating in China to provide access, cooperation, or support for Beijing's intelligence-gathering activities.[5]

It continued:

> The Intelligence Law, by contrast, repeatedly obliges individuals, organizations, and institutions to assist Public Security and State Security officials in carrying out a wide array of "intelligence" work. Article Seven stipulates that "any organization or citizen shall support, assist, and cooperate with state intelligence work according to law." Article 14, in turn, grants intelligence agencies authority to insist on this support: "state intelligence work organs, when legally carrying forth intelligence work, may demand that concerned organs, organizations, or citizens provide needed support, assistance, and cooperation." Organizations and citizens must also protect the secrecy of "any state intelligence work secrets of which they are aware." These clauses appear to limit the obligations on individuals to Chinese citizens, but they do not stipulate that only Chinese "organizations" are subject to these requirements. *Id.*

---

[4] Yuan Yang, Is Huawei compelled by Chinese law to help with espionage?, Financial Times, *available at* https://www.ft.com/content/282f8ca0-3be6-11e9-b72b-2c7f526ca5d0 (last accessed March 16, 2021).
[5] Murray Scot Tanner, Beijing's New National Intelligence Law: From Defense to Offense, Lawfare, *available at* https://www.lawfareblog.com/beijings-new-national-intelligence-law-defense-offense (last accessed March 16, 2021).

28.     The same interpretations of the NIL have also been echoed in the New York Times: "[the National Intelligence Law] isn't protective; it's proactive. 'All organisations [sic] and citizens shall support, assist and cooperate with national intelligence efforts according to the Law,' it says."[6]

29.     The relevance of the foregoing overview of Chinese legal provisions is that, as a Chinese citizen, when approached by a purported MSS-affiliate, Mr. Ji was compelled to provide any and all information, assistance, and support requested or suffer consequences without parallel in the United States. Thus, given the ruse employed by the FBI, Mr. Ji's statements were necessarily "compelled" by extrinsic considerations attendant to the interrogation, involuntary within the meaning of the relevant United States' constitutional provisions, and thus, must necessarily be suppressed.

## III.     Request for an Evidentiary Hearing

30.     Evidentiary hearings are required "when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion." *United States v. Edgeworth*, 889 F.3d 350, 353 (7th Cir. 2018) (internal citations omitted). Counsel assumes the government is not willing to concede the fact that its agent, in the course of posing as an agent of PRC intelligence, coerced and, threatened, directly or by implication, Mr. Ji in a manner sufficient

---

[6] Yi-Zheng Lian, Where Spying Is the Law, New York Times, *available at* https://www.nytimes.com/2019/03/13/opinion/china-canada-huawei-spying-espionage-5g.html (last accessed March 16, 2021); *see also, e.g.*, Reuters, China passes tough new intelligence law, *available at* https://www.reuters.com/article/us-china-security-lawmaking-idUSKBN19I1FW (last accessed March 16, 2021); Sui-Lee Wee, New York Times, China's New Cyber Security Law Leaves Foreign Firms Guessing, *available at* https://www.nytimes.com/2017/05/31/business/china-cybersecurity-law.html (last accessed March 16, 2021); Liza Lin & Yoko Kubota, Wall Street Journal, U.S. Tech Firms Spooked by China's Arcane Cybersecurity Law, *available at* https://www.wsj.com/articles/chinas-blurry-cyber-laws-give-u-s-tech-companies-no-security-1512558004 (last accessed March 16, 2021).

to render his statements involuntary. There is a significant amount of evidence and testimony counsel wishes to present as to both the specific nature of the meetings—which were by and large captured on audio and video recording equipment—and the relevant provisions of PRC law, the specifics of Mr. Ji's personal characteristics, all of which necessitate a hearing on this motion.

## IV. Conclusion

31.     Based on the foregoing, Mr. Ji, through counsel thus request an evidentiary hearing to resolve this motion; and ultimately, that the Court suppress any and all statements made during the course of his meetings and involvement with an undercover agent, including the meetings that occurred on April 25, 2018, May 17, 2018, and September 25, 2018.

Respectfully submitted,

/s/ Damon M. Cheronis
**Damon M. Cheronis**

/s/ Ryan J. Levitt
**Ryan J. Levitt,**
Attorneys for Defendant.

**Law Office of Damon M. Cheronis**
140 S. Dearborn Street Suite 411
Chicago, IL 60603
(312) 663-4644
damon@cheronislaw.com
ryan@cheronislaw.com

## CERTIFICATE OF SERVICE

I, Damon M. Cheronis, hereby certify that on June 4, 2021, I electronically filed the foregoing **Defendant's Motion to Suppress Statements Made to an Undercover Agent** with the Clerk of the U.S. District Court for the Northern District of Illinois, Eastern Division, by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Damon M. Cheronis
Damon M. Cheronis
Law Office of Damon M. Cheronis
140 S. Dearborn Street Suite 411
Chicago, Illinois 60603
(312) 663-4644
damon@cheronislaw.com