THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | 18 CR 611 |
| | ) | Judge Ronald A. Guzman |
| v. | ) | |
| | ) | |
| JI CHAOQUN | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION
FOR DISCLOSURE; OR ALTERNATIVELY TO SUPPRESS EVIDENCE OBTAINED
OR DERIVED FROM THE ISSUANCE OF NATIONAL SECURITY LETTERS**

## TABLE OF CONTENTS

I. Background .......................................................................................... 1-3

II. Discussion ........................................................................................ 3-16

    A. National Security Letters as an Investigatory Tool ............................3-7

        i.  The Right to Financial Privacy Act (12 U.S.C. § 3414) .............................3-4

        ii. The Electronics Communications Privacy Act (18 U.S.C. § 2709) ..............4-5

        iii. The Fair Credit Reporting Act (15 U.S.C. §§ 1681(u) and (v))..................5-6

        iv. The National Security Act (50 U.S.C. § 3162) ..............................................6-7

    B. Public Scrutiny of the FBI's Abuse of NSLs as an Investigatory Tool ..............7-9

    C. Disclosure is Required Under the Fourth and Fifth Amendment And Applicable Federal Rules .......................................................................9-10

    D. The Searches Conducted Pursuant to the NSLs at Issue Violated the Fourth Amendment .....................................................................................10-14

    E. The Searches at Issue May Have Been Conducted in Violation of Their Authorizing Statutes ...........................................................................14-16

III. Conclusion ...................................................................................... 16

## TABLE OF AUTHORITIES

**Amendments**

U.S. Const. amend. IV ................................................................................................1

U.S. Const. amend. V ................................................................................................1

U.S. Const. amend. VI ...............................................................................................1

**Cases**

*ACLU v. Clapper*, 959 F. Supp. 2d 724 (S.D.N.Y. 2013)
................................................................................................... 13

*Alderman v. United States*, 394 U.S. 165 (1969)
..................................................................................................9

*Boyd v. United States*, 116 U.S. 616 (1886)
..................................................................................................9-10

*Brady v. Maryland*, 373 U.S. 83 (1963)
..................................................................................................9

*Carpenter v. United States*, 138 S.Ct. 2206 (2018)
..................................................................................................10-12

*Carroll v. United States*, 267 U.S. 132 (1925)
................................................................................................... 10

*Doe v. Ashcroft*, 334 F. Supp. 2d 471 (S.D.N.Y. 2004)
................................................................................................... 13

*Doe v. Gonzalez*, 500 F. Supp 2d 379 (S.D.N.Y. 2007)
..................................................................................................8

*Doe v. Mukasey*, 549 F. 861 (2d Cir. 2008)
..................................................................................................8

*Electronic Frontier Foundation v. United States Dep't. of Justice*, 2019 WL 2098084
(N.D. Cal. 2019) ..................................................................................................3

*Hernandez v. Midland Credit Mgmt. Inc.*, 2017 WL 2985764
(N.D. Ill. 2017) (Gotschall, J.) ................................................................................... 15

*Katz v. United States*, 389 U.S. 347 (1967)
.................................................................................................................10-11

*Klayman v. Obama*, 957 F. Supp. 2d 1 (D.D.C. 2013)
................................................................................................................. 13

*Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir 2002)
.....................................................................................................................4

*Kyllo v. United States*, 533 U.S. 27 (2001)
................................................................................................................. 11

*Murray v. United States*, 487 U.S. 533 (1988)
.....................................................................................................................9

*Riley v. California*, 573 U.S. 373 (2014)
................................................................................................................. 11

*Robins v. Spokeo*, 10 CV 5306 (C.D. Cal. 2010)
.................................................................................................................15-16

*Robins v. Spokeo, Inc.*, 742 F.3d 409 (9th Cir. 2014)
.................................................................................................................15-16

*Robins v. Spokeo*, 867 F.3d 1108 (9th Cir. 2017).
.................................................................................................................15-16

*Smith v. Black*, 904 F.2d 950 (5th Cir. 1990)
................................................................................................................. 10

*Smith v. Maryland*, 442 U.S. 735 (1979)
................................................................................................................. 10

*Smith v. Obama*, 24 F. Supp. 3d 1005 (D. Idaho 2014)
................................................................................................................. 13

*Smith v. Obama*, 816 F.3d 1239 (9th Cir. 2016)
................................................................................................................. 13

*Spokeo. Inc. v. Robins*, 136 S. Ct. 1540 (2016)
.................................................................................................................15-16

*United States v. Barcelo*, 628 Fed. Appx. 36 (2d Cir. 2015)

.........................................................................................................9

*United States v. Di Re*, 332 U.S. 581 (1948)
......................................................................................... 11

*United States v. Gamez-Orduno*, 235 F.3d 453 (9th Cir. 2000)
..........................................................................................9

*United States v. Ienco*, 182 F.3d 517 (7th Cir. 1999)
..........................................................................................2

*United States v. Jones*, 565 U.S. 400 (2012)
......................................................................................... 11

*United States v. Knotts*, 460 U.S. 276 (1983)
......................................................................................... 11

*United States v. Miller*, 425 U.S. 435 (1976)
....................................................................................11-12

*United States v. U.S. District Court (Keith)*, 407 U.S. 297 (1972)
..........................................................................................9

*Wong Sun v. United States*, 371 U.S. 471 (1963)
..........................................................................................9

**Rules**

Fed. R. Crim. P. 12 ....................................................................... 1, 9

Fed. R. Crim. P. 16 ....................................................................... 1, 9

**Statutes**

12 U.S.C. § 3401 *et seq.* ...............................................................3-4

15 U.S.C. 1681(u) .........................................................................5-6

15 U.S.C. 1681(v) .........................................................................5-6

18 U.S.C. § 371 ...............................................................................1

18 U.S.C. § 951 ...............................................................................1

18 U.S.C. § 1001 ....................................................................................................1

18 U.S.C. § 1343 ....................................................................................................1

18 U.S.C. § 2703 .................................................................................................. 12

18 U.S.C. § 2709 ........................................................................................... 4-5, 13

31 U.S.C. § 5312 ....................................................................................................4

50 U.S.C. § 1806 ....................................................................................................9

50 U.S.C. § 3162 ............................................................................................ 14, 16

USA PATRIOT ACT of 2001, Pub. L. No 107-56, 115 Stat. 272 (2001)............................3

**Other Authorities**

A Review of the Federal Bureau of Investigation's Use of National Security Letters,
        U.S. Department of Justice Office of the Inspector General, March 2007................4

Liberty and Security in a Changing World: Report and Recommendations
        of the President's Review Group on Intelligence and Communications
        Technology, December 18, 2013 .................................................................8

Letter From Elizabeth Warren, Rand Paul, and Ron Wyden, December 12, 2019..............9

Secret FBI Subpoenas Scoop Up Personal Data from Scores of Companies,
        New York Times, September 20, 2019 .......................................................9

Statistical Transparency Report Regarding the Use of National Security Authorities
        Office of Civil Liberties, Privacy, and Transparency, April 2019 ..............................3

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION
FOR DISCLOSURE; OR ALTERNATIVELY TO SUPPRESS EVIDENCE OBTAINED
OR DERIVED FROM THE ISSUANCE OF NATIONAL SECURITY LETTERS**

Defendant, **Ji Chaoqun**, by and through his attorneys, **the Law Office of Damon M. Cheronis**, pursuant to the Search and Seizure, Due Process, and Effective Assistance of Counsel provisions of the Fourth, Fifth, and Sixth Amendment to the Constitution of the United States, Rules 12(3)(c) and 16 of the Federal Rules of Criminal Procedure, as well as the other authority cited herein, respectfully moves this Court to order the government to disclose the materials specified herein pertaining to its issuance of national security letters ("NSLs") in this case, or alternatively, to suppress any and all evidence obtained or derived from the issuance of those NSLs.

In support of this motion, Mr. Ji, through counsel, submits the following memorandum.

I.      **Background**

On January 24, 2019, the grand jury returned a six count indictment charging Mr. Ji with one count of engaging in a conspiracy to violate the laws of the United States in violation of 18 U.S.C. § 371, one count of failing to register as a foreign agent in violation of 18 U.S.C. § 951(a), three counts of wire fraud in violation of 18 U.S.C. § 1343, and one count of making a false statement in violation of 18 U.S.C. § 1001(a)(2). Dkt. # 32.

Discovery tendered to date indicates the FBI formally initiated its full investigation into Mr. Ji back on October 18, 2016. As early as January 26, 2017, the FBI was receiving responses to national security letters previously issued to communication service providers, financial institutions, and others.

Counsel initially received only FD-302, FD-1057, and other standard form reports, albeit in heavily-redacted form, suggesting as much. In accordance with Local Rule 37.2 and Local Criminal

Rules 12.1 and 16.1, on July 9, 2020, counsel requested additional disclosures from the government, namely, the letters themselves, as well as any and all certifications, affidavits, etc., communications with the recipient entities or its representatives, all materials produced in response by the recipient, and disclosure of the legal grounds for each respective letter issued by the government in the course of this investigation.

Through a correspondence dated August 6, 2020, the government at first declined to voluntarily make such disclosures. It did nonetheless subsequently provide the defense with voluminous returns from previously issued NSLs on November 30, 2020, including returns from Pinger, Spokeo, American Express, Paypal, JP Morgan Chase, and AT&T. Counsel has not to date received the letters themselves, as well as any and all certifications, affidavits, etc., communications with the recipient entities or its representatives, or information regarding the government's legal grounds for the issuance of such letters.

Altogether, the aforementioned materials suggest the issuance of NSLs, in either the late fall or early winter of 2016-2017, to the following entities: Google, Pinger, AT&T, Sprint, Spokeo, American Express, Discover, and PayPal.

As a result of those letters, upon information and belief, the government obtained evidence or evidence was eventually derived from those returns that the government may seek to use in its case-in-chief at trial.[1]

---

[1] As will be discussed further herein, the government ultimately bears the burden to show that any evidence it intends to introduce at trial is not fruit of the poisonous tree. *See United States v. Ienco*, 182 F.3d 517, 528 (7th Cir. 1999). A unilateral, ex ante determination regarding fruits should thus not be allowed to circumvent litigation in the event the government ultimately takes the position that it intends to use this or related evidence but claims an exception to the exclusionary rule applies.

Based on the following, Mr. Ji, through counsel, is now respectfully moving the Court to suppress any and all evidence obtained or derived from the issuance of NSLs. Counsel further requests the Court order the government to disclose any materials necessary to make a sufficient determination on this issue.

## II. Discussion

### A. National Security Letters as an Investigatory Tool

NSLs first appeared in their modern form and use largely as a result of the Patriot Act's expansion of the FBI's pre-existing authority to issue such letters. *See* USA PATRIOT ACT of 2001, Pub. L. No 107-56, 115 Stat. 272 (2001). Between 2015 and 2017, the FBI issued over 37,000 NSLs. *Electronic Frontier Foundation v. United States Dep't. of Justice*, 2019 WL 2098084 (N.D. Cal. 2019).[2] In addition to the expansions authorized by the USA PATRIOT Act (P.L. 107-56), there are four primary statutory frameworks through which NSLs derive their authority, each of which will be discussed in turn.

### i. The Right to Financial Privacy Act (12 U.S.C. § 3414)

Originally enacted in 1978, the RFPA was designed "to protect the customers of financial institutions from unwarranted intrusion into their records while at the same time permitting legitimate law enforcement activity." H.R. Rep. No. 95-1383, at 33 (1978). Thus, 12 U.S.C. § 3414(a)(5)(A), and other relevant provisions of the RFPA, 12 U.S.C. § 3401 *et seq.*, mandates that "financial institutions" comply with records requests from the FBI under the terms specified therein

---

[2] In its April 2019 "Statistical Transparency Report Regarding the Use of National Security Authorities," the Office of Civil Liberties, Privacy, and Transparency reported the number of NSLs issued between the years 2013 until 2018 respectively as 19,212, 16,348, 12,870, 12,150, 12,762, and 10,235. Office of Civil Liberties, Privacy, and Transparency, April 2019, Statistical Transparency Report Regarding the Use of National Security Authorities, p. 33, *available at* https://www.dni.gov/files/CLPT/documents/2019_ASTR_for_CY2018.pdf (last accessed June 3, 2021).

if "such records are sought for foreign counter intelligence purposes to protect against international terrorism or clandestine intelligence activities."

The type of records the FBI typically obtains through NSLs issued pursuant to § 3414 include information concerning open and closed checking and savings accounts, safe deposit box records from banks, credit unions, thrift institutions, investment banks or investment companies, as well as transactions with issuers of travelers checks, operators of credit card systems, pawnbrokers, loan or finance companies, travel agencies, real estate companies, casinos, and other entities.[3]

"Financial institutions" to which NSLs can be directed under this provision is defined in § 3414(e), which in turn incorporates 31 U.S.C. §§ 5312(a)(1) and (c)(2). Those provisions, while broader than recounted here, generally include only banks, credit unions, currency exchanges, insurances companies, etc., or other business engaged similar or substitute activity.

### ii. The Electronic Communications Privacy Act (18 U.S.C. § 2709)

The ECPA was primarily created in order to keep private electronic communications private. *See* S. Rep. No. 99-541, at 35-36 (1986); *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 875 (9th Cir 2002) ("[t]he legislative history of the ECPA suggests that Congress wanted to protect electronic communications that are configured to be private, such as email and private electronic bulletin boards"). Thus, it allows the FBI to obtain only "subscriber information and toll billing records information, or electronic communication transactional records in [the] custody or possession" of a "wire or electronic communication service provider." 18 U.S.C. § 2709(a).

---

[3] *See* A Review of the Federal Bureau of Investigation's Use of National Security Letters, U.S. Department of Justice Office of the Inspector General, March 2007, *available at* https://oig.justice.gov/special/s0703b/final.pdf (last accessed June 3, 2021). This report was one of multiple reports issued by the Inspector General in and around this time, and are collectively referred to herein as "DOJ OIG Report."

§ 2709 further limits the circumstances under which a NSL may issue to where an authority figure within the FBI "not lower than Deputy Assistant Director at Bureau or a Special Agent in Charge in a Bureau field office" may, after "specifically identif[ying] a person, entity, telephone number, or account as the basis for a request," require production of the name, address, length of service, and local and long distance toll billing records if it is certified in writing, *inter alia*, that the "records sought are relevant to an authorized investigation to protect against international terrorism or clandestine intelligence activities . . . ." 18 U.S.C. § 2709(b)(1).

Despite these limitations, through the provisions of the ECPA, the FBI historically obtains a wide category of records, as detailed in the DOJ OIG Report. *See* DOJ OIG Report pp. xii-xiii.

### iii. The Fair Credit Reporting Act (15 U.S.C. §§ 1681(u) and (v))

The FCRA was enacted in 1970 to protect personal information collected by credit reporting agencies. *See* 15 U.S.C. § 1681 *et seq*. The PATRIOT ACT amended the law to authorize two types of NSLs, under § 1681(u) and § 1681(v), referred to as "FCRAu NSLs," and "FCRAv NSLs," respectively. FCRAu NSLs may seek disclosure for counterintelligence purposes, whereas FCRLv NSLs are limited to counterterrorism investigations. FCRAu NSLs demand that "consumer reporting agencies," the definition of which will be discussed in greater detail in Section II(E), *infra*, provide the FBI information about an individual's credit history, including the names and addresses of all financial institutions at which the consumer maintains or has maintained an account, the name, addresses, and places of employment of the consumer, if the FBI certifies that the request is:

> sought for the conduct of an authorized investigation to protect against international terrorism or clandestine intelligence activities, provided that such an investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution of the United States. 15 U.S.C. § 1681u(b).

§ 1681(v), amended to the FCRA by the PATRIOT ACT in 2001, further allows the FBI to obtain a consumer reporting agency's credit reports and "all other consumer information in its files" if the FBI properly certifies that the information is "necessary for [the FBI's] investigations of, intelligence or counter-intelligence activities or analysis related to, international terrorism . . . ."

### iv. The National Security Act (50 U.S.C. § 3162)

The National Security Act, as amended in 1994, permits the FBI or any other investigative agency to request:

> [A]ny financial agency, financial institution, or holding company, or from any consumer reporting agency, such financial records, other financial information, and consumer reports as may be necessary in order to conduct any authorized law enforcement investigation, counterintelligence inquiry, or security determination. Any authorized investigative agency may also request records maintained by any commercial entity within the United States pertaining to travel by an employee in the executive branch of Government outside the United States. 50 U.S.C. § 3162(a)(1).

Though requests under this provision are rare (*see* DOJ OIG Report, p. xiv), the statute requires that the additional following conditions be met:

> (A) the records sought pertain to a person who is or was an employee in the executive branch of Government required by the President in an Executive order or regulation, as a condition of access to classified information, to provide consent, during a background investigation and for such time as access to the information is maintained, and for a period of not more than three years thereafter, permitting access to financial records, other financial information, consumer reports, and travel records; and

> (B)(i) there are reasonable grounds to believe, based on credible information, that the person is, or may be, disclosing classified information in an unauthorized manner to a foreign power or agent of a foreign power;

> (ii) information the employing agency deems credible indicates the person has incurred excessive indebtedness or has acquired a level of affluence which cannot be explained by other information known to the agency; or

> (iii) circumstances indicate the person had the capability and opportunity to disclose classified information which is known to have been lost or compromised to a foreign power or an agent of a foreign power. 50 U.S.C. § 3162(a)(2).

All NSLs issued pursuant to § 3162 must be accompanied by a written certification from a high-ranking official within the FBI as specified in § 3162(a)(3)(A), affirming that: (1) the person concerned is or was an executive branch employee in a position required by the President in an executive order or regulation to consent to the release of related records as a condition of access to classified information; (2) the request is made or authorized pursuant to an authorized inquiry and is permitted under § 3162; and (3) the records to be reviewed are ones the employee has previously agreed to make available to the investigating agency.

### B. Public Scrutiny of the FBI's Abuse of NSLs as an Investigatory Tool.

The massive expansion of data collection occurring today through the issuance of NSLs has come under increasingly intense scrutiny in recent months and years. As the DOJ OIG Report itself summarized back in 2007:

> [W]e found that the FBI used NSLs in violation of applicable NSL statutes, Attorney General Guidelines, and internal FBI policies. In addition, we found that the FBI circumvented the requirements of the ECPA NSL statute when it issued at least 739 "exigent letters" to obtain telephone toll billing records and subscriber information from three telephone companies without first issuing NSLs. Moreover, in a few other instances, the FBI sought or obtained information to which it was not entitled under the NSL authorities when it sought educational records through issuance of an ECPA NSL, when it sought and obtained telephone toll billing records in the absence of a national security investigation, when it sought and obtained consumer full credit reports in a counterintelligence investigation, and when it sought and obtained financial records and telephone toll billing records without first issuing NSLs. *Id.* at p. 124.

More specifically, the report found that (*id.* at pp. 121-124):

- a "significant number of NSL-related possible violations were not being identified or reported" as required;

- the only FBI data collection system produced "inaccurate" results;
- the FBI issued over 700 exigent letters acquiring information in a manner that "Circumvented the ECPA NSL statute and violated the Attorney General's Guidelines . . . and internal FBI policy";
- the FBI's Counterterrorism Division initiated over 300 NSLs in a manner that precluded effective review prior to approval;
- 60% of the individual files examined showed violations of FBI internal control policies;
- the FBI did not retain signed copies of the NSLs it issued;
- the FBI had not provided clear guidance on the application of the Attorney General's least-intrusive-feasible-investigative-technique standard in the case of NSLs;
- the precise interpretation of toll billing information as it appears in the ECPA NSL statute is unclear;
- SAC supervision of the attorneys responsible for review of the legal adequacy of proposed NSLs made some of the attorneys reluctant to question the adequacy of the underlying investigation previously approved by the SAC;
- there was no indication that the FBI's misuse of NSL authority constituted criminal conduct;
- personnel both at FBI headquarters and in the field considered NSL use indispensable; and
- information generated by NSLs was fed into a number of FBI systems.

Prior to the 2006 USA PATRIOT ACT amendments, NSL procedures under § 2709 were found to have violated both the First Amendment and separation of powers principles. *See Doe v. Gonzalez*, 500 F. Supp 2d 379 (S.D.N.Y. 2007); *Doe v. Mukasey*, 549 F. 861 (2d Cir. 2008). Subsequent to the leaks relating to the NSA's bulk metadata collection program under FISA, the White House established a working group, which, as set forth in its December 12, 2013 report, proposed that NSL statutes be reformed to: (1) require court approval for all NSLs except in emergency circumstances; (2) require § 215 orders be used only in international terrorism and international espionage investigations; (3) amend the NSL statutes to track § 215 minimization requirements; and (4) hold NSLs to greater oversight and public reporting requirements.[4] Despite

---

[4] *See* Liberty and Security in a Changing World: Report and Recommendations of the President's Review Group on Intelligence and Communications Technology, December 18, 2013, *available at*

significant efforts by civil liberties organizations and others to curtail the practice, it appears to continue largely unabated, as the New York Times recently reported that the FBI has now issued over a half million NSLs since 2001.[56]

### C. Disclosure is Required Under the Fourth and Fifth Amendment and Applicable Federal Rules.

In the first instance, compelling disclosure of the materials described herein is necessary in order to allow the full and fair functioning of the adversarial process, as required by the Fourth and Fifth Amendments, and Rules 12 and 16 of the Federal Rules of Criminal Procedure. *See United States v. U.S. District Court (Keith),* 407 U.S. 297, 321 (1972); *Alderman v. United States*, 394 U.S. 165, 168 (1969); Fed. R. Crim. P. 12(b)(4); 16(A)(1)(E). This is not a situation where *ex parte* and *in camera* review is expressly permitted by the authorizing statute, as is the case with FISA surveillance. *See* 50 U.S.C. § 1806(f). Without such disclosures, counsel cannot fully assess whether grounds for suppression exist, and whether the FBI or other agencies lawfully obtained evidence or evidence derived from the fruits of these searches will be introduced at trial. *See Wong Sun v. United States*, 371 U.S. 471, 486-88 (1963); *Murray v. United States*, 487 U.S. 533, 536-37 (1988); *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Barcelo*, 628 Fed. Appx. 36 (2d Cir. 2015) (*Brady* disclosure obligations apply to pretrial suppression hearings); *United States v. Gamez-Orduno*, 235 F.3d 453, 461

---

https://obamawhitehouse.archives.gov/blog/2013/12/18/liberty-and-security-changing-world (last accessed June 23, 2020).

[5] Valentino-DeVries, Jennifer, New York Times, September 20, 2019, Secret FBI Subpoenas Scoop Up Personal Data from Scores of Companies, *available at* https://www.nytimes.com/2019/09/20/us/data-privacy-fbi.html (last accessed June 3, 2021).

[6] Instructive on the point is also a recent bipartisan letter, dated December 12, 2019, and signed by Senators Elizabeth Warren, Rand Paul, and Ron Wyden, to the CEOs of Equifax, Experian, and TransUnion (*available at* https://www.warren.senate.gov/oversight/letters/in-bipartisan-letter-senators-warren-paul-and-wyden-ask-credit-reporting-agencies-equifax-experian-and-transunion-for-transparency-about-their-handling-of-fbi-requests-for-consumer-financial-data) (last accessed June 3, 2021).

(9th Cir. 2000) (noting disclosures must occur "at a time when disclosure would be of value to the accused") (internal citations and quotations omitted); *Smith v. Black*, 904 F.2d 950, 965-66 (5th Cir. 1990) (disclosures constitutionally required where the information would "affect[ ] the outcome of [a] suppression hearing"). Disclosure is thus required both as a constitutional matter and under the federal rules, and counsel and Mr. Ji respectfully request that the Court order as much.

### D. The Searches Conducted Pursuant to the NSLs at Issue Violated the Fourth Amendment.

With the caveat that the showing herein is restricted by the fact that the government has not voluntarily disclosed all information necessary to allow the defense to address the matter—or the Court to decide it—counsel submits there are nonetheless adequate grounds to find that the searches conducted pursuant to the NSLs issued in this case violated the Fourth Amendment.

In its bellwether opinion *Katz v. United States*, 389 U.S. 347, 351 (1967), the Supreme Court recognized that "the Fourth Amendment protects people, not places," and in so doing, "expanded our conception of the Amendment to protect certain expectations of privacy as well." *Carpenter v. United States*, 138 S.Ct. 2206, 2213 (2018). Thus, when an individual "seeks to preserve something as private," and his expectation of privacy is "one that society is prepared to recognize as reasonable," official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause. *Smith v. Maryland*, 442 U.S. 735, 740 (1979).

Although no single rubric definitively resolves which expectations of privacy are entitled to protection, the analysis is informed by historical understandings "of what was deemed an unreasonable search and seizure when [the Fourth Amendment] was adopted." *Carroll v. United States*, 267 U.S. 132, 149 (1925). On this point, the Supreme Court has recognized a number of basic guideposts. First, that the Amendment seeks to secure "the privacies of life" against "arbitrary

power." *Boyd v. United States*, 116 U.S. 616, 630 (1886). Second, and relatedly, that a central aim of the Framers was "to place obstacles in the way of a too permeating police surveillance." *United States v. Di Re*, 332 U.S. 581, 595 (1948). Thus, as technology has enhanced the government's capacity to encroach upon areas normally guarded from inquisitive eyes, the Supreme Court has sought to "assure [ ] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Kyllo v. United States*, 533 U.S. 27, 34 (2001). For that reason, in *Kyllo*, a "mechanical interpretation" of the Fourth Amendment was rejected in holding that the use of a thermal imager to detect heat radiating from the side of the defendant's home was a search. *Id.* at 35. Likewise, in *Riley*, based to a large extent upon the "immense storage capacity" of modern cell phone, the Court held that police officers must generally obtain a warrant before searching the contents of a phone. *Riley v. California*, 573 U.S. 373, 393 (2014).

Nonetheless, a conflict has slowly been taking form within the context of Fourth Amendment jurisprudence between the line of cases discussing expectations of privacy and the third party doctrine. More specifically, the first line of decisions center around the concept of personal expectations of privacy as inaugurated by *Katz, supra*, and developed in cases such as *United States v. Knotts*, 460 U.S. 276 (1983) (augmented visual surveillance by placing a beeper in a container of chloroform not a search due to no expectation of privacy in movements from one place to another), and *United States v. Jones*, 565 U.S. 400, 404-05 (2012) (GPS monitoring of vehicle a search based on physical trespass, but recognizing impingement on expectation of privacy in dicta).

The second line of cases center on the third-party doctrine, which traces its roots to *United States v. Miller*, 425 U.S. 435, 443 (1976), where individuals have "no legitimate expectation of privacy in information he voluntarily turns over to third parties . . . even if the information is

revealed on the assumption that it will be used only for a limited purpose." In *Miller*, the Supreme Court rejected a Fourth Amendment challenge to a subpoena for bank records, as the defendant could "assert neither ownership nor possession of the documents; they were 'business records of the banks.'" *Id.* at 440. Moreover, the checks sought were "not confidential communications but negotiable instruments to be used in commercial transactions," and the bank statements contained information "exposed to [bank] employees in the ordinary course of business." *Id.* at 442. In *Smith*, the Court found similarly with respect to pen registers revealing the numbers a telephone has dialed, as the Court "doubt[ed] that people in general entertain any actual expectation of privacy in the numbers they dial," and after all, numbers dialed are used by the phone companies "for a variety of legitimate business purposes." *Id* at 742-43.

In *Carpenter*, *supra*, from which much of the foregoing discussion is derived, the Supreme Court confronted this conflict head on in the context of a government request for a court order authorizing the collection of historical cell site location information ("CSLI") pursuant to the Stored Communications Act, 18 U.S.C. § 2703(d). *Id.* at 2212. It recognized that "the ability to chronicle a person's past movements," as has arisen with technological advancements, "does not fit neatly under existing precedents," in particular the principle that "[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere." *Id.* at 2216-17. It further recognized that "[p]rior to the digital age, law enforcement might have pursued a suspect for a brief stretch, but doing so 'for any extended period of time was difficult and costly and therefore rarely undertaken.'" *Id.* at 2217 (citing *Jones*, 565 U.S. at 429). For that reason, "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly

monitor and catalogue every single movement of an individual's car for a very long period." *Id.* (quoting *Jones*, 565 U.S. at 430).

Ultimately, because of the privacy concerns CSLI raises, including the fact that "in combination with other information," it could allow the government to "deduce a detailed log of [an individual's] movements," "the government may [not] subpoena third parties for records in which the suspect has a reasonable expectation of privacy." *Id.* at 2218- 21. Therefore, the Supreme Court found that the warrantless acquisition of seven days of CSLI was an unreasonable search, the fruits of which were required to be suppressed. *Id.* at 2220.

Challenges to NSLs on Fourth Amendment grounds have been limited, and all to counsel's knowledge occurred pre-*Carpenter*. *See, e.g., Doe v. Ashcroft*, 334 F. Supp. 2d 471, 526-57 (S.D.N.Y. 2004) (finding § 2709 violates Fourth Amendment prior to 2006 PATRIOT Act amendments); *Klayman v. Obama*, 957 F. Supp. 2d 1 (D.D.C. 2013) (bulk metadata collection under § 215 of the PATRIOT Act constituted unreasonable search, as third-party doctrine did not extinguish expectation of privacy a person has when using a telephone company or ISP); *ACLU v. Clapper*, 959 F. Supp. 2d 724 (S.D.N.Y. 2013) (reaching opposite holding as *Klayman*); *Smith v. Obama*, 24 F. Supp. 3d 1005 (D. Idaho 2014) (same) (*rev'd in Smith v. Obama*, 816 F.3d 1239 (9th Cir. 2016)).

Here, whether viewing the myriad NSLs issued in isolation or in tandem—which includes those issued to Google, Pinger, AT&T, Sprint, Spokeo, American Express, Discover, and PayPal— the wealth of private information the government likely obtained about Mr. Ji can reasonably be assumed to be significant. Absent any prior judicial review, let alone myriad other traditional Fourth Amendment requirements, these searches should be recognized for what they are: presumptively

unreasonable and constitutionally prohibited. Suppression is thus warranted for the evidence and fruits obtained therefrom.

### E. The Searches at Issue May Have Been Conducted in Violation of their Authorizing Statutes.

As described herein, there are a significant number of statutory requirements that must be followed and observed before a NSL can properly be issued. For the past few decades at least, these provisions have by and large stood as the exclusive bulwark against unnecessary governmental intrusion and excess. By their own terms, of which there are many, these provisions are mandatory. While perhaps not informed enough to fully pass judgment at this point, counsel believes that some of these provisions may have been violated, and statutory grounds exist to suppress their fruits.

For example, the NSL issued to Spokeo necessarily must have issued under the FCRA or the National Security Act provisions. The more expansive returns authorized by § 1681v could not be justified, as a NSL issued pursuant to that provision requires a nexus to counterterrorism, which was certainly not as issue here. The government nonetheless obtained, at a minimum, the following: (1) a listing of five separate email addresses reportedly associated with Mr. Ji; his Spokeo User ID; name; associated email; IP address; date and time of his most recent login; purchase URL; details concerning the records purchased; the name, type, and date added for Mr. Ji's credit card; details concerning Mr. Ji's reported subscription with Spokeo, including his price, start date, and end date; and other payment details.

Regardless, both provisions of the FCRA, as well as § 3162, authorize the issuance of NSLs exclusively to "consumer reporting agencies." As Spokeo itself has formally argued before federal courts at all levels, it does not fall within that definition, and the FCRA does not apply to it.

Specifically, the FCRA, 15 U.S.C. § 1681a(f), defines "consumer reporting agency" as any entity that:

> for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

In *Robins v. Spokeo*, 10 CV 5306 (C.D. Cal. 2010), Spokeo was sued for alleged violations of the FCRA, based on its alleged collection and dissemination of inaccurate information regarding the plaintiff. *Id.* Dkt. # 40. In its motion to dismiss, Spokeo argued that the plaintiff failed to state a claim because Spokeo is not a "consumer reporting agency" within the meaning of § 1681a(f), the same term to which § 1681u restricts the issuance of NSLs. *Id.* at Dkt. # 46. Specifically, Spokeo argued that it does not "*regularly* engage" in providing consumer credit information for "the *purpose of furnishing consumer reports.*" *Id.* Moreover, the search results provided by Spokeo are not "consumer reports" because Spokeo "does not gather or provide the information with the intent that it will be used for a purpose specified by the FCRA." *Id.* It continued, "to the contrary, Spokeo requires that its users agree *not* to use the information for those purposes." *Id.*

The district court found that for purposes of the deferential Fed. R. Civ. P. 12(b)(6) standard, the plaintiff alleged sufficient facts to survive a motion to dismiss on these grounds. *Id.* at Dkt. # 52 p. 4. When required to pass on the merits of an interlocutory appeal, the Ninth Circuit expressly declined to opine on "whether "Spokeo qualifies as a consumer reporting agency." *Robins v. Spokeo, Inc.*, 742 F.3d 409, 414 n. 4 (9th Cir. 2014).[7] And after granting *certiorari*, the Supreme Court did

---

[7] As it did when the matter was up before it a second time in *Robins v. Spokeo*, 867 F.3d 1108 n. 1 (9th Cir. 2017); *see also Hernandez v. Midland Credit Mgmt. Inc.*, 2017 WL 2985764, *1 (N.D. Ill. 2017) (Gotschall, J.) (referring to *Robins* describing Spokeo as an *alleged* consumer reporting agency).

the same. That is, as it granted *certiorari* on other grounds, "[f]or purposes of this opinion, [the Court] assume[s] that Spokeo is a consumer reporting agency." *Spokeo. Inc. v. Robins*, 136 S. Ct. 1540, 1556 n. 4 (2016). Suffice to say then, at a minimum, colorable grounds exist to question whether Spokeo qualified as a "consumer reporting agency."

Whether the Spokeo NSL was issued under the FCRA, or the less common National Security Act, the latter likewise restricts the issuance of NSLs seeking this category of information to "consumer reporting agencies" as defined in the FCRA, § 1681a. Moreover, if the latter were relied upon, counsel believes there are also substantial grounds to question whether Mr. Ji qualifies as an individual meeting the mandatory requirements set forth in § 3162(a)(3)(A)(i)-(iii).

## III.     Conclusion

Based on the foregoing, Mr. Ji, through counsel, respectfully moves this Court to order the government to disclose the materials specified herein pertaining to its issuance of NSLs in this case, or alternatively, to suppress any and all evidence obtained or derived from the issuance of NSLs.

Respectfully submitted,

/s/ Damon M. Cheronis
**Damon M. Cheronis**

/s/ Ryan J. Levitt
**Ryan J. Levitt,**
Attorneys for Defendant.

**Law Office of Damon M. Cheronis**
140 S. Dearborn Street Suite 411
Chicago, IL 60603
(312) 663-4644
damon@cheronislaw.com
ryan@cheronislaw.com

16

## CERTIFICATE OF SERVICE

I, Damon M. Cheronis, hereby certify that on June 4, 2021, I electronically filed the foregoing **Memorandum of Law** with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, by using the CM/ECF system, and in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, Local Rules 5.5 and 5.9, and General Order 16-0020.

s/ Damon M. Cheronis
Damon M. Cheronis
Law Office of Damon M. Cheronis
140 S. Dearborn Street Suite 411
Chicago, Illinois 60603
(312) 663-4644
damon@cheronislaw.com