UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JI CHAOQUN

No. 18 CR 611

Judge Ronald A. Guzman

**GOVERNMENT'S RESPONSE OPPOSING DEFENDANT'S MOTION TO SUPPRESS UNDERCOVER STATEMENTS**

Ji filed a motion to suppress incriminating statements he made to an undercover agent (UC) who was posing as a fellow member of the Chinese state intelligence apparatus. R. 144. Ji claims his statements were involuntary because, according to him, Chinese law requires individuals to comply with state security officials. *Id.*

Ji's motion should be denied. There is zero support for Ji's claim that the purported Chinese law is what caused him to make the challenged statements. In fact, to the contrary, the recorded conversations between Ji and the UC make abundantly clear that Ji believed the UC to be a like-minded individual who was a member of his conspiracy rather than a state security official to whom he was required to speak. In any event, Supreme Court and Seventh Circuit precedent require coercive governmental misconduct as a prerequisite to suppression, and Ji points to no such misconduct here.

1

# BACKGROUND

### *The Government's Initial Investigation of Ji and Xu*

Ji, 30 years' old, graduated from the Beihang University of Aeronautics and Astronautics (BUAA) in China in approximately June 2013 with a Bachelor of Science degree. He came to the United States in August 2013 on a student visa and, in December 2015, graduated with a master's degree in Electrical Engineering from the Illinois Institute of Technology. Compl. ¶ 12. Ji is fluent in Mandarin and English.

In October 2017, the Southern District of Ohio executed a search warrant on an email account used by Xu Yanjun, a Chinese intelligence officer.[1] *Id.* ¶ 7. Xu's emails revealed that he was directing an individual in the United States to provide the Chinese intelligence service with proprietary technical information. This individual worked for a cleared defense contractor that supplied engines for military aircraft.[2] *Id.* ¶ 8.

In December 2017, the Southern District of Ohio executed a search warrant on Xu's Apple iCloud account. *Id.* ¶ 10. A document in the iCloud account identified Xu as having held positions with the Ministry of State Security ("MSS") since June 2003 and holding the position of Deputy Division Director of the Jiangsu Province Ministry of State Security ("JSSD"). *Id.* ¶ 10. The MSS handles China's civilian intelligence collection and is responsible for counter-intelligence and foreign intelligence, as well

---

[1] The complaint identifies Xu as "Intelligence Officer A." As described below, Xu has been publicly charged and his identity is no longer confidential.

[2] Ji claims that the government turned to the undercover ruse only after the government could find no evidence of Ji's criminal wrongdoing. R. 144 at 1. The government sets forth the summary facts above in part to refute this untrue claim.

as political security. *Id*. at ¶ 5. The Jiangsu Province Ministry of State Security ("JSSD") is a provincial department of the MSS. *Id*.

Xu's iCloud account contained text messages indicating that another JSSD intelligence officer introduced Ji to Xu in approximately 2013. *Id*. at ¶ 13. The text messages also revealed discussions between Ji and Xu in which they arranged to meet at a train station in Nanjing, China, in close proximity to the JSSD headquarters. *Id*. at ¶¶ 13, 19. These messages are consistent with Ji's travel records and the information Ji gave to the undercover agent (UC), as discussed below. *Id*. at ¶ 15. The text messages also reflected efforts to set up additional meetings between Ji and Xu, again consistent with Ji's statements to the UC. *Id*. at ¶ 20.

In March 2018, the government executed a search warrant on an email account used by Ji. *Id*. at ¶ 22. Ji also used a false identity to register the email address. Ji's emails reflect that, in August 2015, he sent Xu background reports on eight U.S.-based individuals, disguising them as "midterm test questions." *Id*. All eight individuals were naturalized U.S. citizens born in Taiwan or China; who lived in the United States; and either currently worked in, or were recently retired from, a career in the science and technology industry. *Id*. at ¶ 26. Ji's purchase of these reports was corroborated by his credit card records and IP records. *Id*. at ¶¶ 23, 24.

At this point in time, the government also was aware that Ji had enlisted in May 2016, in the U.S. Army's Military Accessions Vital to the National Interest program ("MAVNI") program. *Id*. at ¶ 37. The MAVNI program authorizes the U.S. Armed Forces to recruit certain legal aliens whose skills are considered to be vital to

the national interest. *Id*. The benefit to the alien is an expedited citizenship application. *Id*. On December 6, 2017, as part of his MAVNI application, Ji underwent a Single Scope Background Investigation ("SSBI") interview with a U.S. Army officer. *Id*. at ¶ 40. An SSBI is a detailed background investigation conducted by the U.S. government for those who need access to Top Secret classified information.[3] During the interview, the Army officer had Ji fill out a form with the question, "Have you, a relative of yours, or an associate of yours, ever been a member, supporter, or representative of any of the organizations listed below?" The MSS was one of the listed organizations, to which Ji answered "No." He signed that form stating the information was true and accurate to the best of his knowledge.

On or about April 4, 2018, Xu was charged in the Southern District of Ohio with conspiracy to commit economic espionage and trade secret theft, in violation of 18 U.S.C. §§ 1831 and 1832.[4] Belgian authorities arrested Xu in April 2018, and he was eventually extradited to the United States. He is currently awaiting trial in Ohio.

At this point, the government knew about Ji's relationship with the Chinese intelligence apparatus, including Xu, Ji's efforts to assist them, and Ji's lies to the U.S. Army, all in violation of U.S. laws. This knowledge and Xu's arrest presented an opportunity to meet with Ji about the details of his efforts to covertly act within the United States as an agent of the Chinese intelligence apparatus. An undercover

---

[3] U.S. Army, Personnel Security, available at
https://www.dami.army.pentagon.mil/site/PerSec/InvTypes.aspx (last visited Aug. 2, 2021).

[4] 18 CR 43 (N.D. Ohio) (Black, J.).

agent (UC) met with Ji on three occasions as part of this ruse. These meetings were audio/video recorded and are described in greater detail next.[5]

### *First undercover meeting*

The first undercover meeting occurred on April 25, 2018.[6] At the start of the meeting, the undercover agent (UC) approached Ji in a public place during the day, referred to Ji's "Nanjing friend" (code for Chinese intelligence), and asked Ji, "Is it convenient for you to talk?" Ex. E, 4/25/18 Tr. 1. Ji initially indicated he had to attend Army training but then decided he would skip the training. *Id*. at 2-3. The UC indicated they could meet at a nearby hotel, and Ji responded that he was familiar with that hotel. *Id*. After Ji ran some unrelated errands, Ji and the UC went to the UC's hotel room together. *Id*. at 3-5.

As the video shows, the UC and Ji were the only two individuals in the room. Both were seated, and Ji appears comfortable and relaxed. *See, e.g.* Ex. A at 00:20-00:30; 23:00-23:20. The UC often was leaned back in his chair. *Id*. at 13:15-13:30. There are periods of laughter. *Id*. at 00:12; 45:00-45:10; 45:30-45:40. Once in the room, the UC offered Ji some water. Ex. E, 4/25/18 Tr. at 6.

The UC explained that Xu had been arrested and supervisors were investigating how the U.S. had learned about Xu. *Id*. at 6-7. The UC was supposed to find out what happened, by meeting with those with whom Xu had communicated, and by looking into whether the U.S. somehow had obtained the communications

---

[5] The government will submit copies of the recordings to the Court, marked as Exs. A-C.

[6] Draft transcripts of the meetings, attached to assist the Court's review, contain preliminary, draft translations and transcriptions, and are subject to change before trial.

between Xu and Ji. *Id.* Ji detailed his communications with Xu and other intelligence officers, including the methods (in-person meetings, phone calls, text messages, emails, WeChat) and frequency of communication. *Id.* at 8, 10.

Ji also stated that once he received his citizenship, he would travel back to China and would meet with the intelligence officers. *Id.* at 12-13. He explained that he would obfuscate his travel to China by first flying to Japan and then using his Chinese passport to fly from Japan to China. *Id.* at 23.

Ji repeatedly volunteered to the UC, without prompting, that if the intelligence officers wanted any information about the MAVNI program, he could gather and provide it. *Id.* at 16, 18. Ji also offered to help assess and target other Chinese enlistees in the MAVNI program. *Id.* at 17. Ji informed the UC that he had access to all military bases with his military ID and volunteered, without prompting, to take pictures of aircraft carriers for the benefit of the Chinese intelligence services. *Id.* at 19.

The meeting in the hotel room lasted approximately 50 minutes.

### *Second undercover meeting*

The second undercover meeting occurred during the day on May 17, 2018, in a hotel room, and lasted approximately 75 minutes. Ji and the UC were dressed in comfortable, casual attire. In the video, Ji often appears in command of the conversation. *See, e.g.*, Ex. B, 00:15-8:00. For much of the interview, Ji was leaning forward while the UC is sitting back in his chair. *Id.* at 15:35-15:50; 38:00-40:00. Ji

laughed throughout the interview. *See, e.g.*, *id*. at 25:15-25:20; 38:25-38:30; 46:20-46:25; 1:04:50-1:04:55; 1:05:55-1:06:02.

At the start, the UC asked Ji, "Everything is okay?" and Ji responded, "Everything is okay." Ex. F, 5/17/18 Tr. 1. Ji then handed the UC a stack of documents he had voluntarily brought with him, which the government later determined to include reports confirming his top-secret clearance and documents detailing the MAVNI program. *Id*. Ji explained that the Army did not check China-based references as part of the background investigation, only U.S. based references. *Id*. at 2-4.

Throughout this meeting, Ji detailed his in-person meetings in China with Xu and other Chinese intelligence officers, including that he first met them at a recruitment fair, "often" dined with one of the officers, and received thousands of dollars in cash from them. *Id*. at 5-8, 18, 20. Ji explained his instructions were "to get to meet people, some American friends." *Id*. at 19. Ji's plan was "to have my status adjusted by joining the military and then get quick access to those places in the U.S. that tend to have limited access to Chinese people." *Id*. at 19. Once he became a citizen, he would be able to access sensitive databases at FBI or NASA. *Id*. at 20.

With respect to the background reports that Ji purchased, Ji further explained that the intelligence officers had sent him a list of names and companies for whom he should order background reports. *Id*. at 8. He obtained the reports using a fake online account with a fake name, fake address, and a false phone number he obtained

7

from the online service PINGER; and he sent the reports by email and chat to the intelligence officers encrypted and falsely labeled as "Mid Term Quiz Questions." *Id*. at 8-9, 11, 14, 18. Ji explained that he needed to order the reports because it was difficult for the intelligence officers to pay for the reports from China. *Id*. at 9. He received $1,000 for completing this tasking. *Id*. at 8, 18.

### *Third undercover meeting*

The third undercover meeting occurred during the day on September 25, 2018, in a hotel room, and lasted approximately 30 minutes. Like the first and second meetings, in the recording, Ji appears comfortable and relaxed. His tone is jovial throughout. Ji often is leaning forward while the UC is sitting back in his chair. *See, e.g.*, Ex. C, 00:10-5:00; 31:00-33:00. Ji laughed at various points. *See, e.g.*, *id*. at 29:15-29:20. At one point, Ji and the UC moved closer together so they could review documents together. *Id*. at 36:15-37:25.

At the start, Ji apologized for being late. The UC responded, "No problem, uh, uh, take your time, there is no hurry." Ex. G, 9/25/18 Tr. 1. They initially discussed the individuals protesting outside the hotel, celebration of the Chinese Autumn Festival, and the weather. *Id*. at 5-6. Once inside the hotel room, Ji informed the UC that his MAVNI process had been delayed again due to the Army's backlog in reviewing background checks. *Id*. at 7-9. Ji provided more details about his communications with the intelligence officers, including identifying the phones he used, but explained he no longer had frequent contact with them. *Id*. at 10-12, 15.

He revealed that he had also met with the leader of the immediate supervisor of one of the officers. *Id*. at 17.

Ji volunteered that once he obtained his citizenship he would "look for jobs with secret clearance" such as "CIA, FBI jobs, or go to NASA." *Id*. at 23. The UC asked Ji, "[W]hat type of job would you be able to provide specific assistance to the nation?" *Id*. at 23. Ji responded, "That would probably be when I could see information that others cannot," referring to classified information. *Id*. at 23. The UC then asked if Ji was "willing to help us to" obtain sensitive information, to which Ji responded, "Yes, I am willing." *Id*. at 23. The UC then specifically clarified, "You must be willing on your own terms. If you do not want to, we cannot force you. You must be willing…." *Id*. at 24. Ji explained to the UC that certain U.S. government projects are so sensitive that they require native-born Americans, such as the Air Force's project on nuclear energy. *Id*. at 25. Later, the UC noted that the intelligence officers wanted to maintain a good relationship with Ji, and Ji responded that he also hoped "to keep the relations with them." *Id*. at 27-28.

\*     \*     \*

For all three meetings, the UC did not display any weapons. The tone was conversational throughout. The UC did not raise his voice. The UC did not become physically or verbally aggressive. The UC did not accuse Ji of lying. The UC did not make any threats or promises. The UC did not suggest Ji was in any legal trouble, faced criminal liability, had to cooperate, or that anything negative (or positive) would happen to him or his family.

9

After Ji's arrest in September 2018 and pursuant to search warrants, the government searched the two phones that were in Ji's possession at the time of his arrest and additional phones belonging to Ji that were at his residence. The phones contained, among other items:

- Text messages between Xu and Ji.

- Photos of a PRC government document, in Chinese, marked "Top Secret" and titled, "Registration Form for Personnel Working Overseas of the Ministry of State Security." This registration form was issued to "Ji Chaoqun." The metadata indicated the photos of this document had been taken in Nanjing (where the JSSD was located) in January 2014. Ji's travel records confirm that he was in China at that time. This information also is consistent with Ji's statements to the UC about his meetings with Chinese intelligence officers.

- Photos of a stack of U.S. $100 bills. The metadata indicated these photos had been taken in Nanjing on the same date as the photos of the registration form. Again, this information is consistent with Ji's statement to the UC about receiving substantial payments from the MSS officers while in China.

## APPLICABLE LAW

Under the Due Process Clause of the Fifth Amendment, the Court may admit a defendant's statement only if he made it voluntarily. *See United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998).

The defendant must make a prima facie case of involuntariness, but the ultimate burden remains on the government to show voluntariness by a preponderance of the evidence. *See United States v. Toro*, 359 F.3d 879, 885 (7th Cir. 2004); *United States v. Carter*, 910 F.2d 1524, 1529 (7th Cir. 1990). Here, to establish a prima facie case of involuntariness, Ji would have to establish (a) that he subjectively believed he had no real choice but to make incriminating statements to the UC; (b) that such belief was objectively reasonable; and (c) that defendant's lack

10

of choice was the result of coercive government conduct. *See Colorado v. Connelly*, 479 U.S. 157 (1986); *United States v. Bary*, 978 F. Supp. 2d 356, 362–66 (S.D.N.Y. 2013).

## ARGUMENT

### I. THE COURT SHOULD DENY JI'S MOTION WITHOUT A HEARING BECAUSE JI CANNOT MAKE A PRIMA FACIE SHOWING OF ILLEGALITY

Ji summarily claims—without the support of an affidavit or other evidence—that his statements to the UC were the product of coercion, in light of Chinese law purportedly requiring Chinese citizens to speak to Chinese state security officers. His claims are based on vague conjecture, are insufficient to establish involuntariness or government coercion, and are directly contradicted by the recorded interviews between him and the UC.

Ji must present "definite, specific, detailed, and nonconjectural facts" that show his statements were involuntary due to police coercion. *See United States v. Rodriguez*, 69 F.3d 136, 141 (7th Cir. 1995). Here, that would—at a bare minimum—require that Ji make a prima facie claim (that is, based on definite, specific, detailed, and nonconjectural facts and "without relying on vague or conclusory allegations," *Toro*, 359 F.3d at 885[7]), that he subjectively believed he had no real choice but to

---

[7] In *United States v. Toro*, the defendant argued he was entitled to a pre-trial hearing to determine the voluntariness of his confession. 359 F.3d at 885. The Seventh Circuit ruled that he had failed to present sufficient facts to make a prima facie showing that would entitle him to a hearing. In the district court, Toro had filed an affidavit stating he had been intoxicated at the time of the confession. *See id.* The Seventh Circuit ruled that these facts were vague and conclusory. Specifically, Toro "did not detail any facts showing mental or physical coercion by the police" and how the intoxication had caused such coercion to become more effective. *See id.* Because of Toro's failure to establish a prima facie case, the Seventh Circuit upheld the district court's denial of the motion to suppress without a hearing. *See id.*

speak to the UC. *See Bary*, 978 F. Supp. 2d at 362–66. Ji's motion contains no allegations about his subjective belief that he had no choice but to speak. Ji does not allege—and proffers no evidence—that he believed that the UC was a state security officer, as defined by the Chinese law; or that he was aware at the time of the UC meetings of one or more of the Chinese state security laws he now cites; or that he believed at the time of the UC meetings that under one or more of these Chinese state security laws, he was required to cooperate with the UC. And he does not allege, and proffers no evidence, that he believed non-cooperation would result in a penalty.

In addition, Ji must show that the purportedly coercive police misconduct was the *cause* of his confession.[8] *See, e.g.*, *Connelly*, 479 U.S. at 164 ("Absent police conduct *causally related* to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.") (emphasis added); *id.* at n.2 (noting that "[e]ven where there is causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a violation of the Due Process Clause" because of the "crucial element of police overreaching"); *Holland v. McGinnis*, 963 F.2d 1044 (7th Cir. 1992) (noting an involuntariness claim requires proof of improper coercion and causation). There is no causal chain here: Ji's motion contains no facts suggesting the coercion (the purported Chinese law requiring cooperation) *caused* him to make his statements.

---

[8] To the extent Ji is arguing more generally that his statement was involuntary because China is a repressive regime, this claim also fails. First, he has not alleged causation for this claim either. Second, this claim is even more vague and conclusory with indefinite and conjectural allegations about oppression and no specific facts or data about the nature or circumstances of oppression.

Even if Ji made such allegations, they would be contradicted by the video. The recorded conversations between Ji and the UC make clear that Ji believed the UC to be a co-conspirator in the MSS and that Ji was making statements to the UC in an effort to assist the conspiracy. That is why, for example, Ji was at such ease during the conversation and why he volunteered, without prompting, to gather additional information for the intelligence service, such as photos of aircraft carriers. At no point during these recorded conversations did Ji exhibit any signs of duress or compulsion.

Separately, Ji's motion does not contain specific, detailed allegations about the obligations Chinese laws impose. The motion does not point to specific text or interpretations of such text. Importantly, it contains no declaration from an expert in Chinese law supporting Ji's allegations, and publicly available declarations available online contradict Ji's interpretation.[9] For example, an expert who filed a declaration before the Federal Communications Commission explained that, contrary to Ji's claims, China's National Intelligence Law does not require cooperation that would contradict the legitimate rights and interests of persons, would violate the laws of another country, or if the person is outside China. Chen & Fang Declaration at 6. Even in the article cited by Ji, the author explained it is "unclear" whether the

---

[9] *See* Declaration of Jihong Chen and Jianwei Fang, Before the Federal Communications Commission (May 27, 2018), available at https://thechinacollection.org/wp-content/uploads/2019/03/Huawei-Declaration.pdf (Chen & Fang Declaration).

National Intelligence Law compels persons to cooperate with intelligence officials.[10] In short, even if Ji could establish that he subjectively believed he was required to cooperate with the UC pursuant to Chinese law, he cannot establish that his purported belief about the Chinese law was objectively reasonable.

In sum, Ji has not alleged *any* facts—much less the necessary "definite, specific, detailed" facts required—that would show that his statements to the UC were the result of compulsion. His motion should be denied due to his failure to establish a prima facie case of involuntariness.

## II.  JI CANNOT ESTABLISH THE REQUIRED COERCIVE POLICE MISCONDUCT

Even if Ji had shown a subjective belief of compulsion that was caused by some Chinese law, his motion still fails because it does not allege any coercive government misconduct.

In *Connelly*, the Supreme Court held that coercive police activity is "a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." 479 U.S. at 167. Where the police do not create the claimed duress (in *Connelly*, mental illness; here, any purported knowledge by Ji of Chinese law requiring him to speak to state security officials), the statements are not the product of coercive government misconduct and therefore voluntary.[11] *See also Rice v. Cooper*, 148 F.3d 747, 750-51 (7th Cir. 1998)

---

[10] Murray Scot Tanner, Beijing's New National Intelligence Law: From Defense to Offense, Lawfare, *available at* https://www.lawfareblog.com/beijings-new-national-intelligence-law-defense-offense.

[11] Courts have repeatedly applied *Connelly*'s rationale to admit statements made as a result of conditions external to governmental misconduct. *See Stechauner v. Smith*, 852 F.3d 708,

(explaining that the police's lack of knowledge about the defendant's characteristics showed a lack of police abuse and defeated claim of involuntariness). In other words, simply the existence of a factor that may have compelled the defendant to confess is insufficient.

Ji does not allege *any* misconduct on the part of U.S. law enforcement. It is undisputed that law enforcement, including the UC, did not threaten him. Like in *Connelly* and subsequent cases, there is no indication here that FBI agents made use of some external factor (the supposed Chinese laws) to compel Ji to make statements—or were even aware of those purported laws. Neither the UC nor the FBI agents referenced the law or suggested Ji had to answer their questions because of the law. Indeed, the opposite is true—the UC went so far as to tell Ji, "You must be willing on your own terms. If you do not want to, we cannot force you." And at no point did Ji express to the UC that he felt he was under duress or felt compelled to respond to the questions. Ji's claim is like that of Connelly: he argues he did not act of free will because a factor extrinsic from governmental conduct (Chinese laws here, mental illness in *Connelly*) compelled him to speak to the police. But the Supreme

---

718 (7th Cir. 2017) (rejecting defendant's claim that his confession was involuntary because he was on narcotic pain medication at the time of the confession; defendant did not cite any "coercive interrogation tactic" the officers used, such as administering the drugs or giving him drugs against his will); *United States v. Hurt*, 92 F.3d 1188 (7th Cir. 1996) (unpublished) (noting that, although police were aware of defendant's limited mental capacity, they did not subject defendant to "improper interrogation techniques designed to take advantage of her mental capacity"); *Thomas v. Parke*, 139 F.3d 902 (7th Cir. 1998) (defendant had not even alleged coercive police tactics and "must show more than mere intoxication to succeed on a voluntariness claim").

Court has made clear that this claim must fail because its catalyst was not governmental misconduct.

*United States v. Lawal,* 231 F.3d 1045 (7th Cir. 2000), is analogous. There, the defendant claimed his confession to American police should have been suppressed in part because "he comes from a country where he would have been beaten or tortured if he did not comply with police demands." *See id.* at 1048. The Seventh Circuit rejected this claim because a defendant's "personal characteristics," including some hidden concern about a foreign country's practices, standing alone were insufficient to show involuntariness; the necessary predicate of coercive police activity was missing. *See id.* The police, in questioning the defendant, had not invoked the purported foreign country's practices. Here, like in *Lawal*, Ji claims that his country required compliance with the demands of state security officials. And like in *Lawal*, Ji's claim must fail because he has not cited any coercive police misconduct.[12]

Ji likely will argue that the government put into place the specific ruse used by the UC. There are two problems with this argument. First, the fact of government involvement, by itself, is sufficient to create governmental misconduct. In *Lawal*, for example, the government used police officers to question the defendant, and the defendant claimed his fear was based on his country's practices with respect to police officers. Although there was this connection between the claimed fear and the governmental conduct, that was insufficient because the government had not

---

[12] This case presents an even less substantial claim of involuntariness. *Lawal* involved a custodial interrogation, which has some level of inherent coercion. Not so here.

engaged in any abusive practices, such as threats or promises, or invocation of the foreign country's practices. The same is true here: although there is a connection between the government's conduct the defendant's claimed fear, this connection is insufficient without some abusive practice.

Second, a ruse is permissible, especially in a non-custodial setting. *See, e.g.*, *Dassey v. Dittmann*, 877 F.3d 297, 304 (7th Cir. 2017) ("In several cases, the [Supreme] Court has held that officers may deceive suspects through appeals to a suspect's conscience, by posing as a false friend, and by other means of trickery and bluff."); *United State v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001) ("Nothing is more common in the noncustodial setting of police investigations than for an undercover police officer to extract a damaging admission from a criminal suspect simply by pretending to be another criminal."). And, by definition, a ruse can involve misrepresentations about the government agent. The Seventh Circuit could not have been clearer that government involvement of this type doesn't create involuntariness: "[M]isrepresentations, of course, may cause a suspect to confess, but causation alone does not constitute coercion." *See Holland v. McGinnis*, 963 F.2d 1044 (7th Cir. 1992). Because the Fifth Amendment functions to curb abusive police practices, a prerequisite is an abusive practice. *Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) (the Constitution is "aimed not at protecting people from themselves but at curbing abusive practices by public officers"). And there were no abusive methods employed here. No threats or promises were made, including no representations about what any Chinese law may or may not require.

17

### III. THE TOTALITY OF CIRCUMSTANCES SHOW JI'S STATEMENTS WERE VOLUNTARY

The fact that Ji was not coerced by law enforcement officials is further demonstrated by the content of the recorded meetings with the UC.[13]

As an initial matter, Ji was not in custody during any of the three UC meetings. In addition to meaning that he did not need to be advised of *Miranda* rights, *see Kontny*, 238 at 817, the fact that Ji was not in custody means that "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present." *Illinois v. Perkins*, 496 U.S. 292 (1990); *see also Kontny*, 238 F.3d at 817 (explaining "the fact that the [defendants] were not in custody has a broader significance" because it is not an "inherently intimidating situation"). That is, there is no "presumption of coercion," unlike in a custodial setting. *United States v. Khomutov*, No. 18 CR 00400-1, 2020 WL 1304834, at *7 (N.D. Ill. Mar. 19, 2020).

The result is that non-custodial meetings present a high bar for exclusion. *See Dassey v. Dittmann*, 877 F.3d 297, 304 (7th Cir. 2017) ("The Supreme Court has not found that police tactics not involving physical or mental exhaustion taken alone were sufficient to show involuntariness."). Ji has not cited a single case in which non-custodial statements to an undercover government agent were suppressed, and the government has not been able to locate one. *Cf. United States v. Walker*, 760 F2d 144 (7th Cir 1985) ("Statements obtained in the course of undercover investigations

---

[13] Ji is not entitled to a hearing because there are no disputed issues of material fact. *See United States v. Greve*, 490 F.3d 566, 572 (7th Cir. 2007). The UC meetings were recorded and there are no disputes about what occurred. The undisputed facts show no coercive police activity was undertaken at the meetings. On his subject beliefs and causation, Ji failed to put in facts to make his prima facie case, so no disputed facts exist there as well.

generally do not fall within the traditional protection of the Fifth Amendment");
*United States v. Williamson*, No. 1:06CR474, 2011 WL 5836258, at *5 (M.D.N.C. Nov.
21, 2011), *aff'd*, 706 F.3d 405 (4th Cir. 2013) ("Finally, courts have routinely rejected
Fifth Amendment challenges to the government's use of informants and undercover
agents. When a suspect or defendant is unaware that he is speaking to a government
agent, there is no inherent 'compulsion' or 'coercion[.]'").

In addition, Ji's age, education, intelligence level, and mental state, the nature
of the conversations with the UC, and the lack of any threats or physical pressures
all prove that his statements were voluntary. *United States v. Huerta*, 239 F.3d 865,
871 (7th Cir. 2001) (identifying these as relevant to voluntariness). Ji was
approximately 26 years' old during the meetings. He was not a child or a young adult
who could be easily manipulated. He did not have a limited mental capacity. He was
highly educated in a complex, technical field, and was able to engage in highly
sophisticated rational thought. Although Ji does not appear to have had extensive
contact with the criminal system, his actions show a sophisticated understanding of
how law enforcement operates and the capability to assess and mitigate risks: He
attempted to hide his criminal activities by setting up false online accounts,
encrypting files, and disguising the files. These unique characteristics further
support that Ji's conduct with the UC was voluntary.

The characteristics of the meetings also are consistent with voluntariness. The
meetings took place in the middle of the day, in a public place, and were brief—all
lasted less than 90 minutes. The UC did not raise his voice and posed many open-

ended questions. The meeting was conversational throughout. And, there were no threats or promises of leniency. It is apparent Ji was at ease; his body language showed comfort as did his jovial attitude, including laughter at various points. *See Dittman,* 877 F.3d at 304 (factors indicating voluntariness included "[t]he interrogation took place in a comfortable setting, without any physical coercion or intimidation, without even raised voices, and over a relatively brief time. Dassey provided many of the most damning details himself in response to open–ended questions."). Notably, Ji agreed to meet with the UC three different times over the course of five months, hardly a sign of compulsion. Ji never went to law enforcement to complain that he was being targeted by an oppressive regime, nor did he report these contacts with a foreign power to his military commanding officers. Instead, he repeatedly suggested information he could obtain, and volunteered, without prompting, to undertake additional efforts on behalf of the Chinese intelligence services. These are clear indications that Ji believed he was volunteering to assist his co-conspirators, rather than being compelled to speak to a security official.

## CONCLUSION

For the reasons set forth above, the government requests that the Court deny defendant's motion to suppress the statements to the UC.

Respectfully submitted,

JOHN R. LAUSCH, Jr.
United States Attorney

By:   <u>/s/    Vikas Didwania   </u>
VIKAS DIDWANIA
BARRY JONAS
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604

Dated: August 12, 2021