## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | 18 CR 611 |
| | ) | Judge Ronald A. Guzman |
| v. | ) | |
| | ) | |
| JI CHAOQUN | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION
## TO SUPPRESS STATEMENTS MADE TO AN UNDERCOVER AGENT

Defendant, **Ji Chaoqun**, by and through his attorneys, **the Law Office of Damon M. Cheronis**, respectfully submits the following reply in support of his motion to suppress any and all statements made during the course of his meetings and involvement with an undercover agent, including meetings that occurred on April 25, 2018, May 17, 2018, and September 25, 2018.

## I.      Background

On June 4, 2021, Mr. Ji, through counsel, filed a motion to suppress statements made to an undercover agent. Dkt. # 144. This motion was predicated on the fact that, in summary, the United States government sent an undercover agent to engage Mr. Ji by posing as a long-term overseas asset of the Ministry of State Security ("MSS"), the intelligence, security, and secret police agency of the People's Republic of China ("PRC"). Through this ruse, the United States cloaked itself in the guise of a government it publicly condemns as brutal and authoritarian in an attempt to extract information from Mr. Ji, and by directing veiled threats to him, it deprived Mr. Ji of the right to voluntarily refuse to answer questions. Specifically, the ruse involved having its agent pose as a

Chinese intelligence operative conducting a covert investigation to determine the "leak" responsible for the international embarrassment that was the arrest of one of its high ranking intelligence officers by its chief rival in which Mr. Ji was cast as a prime suspect. Mr. Ji's statements to the undercover agent were involuntary because black letter Chinese law is abundantly clear that its citizens have no right to voluntarily refuse to answer questions in such a situation. Moreover, above and beyond black letter law, the practical ramifications of non-compliance are obvious: deprivation of liberty and/or property, bodily injury, torture, and even the possibility of death to the individual and/or his or her family.

The government filed its response in opposition on August 12, 2021. Dkt. # 177. Though it based its arguments primarily on factual disagreements with Mr. Ji's version of events, it asked that the Court deny the motion without the aid of an evidentiary hearing. Counsel hereby submits the following reply on Mr. Ji's behalf in order to address the points and arguments raised by the government in its response.

II.     Discussion

A.  **Factual Correction Regarding a Statement the Undercover Agent Made to Mr. Ji on September 25, 2018.**

The government's response contains a very significant and inaccurate factual claim regarding statements made between the undercover agent and Mr. Ji on September 25, 2018 that requires immediate correction.

As the transcripts attached to its response at Dkt. # 177-3, pp. 23-24 Bates 1A-CRIM_001-0000035-36 indicate, the undercover agent engaged Mr. Ji in speculative talk regarding future employment he could seek after obtaining a security clearance and completion of his Army service.

The undercover stated, "[w]hat would you like to do? You think, for example, Mr. Cha knows, what do you think you can help them with? Help Mr. Cha and the country? . . . . What kind of job you can do to help them?" . . . Do you think; what type of job would you be able to provide specific assistance to the nation?" Mr. Ji then engages in the speculation and provides a few examples, but then states in answer to the last question, "I do not know because it is very difficult to gain access to this type of information. My current situation, it is tough to get information."

The following exchange then occurs:

UC      You are willing to help us to...

JI      Yes, I am willing.

UC      *Okay, okay.* But [we] must wait until you are done with *training*. You apply for jobs and they hire you, and then you will be able to see information.

JI      Yes, right.

UC      Because we cannot force you to work.

JI      [Chuckling] I know.

UC      **You must be willing on your own terms. If you do not want to, we cannot force you. You must be willing.** So, *okay*, if you go to *FBI* or *NASA*, if you are *engineering*, engineering, you may be in contact with high-tech *information*.

At one point in its brief, the government cited *only* the bolded portion of this exchange and claimed it as the undercover agent telling Mr. Ji that whether Mr. Ji wished to answer his *questions* was Mr. Ji's own, voluntary choice. Dkt. # 177 p. 15. In its words: "[n]either the UC nor the FBI agents referenced the law or suggested [Mr.] Ji had to answer their questions because of the law. Indeed, the opposite is true—the UC went so far as to tell [Mr.] Ji, '[y]ou must be willing on your own terms.

If you do not want to, we cannot force you.'" *Id.* This claim was despite the fact that the government itself acknowledged the actual context of the exchange when providing an introductory factual recitation of the events of the third undercover meeting. *See* Dkt. # 177 p. 9.

As the foregoing demonstrates, the claim that this comment was in reference to the questioning by the undercover agent that the defense is seeking to suppress on voluntariness grounds is entirely inaccurate. The context makes abundantly clear that the undercover's comment was made well into the third and final meeting in reference to speculative, future employment Mr. Ji might seek—which is not at all relevant to this motion—and not about answering the undercover's questions, as Mr. Ji had begun doing some five months prior.

### B. The PRC Requires All Citizens to Support, Assist, and Cooperate with National Intelligence Efforts as a Matter of Black Letter Law and Through Extra Legal Means.

The Department of Justice has formally accused Huawei, its corporate officers, and its corporate subsidiaries of being a criminal organization—of being complicit in PRC economic espionage activities. Those entities are formally under indictment for a vast array of charges, including engaging in a RICO conspiracy and a conspiracy to steal trade secrets.[1] As described in the Department of Justice press release announcing the return of a third superseding indictment, those charges "relate to the alleged decades-long efforts by Huawei, and several of its subsidiaries, both in the U.S. and in the People's Republic of China, to misappropriate intellectual property, including from six U.S. technology companies, in an effort to grow and operate Huawei's business."[2]

---

[1] *See United States v. Huawei Technologies, Co., Ltd.,* 18 CR 457 Dkt. # 126 (E.D.N.Y. 2020).
[2] *See* https://www.justice.gov/opa/pr/chinese-telecommunications-conglomerate-huawei-and-subsidiaries-charged-racketeering (last accessed August 18, 2021).

Not only has Huawei been accused by the government of being a criminal organization, but as will be discussed, it has also been formally found by the Federal Communications Commission and other executive agencies to constitute a national security threat based largely on those agencies' interpretation of Chinese national security law and practice. It is as unpersuasive as it is shocking, then, that the government would come to rely on the conclusions of Huawei's legal experts—claims that were resoundingly rejected both in the proceedings they were offered and amidst the wider public discourse—in an effort to adopt its view and argue, in summary, that those laws do not really compel Chinese citizens to cooperate in the country's national security efforts in the way Mr. Ji and counsel claim. *See* Dkt. # 177 p. 13. This point will be returned to very shortly.

First the government's claim that Mr. Ji's motion "does not contain specific detailed allegations about the obligation Chinese laws impose [and it] does not point to specific text or interpretations of such text" stands in need of correction. *Id.* Even a cursory glance at pp. 15-17 ¶ 25-29 of the suppression motion (Dkt. # 144) suffices. As is plain and evident, the motion cites the July 1, 2015 State Security Law, and even more specifically to Chapter One, Article 13, Chapter Six, and Article 77. Furthermore, the motion cites to the Criminal Procedure Code, as amended March 14, 2012, including Articles 118 and 123. And, of course, the motion cites to the National Intelligence Law passed on June 27, 2017. The subsequent paragraphs of the brief then contained precisely what the government claims was omitted—public discussion and interpretation of those provisions of Chinese law.

In any event, to offer its purported contrary interpretation that Chinese law does not, in fact, compel compliance with its policing and security agencies, as noted above, the government relied

upon the Declaration of Jihong Chen and Jianwei Fang submitted to the FCC on May 27, 2018.

Dkt. # 177 p. 13. In that declaration, on behalf of Huawei, those individuals acknowledged the text

of Articles 7 and 14 of the National Intelligence Law:

> **Article 7**: Any organization or citizen shall, in accordance with the law, support, assist
> and cooperate with national intelligence work, and keep confidential the secrets of
> national intelligence work that come to its or his/her knowledge. The State shall
> protect individuals and organizations that support, assist and cooperate with national
> intelligence work.

> **Article 14**: A National Intelligence Work Agency may, when carrying out intelligence
> work pursuant to the law, require relevant organs, organizations and citizens to
> provide necessary support, assistance and cooperation.

*Id.* at p. 30 ¶ 70. The declarants and now the government claim that these provisions do not require

mandatory assistance to Chinese government intelligence efforts because of Article 8, Article 19,

and Article 31 of the same law. *Id.* ¶ 71. In their words:

> Article 8 provides that national intelligence work "shall . . . respect[] and safeguard[]
> human rights, and safeguard[] the legitimate rights and interests of individuals and
> organizations." Likewise, Article 19 provides that "[a] National Intelligence Work
> Agency and its staff members shall not . . . infringe upon the legitimate rights and
> interests of citizens and organizations." Should the national intelligence agencies and
> their staff infringe on the legitimate rights and interests of citizens and organizations,
> Article 31 provides that such actions are to be disciplined by the law, including
> subject to criminal prosecution.

Thus, they concluded that "the National Intelligence Law does not authorize the national

intelligence agencies to compel a telecommunication equipment manufacturer to plant backdoors,

eavesdropping devices or spyware, as such an act would infringe the manufacturer's legitimate rights

and interests." *Id.* ¶ 72.

As an overview, Huawei began attracting the attention and scrutiny of the U.S. government as a potential security risk as early as 2011.[34] In October 2012, the U.S. House Permanent Select Committee on Intelligence (HPSCI) published a report finding that "Huawei . . . cannot be trusted to be free of foreign state influence and thus pose[s] a security threat to the United States and to our systems." *Id.* (citing HPSCI Report at vi-vii).

In late 2017, members of Congress expressed apprehension about "Chinese espionage" and "Huawei's role in [it]" to then-Chairman of the FCC, Ajit Pai.[5] Mr. Pai's reply conveyed "share[d] . . . concerns about the security threat that Huawei . . . pose[s] to our communications networks."[6] He promised to take "proactive steps" to "ensure the integrity of the communications supply chain. . . in the near future." *Id.*

Shortly thereafter, in 2018, Congress passed the National Defense Authorization Act for Fiscal Year 2018 (NDAA), which barred the Defense Department from procuring telecommunications equipment produced by Huawei.[7] The 2019 NDAA subsequently prohibited all executive agencies from obtaining equipment from Huawei expressly, as well as contracting with

---

[3] *See* Mike Rogers & C.A. Dutch Roppersberger, HPSCI, Investigative Report on the National Security Issues Posed by Chinese telecommunications Companies Huawei and ZTE iv (2012), *available at* https://tinyurl.com/82tbt9rh (last accessed August 17, 2021).

[4] Much of the foregoing background information is derived from the recent Fifth Circuit opinion denying Huawei's challenge to the FCC Rule, *Huawei Technologies USA, Inc. et al. v. FCC*, 2 4th 421 (5th Cir. 2021).

[5] Letter from Tom Cotton et al., Members, U.S. Congr., to Ajit Pai, Chairman & Commiss'r, FCC (December 20, 2017), *available at* https://tinyurl.com/yx6xp217 (last accessed August 17, 2021).

[6] Letter from Ait Pai, Chairman, FCC, to Tom Cotton, Sen., U.S. S. (March 20, 2018), https://tinyurl.com/u2verd9 (last accessed August 17, 2021).

[7] *See* Pub. L. No. 115-91, § 1656(b)(1), (c)(3)(A), 132 Stat. 1283, 1762 (2017).

entities that use it, or using loan or grant funds to obtain it.[8] At the same time and subsequently, former President Donald Trump issued executive orders enacting similar restrictions.[9]

Against this backdrop, the FCC issued a Notice of Proposed Rulemaking on April 18, 2018 titled "In the Matter of Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs."[10] In short, the proposed rule sought public comment on the prohibition of public funds "to purchase equipment or services from any communications equipment or service providers identified as posing a national security risk to communications networks or the communications supply chain." 33 FCC Rcd. At 4058. The Rule also adopted a process for designating "covered companies" as national security threats that involved an initial finding by the Public Safety and Homeland Security Bureau, a comment period, and a final designation. *See Huawei Technologies USA, Inc.*, 2 F.4th at 430. Huawei was initially designated as a national security threat barred from receiving public funds.[11]

Huawei vehemently opposed this rule and its designation. It did so by, among other things, submitting all manner of materials, including expert reports, comments, reply comments, and *ex partes*.[12] The wider Huawei defense materials included the purported expert affidavit the government

---

[8] *See* Pub. L. No. 115-232, ¶ 889(a)-(b), (f)(3)(A), 132 Stat. 1636, 1917-18 (2018).

[9] *See* Exec. Order No. 13873, 84 Fed. Reg. 22,689 (May 15, 2019); Exec. Order No. 13913, 85 Fed. Reg. 19,643 (April 4, 2020).

[10] Notice of Proposed Rulemaking in the Matter of Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs, FCC 18-42, WC Docket No. 18-89, 33 FCC Rcd. 4058.

[11] *See, e.g.*, Final Rule in Supply Chain Rulemaking; Huawei Designation; ZTE Designation, 85 Fed. Reg. 230-01 (Jan. 3, 2020) (47 C.F.R. pt. 54)

[12] *See, e.g.*, Designation Order in Supply Chain Rulemaking — Huawei Designation, PS Docket No. 19-351, 35 FCC Rcd. 6604, 2020 WL 3566005, ¶ 45 (released June 30, 2020) (hereinafter "Final Designation Order"). A copy of this order is attached hereto as Exhibit A.

is now relying on. As the FCC Final Order described, Huawei argued "that the Commission relied on unsupported conclusions about Chinese law that ignored Huawei's multiple expert submissions." *Id* at ¶ 5.

The FCC's response in opposition to this position and ultimate findings were nothing short of scathing. As it summarized, "[t]he Chinese National Intelligence Law entrenched the already unwritten understanding that Chinese companies and their employees are required to comply with government orders in the area of national intelligence work." *Id*. at ¶ 21.

The detailed commentary and findings began by recognizing that Article 7 of the National Intelligence Law "on its face obligates 'all organizations and citizens' to 'support, assist, and cooperate with national intelligence efforts in accordance with law' and to 'protect national intelligence work secrets' without any apparent limitation on the type of assistance the Chinese government may demand." *Id* ¶ 22. It continued by noting that, "[i]n a similar vein, Article 14 of the Chinese National Intelligence Law allows Chinese intelligence institutions to request that Chinese citizens and organizations provide necessary support, assistance, and cooperation, while Article 17 permits those intelligence institutions to commandeer an organization's facilities." *Id*. The language of the law, coupled with "a lack of geographic limitation in scope, suggests, by a literal interpretation, an 'unusually broad scope of application.'" *Id*. (internal citations omitted). In fact, "Article 11 of the Chinese National Intelligence Law specifies that Chinese state intelligence agencies may launch intelligence initiatives both within and beyond Chinese borders." *Id*. (internal citations omitted). Thus, it concluded that "the Chinese National Intelligence Law, through its broad application, could reasonably permit the Chinese government and its intelligence agencies to

compel [organizations and citizens] to carry out its directives in cyberespionage or other actions contrary to U.S. national security interests." *Id.*

Still not yet finished, the FCC went on to directly refute many of Huawei's claims in defense of a narrow interpretation of the NIL. It noted that any refusal to a request for assistance from Chinese intelligence "would likely be futile in light of the Chinese government's authoritarian nature, lack of sufficient judicial checks, and its history." *Id.* ¶ 23. Those include the fact that Chinese courts are beholden to the Communist Party, which, as the Chief Justice and President of the Supreme People's Court of China has cautioned, "must firmly resist the western idea[s] of constitutional democracy, separation of powers, and judicial independence." *Id.* (internal citations and quotations omitted). And equally important, ""[i]ndependent oversight bodies over state security organs that citizens and enterprises might turn to if they receive undue requests for cooperation are de facto non-existent." *Id.*

The government's stated position in relation to this motion aside, other executive branch agencies have already recognized the same principles. One such example includes the United States Department of Commerce and the National Telecommunications and Information Administration and its June 9, 2020 letter submitted to the FCC.[13] In that letter, it noted the "Executive Branch . . . fully supports the Commission's initial designation of [Huawei and ZTE Corporation] [as national security threats], and that "the Executive Branch agrees that the companies' ties to the government

---

[13] *See* Letter from Douglas W. Kinkoph, Associate Administrator, Office of Telecommunications and Information Applications, National Telecommunications and Information Administration, to Ajit Pai, Chairman, Federal Communications Commission filed June 9, 2020 (NTIA Letter), *available at* https://tinyurl.com/26ps3z36 (last accessed August 17, 2021). A copy is attached hereto as Exhibit B.

of the [PRC], 'along with Chinese laws obligating them to cooperate with any request by the Chinese government to use or access their system, pose a threat to the security of communications networks . . . .'" *Id* pp. 1-2.

The NTIA letter—making formal representations regarding Executive Branch opinion—went on to state that the NIL and the Cybersecurity Law [CL], in particular:

> impose affirmative legal responsibilities on PRC and foreign citizens, companies, and organizations operating in China to provide access, cooperation, and support for the government's intelligence gathering activities. For example, Article 7 of the NIL states, "[a]ll organizations and citizens shall support, assist, and cooperate with national intelligence efforts in accordance with law, and shall protect national intelligence work secrets that they are aware of." Article 14 declares that PRC intelligence organs "may request that relevant organs, organizations, and citizens provide necessary support, assistance, and cooperation." Article 16 expressly allows Chinese intelligence organs to enter companies' restricted areas and collect files at will. Article 17 goes even further, providing that intelligence services may "have priority use of, or lawfully requisition, state organs', organizations' or individuals' transportation or communications tools, premises and buildings; and when necessary, they may set up relevant work sites, equipment, and facilities." The law provides no ability, check, or balance for companies or individuals to refuse these requests. The law leaves most terms undefined, allowing for arbitrary interpretations that suit the interests of the CCP.

*Id*. at p. 2. (internal citations omitted). It then summarized its position by stating that, "[t]aken together, these laws empower the PRC government to make extensive, affirmative demands on Chinese companies and their officers and employees to advance the CCP's intelligence gathering interests." *Id*. Like the FCC, it recognized the judiciary's "lack[ ] of independence and power to check the demands of the government or the CCP" and other extra-legal means through which it compels compliance with its demands. *Id*. at 3.

RWR Advisory Group LLC[14] issued an extensive report in 2019 discussing the same issues.[15] This report was frequently cited and credited by the FCC in its final order, and most notably, spoke extensively about the Chen and Fang affidavit the government significantly replied upon in its brief (*see* Dkt. # 177 p. 13). First of all, as to the NIL itself, the RWR report drew the same conclusions as virtually every other informed commentator, which it summarized as follows:

> This law in effect only codifies common practice in an increasingly totalitarian regime. Even before current CCP Secretary General Xi Jinping came to power, it would have been difficult for a Chinese citizen to turn down a request for cooperation from the PRC intelligence apparatus. With Xi's centralisation of CCP power, and in an atmosphere of constant struggle against "hostile foreign forces" refusing cooperation becomes all but impossible, regardless of the actual letter of applicable laws.[16]

But as to the Chen and Fang affidavit, the RWR Report's conclusions could not have been blunter, and are worth reciting in full:

> As the Law became so widely used as validating concerns that had previously been based only on an implicit understanding of the way things work in China, the CCP and Huawei ultimately saw it necessary to refute its applicability to the company. It has done so via a recycled May 2018 legal opinion, signed by a CCP member and issued by Zhong Lun Law Firm, that disputes what is stated explicitly in the law. As also noted by Sinopsis[:]
>
>> "The opinion, from May 2018, was prepared by Zhong Lun Law, a well-known legal practice whose founding and managing partner and deputy Party secretary Zhang Xuebing, has also brought his qualities as an 'outstanding Party member' to his

---

[14] Founded in 1985, RWR Advisory Group LLC is "a Washington, DC-based research, analysis, and advisory firm that specializes in tracking and assessing the risk and threat implications of foreign state-owned or state-controlled enterprises." *See* https://www.rwradvisory.com/about/ (last accessed September 4, 2021).

[15] *See* RWR Advisory Group, Assessing Huawei Risk: How the Track Record of the CCP Should Play into the Due Diligence of Huawei's Partners and Customers (May 2019), *available at* https://www.rwradvisory.com/wp-content/uploads/2019/05/Assessing-Huawei-Risk.pdf (last accessed August 17, 2021). A copy is attached hereto as Exhibit C.

[16] *Id.* at 24 (quoting Lawfare by Proxy: Huawei touts "Independent" legal advise by a CPP member," Sinopsis, February 8, 2019, *available at* https://sinopsis.cz/en/lawfare-by-proxy-huawei-touts-independent-legal-advice-by-a-ccp-member/ (last accessed August 17, 2021). The RWR report also recognized that "Article 11 [of the NIL] specifies that the law's powers are not limited to Chinese soil."

positions at the All-China Youth Federation (ACYF), a United Front organisation led by the CCP Youth League. The opinion for Huawei was coauthored by a CCP member, Chen Jihong. It is worth remembering that Chinese lawyers who openly challenge the CCP's views face disbarment, imprisonment and torture."

Another analysis from Sinopsis delved into the questions raised regarding the special status that Huawei must have to get away with promulgating a legal opinion that directly challenges such an important law.

"Again the proper context for such a document risks being lost in translation: contradicting the official Party line on matters of national security would be suicidal for a normal lawyer in a legal system where such behaviour routinely leads to disbarment, imprisonment and torture; an analysis at odds with the official line would be even more unlikely to come from the authors of the pro-Huawei document, one of whom has received a distinction as an 'outstanding lawyer Party member.' Huawei had the CCP-linked legal opinion reviewed by Clifford Chance, an international law firm with extensive operations in China, whose endorsement of it came with a disclaimer explicitly rejecting its construal as a "legal opinion on the application of PRC law.' While keeping the document confidential, Huawei officers including its top executives in Poland and the Czech Republic took to citing the document as an 'independent legal opinion' by a British firm."

*Id.* pp. 24-25 (internal citations omitted). Instead, and again, not only the FCC and other executive branch agencies, but practically every informed and unbiased commentator has reached the same conclusion.[17] The point is overwhelmingly clear and beyond credible dispute: no Chinese citizen has

---

[17] *See, e.g.,* Murray Scot Taner, Beijing's New National Intelligence Law: From Defense to Offense, Lawfare, *available at* https://www.lawfareblog.com/beijings-new-national-intelligence-law-defense-offense (last accessed August 17, 2021); H.R. McMaster, How China sees the world and how we should see China, The Atlantic, *available at* https://www.theatlantic.com/magazine/archive/2020/05/mcmaster-china-strategy/609088/ (last accessed August 17, 2021) ("'[a]ny organization or citizen,' reads Article 7 of China's National Intelligence Law, 'shall support, assist with, and collaborate with the state intelligence work in accordance with the law, and keep the secrets of the national intelligence work known to the public'"); Applicability of Chinese National Intelligence Law to Chinese and non-Chinese Entities, Mannheimer Swartling (January 2019), *available at* https://www.mannheimerswartling.se/app/uploads/2021/04/msa_nyhetsbrev_national-intelligence-law_jan-19.pdf (last accessed August 17, 2021); Finite State Supply Chain Assessment Huawei Technologies Co., Ltd., Finite State, *available at* https://finitestate.io/wp-content/uploads/2019/06/Finite-State-SCA1-Final.pdf (last accessed August 17, 2021) ("it appears clear that for Chinese citizens and companies alike, participation in 'intelligence work' is a legal responsibility and obligation, regardless

a voluntary right to refuse to answer questions when called upon by a member of China's intelligence services to do so.

Beyond the substantive point, the fact that the government disputed the appropriate interpretation of Chinese law underscores the need for the Court to hold a full, evidentiary hearing on the motion. Evidentiary hearings are required "when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion." *United States v. Edgeworth*, 889 F.3d 350, 353 (7th Cir. 2018) (internal citations omitted). The foregoing dispute regarding interpretation of relevant Chinese legal provisions provides just one—albeit substantial—example of factual disputes between the parties. Furthermore, there is significant authority acknowledging the need to resolve foreign law questions through evidentiary hearings.

Rule 26.1 of the Federal Rules of Criminal Procedure provides:

> A party intending to raise an issue of foreign law must provide the court and all parties with reasonable written notice. Issues of foreign law are questions of law, but in deciding such issues a court may consider any relevant material or source—including testimony—without regard to the Federal Rules of Evidence.

A district court's interpretation of foreign law is a question of law that is reviewed *de novo*. *Access Telecom Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 713 (5th Cir. 1999); *Seguros Del Estado v. Scientific Games*, 262 F.3d 1164, 1171 (11th Cir. 2001); *United States v. Mitchell*, 985 F.2d 1275

---

of geographic boundaries"); Arjun Kharpal, Huawei says it would never hand data over to the government. Experts say it wouldn't have a choice, CNBC, March 4, 2019, *available at* https://www.cnbc.com/2019/03/05/huawei-would-have-to-give-data-to-china-government-if-asked-experts.html (last accessed August 17, 2021) (quoting Martin Thorley, University of Nottingham: "[t]he idea of fighting a request of this nature in the courts is not realistic. In truth the law only confirms what has long been true — that one must submit to the Party if called upon").

(4th Cir. 1993) (citing *United States v. One Afghan Urial Ovis Orientalis Blanfordi*, 964 F.2d 474, 476 (5th Cir. 1992)).

"In exercising this discretion, courts have relied on various forms of evidence to interpret foreign law including affidavits by foreign officials and judges, testimony from attorneys practicing law in the foreign country, certified translations of foreign decrees, and foreign law journals." *United States v. Velez*, 2009 WL 10710482 (S.D. Fla. 2009) (citing *United States v. Mitchell*, 985 F.2 1275, 1280 (4th Cir. 1993)).

Ultimately, district courts can rely on and consider "any relevant source [ ] including expert testimony, whether or not such material is admissible under the Federal Rules of Evidence." *Id.* "Questions of foreign law are a matter of fact to be determined after an adversary presentation by the parties." *In re Candiotti*, 729 F. Supp. 840 (S.D. Fla. 1990).

Moreover, contrary to the government's claimed need for an expert affidavit, there are no form requirements in the Northern District of Illinois[18] to the way in which a motion to suppress needs to proffer materially disputed facts to receive a hearing as some other districts demand. *See, e.g.,* Southern District of Texas Local Rule 7.7 ("[i]f a motion or response requires consideration of facts not appearing of record, proof by affidavit or other documentary evidence must be filed with the motion or response"). Rather, Rule 47(b) of the Federal Rules of Criminal Procedure merely *permits* the filing of an affidavit if the movant so desires. While counsel does intend to present the

---

[18] A fresh review of the applicable local rules—both civil and criminal—reveal a specific affidavit requirement exclusively for civil motions for summary judgment, as is required in that context by Fed. R. Civ. P. 56(e); LR 56.1.

testimony of a foreign law expert or experts at the hearing, this showing is more than sufficient to justify a hearing.

Counsel has nonetheless retained Mr. Donald C. Clarke, George Washington University School of Law Professor and expert on Chinese Law, to testify at such a hearing. Professor Clarke's opinion, in brief summary, will be to offer similar conclusions to citizens such as Mr. Ji, as he found applicable to corporations in his own academic piece strongly critiquing the Chen affidavit. *See* Donald Clarke, The Zhong Lun Declaration on the Obligations of Huawei and Other Chinese Companies under Chinese Law, George Washington University Law School, *available at* https://tinyurl.com/4nfcyhks (last accessed August 28, 2021). He has prepared a declaration specifically for this case after his review of Mr. Ji's initial motion and the government's response that is attached hereto as Exhibit D.

### C. The Government's Erroneous Attribution of the Objective Facets of PRC Law to Mr. Ji's Subjective Beliefs.

It was a common refrain in the government's response to erroneously attribute the objective facets of PRC law and the demands it imposes on Chinese citizens as if they are Mr. Ji's own subjective beliefs and nothing more. It claimed at one point, for example, Mr. Ji "did not act of free will because a factor extrinsic from governmental conduct[,] . . . Chinese laws" in this case. Dkt. # 177 p. 15. Thus, it assumed "this claim must fail because its catalyst was not governmental misconduct." *Id*. at p. 16.

It is only by reframing the objective as subjective that the government was able to argue that the situation involved no coercive police conduct. Donning the mask of an authoritarian regime and approaching one of its citizens in conditions such as these, with the legal and practical backdrop

of how it conducts its national security affairs, is precisely the type of action that qualifies as coercive. *See, e.g., Blackburn v. Alabama*, 361 U.S. 199, 206 (1960) ("[a] number of cases have demonstrated, if demonstration were needed, that the efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of 'persuasion'"); *Dassey v. Dittman*, 877 F.3d 297, 304 (7th Cir 2017) (acknowledging that "[i]nterrogation tactics short of physical force can amount to coercion" and that "Supreme Court precedents do not draw bright lines on [what constitutes voluntariness]"). In this sense, the government's argument that Mr. Ji's statements were voluntary because he was an unregistered foreign agent prove irrelevant; that is, foreign agent or not, he had no ability to voluntarily refuse to speak with the undercover agent.[19]

And factually speaking, counsel and Mr. Ji could not disagree more with the government's version of events. Counsel proffers—and expects to establish at a hearing—that Mr. Ji was terrified upon initially being approached by the undercover agent and learning who he claimed to represent. Mr. Ji tried to get out of the situation by bringing up his prior obligations and the Army training he had that evening. The undercover agent persisted, bringing up the private hotel room he had nearby. In light of the pressure, Mr. Ji asked to leave for just a few minutes to handle some errands. He was visibly upset, disturbed, and anxious[20] as he briefly returned to his apartment. Like all Chinese citizens would in this situation, Mr. Ji held a realistic fear that his refusal to speak with the purported Chinese intelligence operative could result in dire consequences for him and his family.

---

[19] Likewise, for the sake of argument, even if Mr. Ji would have voluntarily spoken with the undercover agent about pleasant or benign matters as the government argues, the same cannot be said with regard to the inquisition to discover and assess blame and responsibility for Mr. Xu's arrest.

[20] Counsel is submitting a classified exhibit in support of this proffered fact, which will be marked as Exhibit E.

That all aside, it is equally important to recall that our law does not presume subjective ignorance of the law as the government claims. *See, e.g., United States v. Dobek*, 789 F.3d 698, 699 (7th Cir. 2015) (reiterating that "[o]rdinarily a person is conclusively presumed to know the law"). The government nonetheless placed significant emphasis on the opposite assumption: Mr. Ji "does not allege—and proffers no evidence—that he believed that the UC was a state security officer, as defined by Chinese law; or that he was aware at the time of the UC meetings of one or more of the Chinese state security laws he now cites; or that he believed at the time of the UC meetings that under one or more of these Chinese state security laws, he was required to cooperate with the UC." Dkt. # 177 p. 12.

It is also important to recognize that it is only through this logical misstep of reframing objective realities concerning Chinese communist law and governance as a purely subjective perception of Mr. Ji's that the government could come to rely on *United States v. Lawal*, 231 F.3d 1045 (7th Cir. 2000), unhelpful as it was. Directly to the point, *Lawal* involved a defendant who was in fact harboring subjective delusions about U.S. law enforcement based on his own past experiences as a Nigerian national. *Id.* at 1048. That defendant "built his entire argument around his unique personal characteristics," including the claims that he "did not comprehend his rights because he is not familiar with the American legal system, he was not informed of his right to contact his consul, he suffers from paranoia, and he comes from a country where he would have been beaten or tortured

if he did not comply with police demands."[21][22] *Id.* The only "unique" personal characteristic Mr. Ji is relying upon in a similar vein is his Chinese citizenship, which is not unique at all but places him in a class of well over a billion. And equally important, law enforcement in *Lawal* did nothing to pray on the defendant's vulnerabilities. Here, of course, the government specifically designed a ruse where it assumed the guise of an authoritarian communist regime with the express purpose of exploiting Mr. Ji and leaving him with no choice but to answer questions—had the agents in *Lawal* similarly posed as Nigerian police the result likely would have been different.

### D. A Hearing is Necessary to Resolve Materially Disputed Facts.

By attaching the Chinese language recordings of the meetings, and proffering its deeply contested version of events, the government is essentially asking the Court to resolve material, factual disputes without the aid of all the relevant evidence, testimony, and information it needs to do so, and without the aid of the greatest truth seeking engine our society has at its disposal—the full and efficient functioning of the adversarial system of justice.

---

[21] *United States v. Toro*, 359 F.3d 879, 885 (7th Cir. 2004) is readily distinguishable on similar grounds. There the relevant distinguishing fact was that the defendant grounded his argument in his inability to understand the investigators' questions based upon his own voluntary intoxication. Any allegations of trickery, and the details of his claim was lacking to be sure, but ultimately, it was the failure to allege any actual coercive behavior undertaken by the police that allowed the district court to properly deny his motion without a hearing. *Id.* at 885. Here, again, law enforcement did engage in significantly coercive behavior by donning the mask of an authoritarian regime and approaching one of its citizens with all of the attendant conditions this situation presents, and with the legal and practical backdrop of how the PRC conducts its national security affairs and disciplines those who fail to comply with its demands.

[22] Furthermore, the government's citation to *Rice v. Cooper*, 148 F.3d 747 (7th Cir. 1998) suffers from the exact same misunderstanding—the defendant's subjective features that law enforcement were unaware of in *Rice* included the fact that the were dealing with an "illiterate and mildly retarded" 16-year-old. Here, the defense will demonstrate at hearing—and the government will likely not disagree—that this was a years' long, meticulously planned investigation in which Mr. Ji and his personal characteristics were thoroughly and extensively studied by investigators, and heavily relied upon in the planning and execution of this false flag operation.

Regardless, and fortunately, it is not a difficult showing a defendant needs to make in order to obtain a hearing to vindicate a constitutional deprivation as serious as this one—evidentiary hearings are required "when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion." *United States v. Edgeworth*, 889 F.3d 350, 353 (7th Cir. 2018) (internal citations omitted). It is likewise important to recall that, ultimately, the government bears the burden of establishing voluntariness by a preponderance of the evidence. *United States v. Carter*, 910 F.2d 1524, 1529 (7th Cir. 1990); *see also United States v. Montgomery*, 14 F.3d 1189, 1194 (7th Cir. 1994) ("[a] confession will be adjudged 'voluntary' if the government demonstrates that under the totality of the circumstances and by a preponderance of the evidence that it was not secured through psychological or physical intimidation but rather was the 'product of a rational intellect and free will'") (internal citations omitted).

In this matter, the disputed issues of material fact include, but are not even remotely limited to, the following:

- Establishing the black letter requirements of PRC law, including the fact that it requires citizens to support, assist, and collaborate with all national security and intelligence efforts;
- That application of said laws demand that Mr. Ji answers the undercover agent's questions in this situation had he believed in the ruse;
- That the relevant PRC laws carry "extraterritorial application"; that is, they apply to all Chinese citizens whether they are present in mainland China or the United States such as Mr. Ji;
- That Mr. Ji in fact believed the undercover agent to be a high ranking long term overseas asset of Chinese intelligence based upon the undercover agent's false representations to him;
- The extralegal means through which Chinese intelligence carries out its agenda, including coercion, threat, imprisonment, bodily injury, torture, and death to the individual and/or the individual's family;
- That the government's meticulous planning and strategizing of this operation included extensive investigation, consideration, and utilization of Mr. Ji's individual

psychological characteristics, personality, etc., and that the undercover agent's interactions with Mr. Ji were specifically structured to take advantage of or "exploit" Mr. Ji's personal psychological characteristics;

- That the government's goals it intended to accomplish through an undercover operation included, among other things, exploiting Mr. Ji's alleged relationship with known Chinese intelligence officers, and developing more serious charges against him given the lack of actual behavior consistent with his alleged status as an unregistered foreign agent;[23]

- On scene surveillance agents' observations of Mr. Ji's physical demeanor that will support a finding of involuntariness;

- Mr. Ji's efforts to cancel or at least delay the initial meeting request;

- Evidence regarding Mr. Ji's condition and vulnerabilities on the date of the September 25, 2018 meeting;

- The government's knowledge and exploitation of its awareness that Mr. Ji had no knowledge of his alleged handler's international arrest close to a month prior to the first meeting;

- That Mr. Ji was not "comfortable and relaxed" during the first meeting as the government claims (Dkt. # 177 p. 5);

- The intent, meaning, and implications of the undercover agent's "purpose" for meeting with Mr. Ji, which is vastly more significant than the government acknowledged (Dkt. # 177 p. 5);

- The inaccuracy of the government's claim that Mr. Ji reported flying to China by way of Japan to obscure his travel (Dkt. # 177 p. 6);

- That Mr. Ji did not "volunteer" information in the sense the government claims (Dkt. # 177);

- That Mr. Ji was not "in command" of the conversation during the second meeting as the government claims (Dkt. # 177 p. 6);

- That Mr. Ji did not "voluntarily" bring documents with him to the second meeting (Dkt. # 177 p. 7);

- That Mr. Ji's purported "plan" to join the military and become gainfully employed had nothing to do with Xu Yanjun (as noted in the motion to dismiss, this is a fact the government in part acknowledged before the grand jury) (Dkt. # 177 p. 7);

- That Mr. Ji did not in fact know the reason that Xu Yanjun asked him to obtain the background reports (Dkt. # 177 p. 8);

- That Mr. Ji was not comfortable and relaxed during any of the meetings (Dkt. # 177 p. 8);

- That Mr. Ji did not "volunteer" any information in the sense the government claims during the meetings (Dkt. # 177 p. 9);

---

[23] Counsel is seeking leave to file an under seal exhibit providing additional information corroborating what the defense intends to prove regarding this and the immediately preceding point, which will be marked as Exhibit F.

- That the undercover agent made numerous, repeated threatening statements despite the government's claim (Dkt. # 177 p. 9) that were subtle but clear in implication;
- That the undercover agent did, in fact, allude to the possibility that Mr. Ji was in trouble (legal or extra legal) depending on the responses and information he provided (Dkt. # 177 p. 9), as well as the possibility of positive consequences due to his cooperation; and
- The additional, repeated, and persistent efforts to contact Mr. Ji made by the undercover agent outside of the three meetings.

## III. Conclusion

Based on the foregoing, and as discussed more fully in his initial motion, Mr. Ji, through counsel thus request an evidentiary hearing to resolve this suppression request; and ultimately, that the Court preclude the government from introducing at trial any and all statements made during the course of his meetings and involvement with an undercover agent, including the meetings that occurred on April 25, 2018, May 17, 2018, and September 25, 2018.

Respectfully submitted,

/s/ Damon M. Cheronis
**Damon M. Cheronis**

/s/ Ryan J. Levitt
**Ryan J. Levitt,**
Attorneys for Defendant.

**Law Office of Damon M. Cheronis**
140 S. Dearborn Street Suite 411
Chicago, IL 60603
(312) 663-4644
damon@cheronislaw.com
ryan@cheronislaw.com

## CERTIFICATE OF SERVICE

I, Damon M. Cheronis, hereby certify that on September 17, 2021, I electronically filed the foregoing **Defendant's Reply in Support of his Motion to Suppress Statements Made to an Undercover Agent** with the Clerk of the U.S. District Court for the Northern District of Illinois, Eastern Division, by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Damon M. Cheronis
Damon M. Cheronis
Law Office of Damon M. Cheronis
140 S. Dearborn Street Suite 411
Chicago, Illinois 60603
(312) 663-4644
damon@cheronislaw.com

23