IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America, ) | |
|     Plaintiff, ) | |
| ) | No. 18 CR 611 |
| v. ) | |
| ) | Judge Ronald A. Guzmán |
| Ji Chaoqun, ) | |
|     Defendant. ) | |

### MEMORANDUM OPINION AND ORDER

For the reasons stated below, Defendant's motion to suppress statements he made to an undercover agent [144] is denied.

### STATEMENT

Ji seeks to suppress statements he made during three meetings with an undercover law enforcement agent ("UC"), who was posing as a member of the Chinese intelligence community. The general background facts are as follows. According to the government, its initial investigation of another Chinese intelligence officer, Xu Yanjun,[1] and its knowledge that Ji had lied on background-investigation forms when applying for the U.S. Army MAVNI program, "presented an opportunity to meet with Ji about the details of his efforts to covertly act within the United States as an agent of the Chinese intelligence apparatus," and led the UC to meet with Ji "on three occasions as part of [the government's] ruse." (Gov't's Resp., Dkt. # 177, at 5.) Ji's three encounters with the UC occurred on April 25, 2018; May 17, 2018; and September 25, 2018. Draft transcripts have been provided by the government, and the Court has viewed videotaped recordings of the conversations.

While the parties characterize the facts differently, the following sequence of events appears undisputed. On the afternoon of April 25, 2018, the UC approached Ji outside his apartment in Chicago. The UC, who had never before met Ji, asked Ji if it was convenient to talk. When Ji responded, "I beg your pardon?", the UC stated, "I need to talk to you," and indicated that he had been sent by Ji's "Nanjing friend," to which Ji responded, "Oh, [I] understand now."[2] Ji and the UC then entered the UC's car, at which time the UC said, "I am not sure whether you are aware that the Nanjing friend was caught." Ji responded, "I don't know," and when the UC asked, "[D]o you know whom I'm referring to?", Ji stated, "I am not sure because I know quite a few people in Nanjing." Using his phone, the UC then showed Ji an article about Xu's arrest. Ji stated he was not aware of the arrest but knew who Xu was. The UC

---

[1] Xu was charged and convicted in the Southern District of Ohio with conspiracy to commit economic espionage and trade-secret theft. *United States v. Xu*, No. 18 CR 43 (S.D. Ohio).

[2] The government states that "Nanjing friend" is code for Chinese intelligence. (Gov't's Resp., Dkt. # 177, at 5.)

told Ji that "this is a serious matter. I came here yesterday. I would like to talk to you about it. They asked me to do it." Ji indicated that he had to attend Army training and asked if they could meet later. The UC urged Ji to meet with him, and they drove to a nearby hotel, where they went to one of the guest rooms. They arrived at the hotel at approximately 3:54 p.m. and left at approximately 4:50 p.m.

A hidden video camera captured Ji and the UC's conversation in the hotel room.[3] The UC offers Ji water and tells Ji to take a seat. The UC sits at the desk while Ji sits in the chair next to the desk. The video does not show anyone else in the room. Both parties appear relaxed, though Ji seems curious as to why he is there. The UC asks Ji if he has met Xu before, and Ji responds, "Yes." The UC again shows Ji the news article about Xu's arrest and indicates that he was sent by Zha Yong, "who works with Mr. Xu," to speak with Ji to find out why Xu was arrested and "why the U.S. became aware of him." The UC states:

> We are not sure whether the problem lies with your communication with them. Why the U.S. targeted Mr. Xu. That's why I asked you to let you know that you could stop contacting them for now . . . because we do not know which communication caused it [*i.e.*, the arrest], whether it was the telephone calls or email messages or what. He told us that you contacted them before. That's why I want to find out what caused the problem. Do you think the problem lies with your contacting them?

The UC reiterated on several occasions that "they" were trying to find out "what caused the problem." Ji indicated that he communicated with Zha through WeChat and text and with a "third person" via email. Some of these communications were to exchange holiday greetings only, according to Ji. The UC then asked about Ji's association with the U.S. Army, and Ji described the MAVNI program, indicating that it was the fastest way to attain U.S. citizenship. Ji also stated that he had passed the FBI background check and had been granted top-secret clearance but could not use the clearance until he was granted U.S. citizenship. Ji stated that he has been in communication via WeChat with other Chinese-born citizens in the U.S. Army but had not met them personally. Ji volunteered to the UC that he could enter all military bases with his military ID and could take pictures "freely there." Ji and the UC discussed that Ji would like to go back to China to see his family. The UC gave Ji a cell phone and told Ji to wait for contact from the UC.

The second meeting occurred on May 17, 2018 and lasted approximately 75 minutes. The UC picked Ji up from his apartment and drove him to the hotel, where they again met in a hotel room. The UC asked, "Do you want . . . ?" and Ji stated, "I am okay." Ji presented documents to the UC, who said, "You printed a lot!" and Ji responded, "I did. I have brought pretty much everything here." Ji indicated that the documents show that the U.S. Army applied for his top-secret clearance and found "no issue." Ji also presented documents on the MAVNI program and his enlistment contract and indicated that the U.S. Army only contacted his

---

[3] The Court has viewed the video and audio recordings of each of the three meetings in the hotel room. The men spoke in Mandarin, so the Court has also referred to the draft translations provided by the government.

reference in the United States, not the ones who lived in China. Ji provided additional details about the background information he gave to the U.S. Army, including his trips to China as well as the identity of individuals he contacted while in China, and how those communications were made (i.e., via email or text). In his motion to suppress, Ji notes that the UC told Ji that "Mr. Xu kept a log of their communications [i.e., between Ji and Xu] and that the Jiangsu Province MSS Division Director tasked [the UC] to verify all of the communications Mr. Ji had with Mr. Xu." (Def.'s Mot. Suppress, Dkt. # 144, at 6.) Ji further notes in his motion that the UC asked numerous questions about the steps Ji took to maintain the privacy of the communications with Xu and describes the UC's inquiries in that regard as "accusatory."

The third meeting occurred on September 25, 2018. Ji had just returned to Chicago on a 6:00 a.m. flight from Denver. The UC picked Ji up at his apartment at approximately 9:53 a.m. and they drove to the same hotel where they previously had met. During the car ride, the UC stated that "they have found, they said, they want to ask you if you have used, any device you used when you communicate with them, like USB, computer or cell phone" and said "they" wanted Ji to give the UC any of those devices. At the hotel, the UC asked about the progress of the background investigation and questioned Ji about his communications with Xu and others. Ji also discussed having purchased background reports on certain individuals and having obtained the reports using a false name, and a false address and phone number. Ji further stated during the meeting that he encrypted the background reports and sent them to intelligence officers by email and a chat application, with the false label of "Mid Term Test Questions."

In all three of these meetings, the video recording shows that both the UC and Ji appear composed and unworried. While Ji seemed curious and slightly more formal during the initial meeting, at no time did he seem pressured or uncomfortable. Both Ji and the UC laughed at several points in the meetings. The UC often sat back in his chair as Ji was speaking. Particularly during the second and third meetings, Ji seemed engaged and eager to provide information. The UC never spoke in an aggressive or threatening way, did not accuse Ji of lying, and did not display any weapons. While the UC reiterated the seriousness of determining the source of the leak and ensuring the security of the communications that Ji had with Chinese intelligence agents, the UC did not threaten Ji or his family with any type of harm, legal action, or criminal liability.

**Analysis**

"The Fifth Amendment . . . guarantees that only voluntary statements may be used against defendants, which means that involuntary statements obtained even in a noncustodial setting must be excluded." *United States v. Zambrano*, No. 20 CR 0049, 2021 WL 3709194, at *6 (N.D. Ill. Aug. 21, 2021). To obtain an evidentiary hearing on a motion to suppress, a defendant is required to "'provide sufficient information to enable the court to conclude that a substantial claim [wa]s presented and that there [we]re disputed issues of material fact which w[ould] affect the outcome of the motion.'" *United States v. Greve,* 490 F.3d 566, 572 (7th Cir. 2007) (citation omitted and alterations in *Greve*). Specifically, Ji has "the burden of presenting 'definite, specific, detailed, and nonconjectural facts' to establish that there was a disputed issue of material fact as to the voluntariness" of his statements. *United States v. Toro*, 359 F.3d 879, 885 (7th Cir. 2004).

Ji begins his motion to suppress by stating that "high ranking U.S. officials have publicly denounced [the People's Republic of China] as a grossly authoritarian, oppressive, and abusive government on many occasions." (Def.'s Mot. Suppress, Dkt. # 144, at 1.) Ji goes on to assert that law enforcement sent the UC to pose as a "high-level operative of one of the world's most powerful intelligence agencies—the People's Republic of China's Ministry of State Security" to elicit information from Ji about whether his contacts with Xu could have been the cause of Xu's arrest. According to Ji, the UC "utilized the imprimatur of the Chinese government and tacitly if not explicitly relied on Chinese legal doctrines requiring Mr. Ji to speak to members of the Chinese government." (*Id*., at 2.) Specifically, Ji points to the 2015 State Security Law of the People's Republic of China, which, in relevant part, provides for criminal punishment should an individual violate the law, including by not "providing necessary support and assistance to national security organs, public security organs, and military organs." (*Id*. at 15) (citation omitted). Ji also references the Criminal Procedure Code of the People's Republic of China, which "provides specific obligations for citizens either suspected of a crime or of being a witness to answer relevant questions truthfully when requested." (*Id*.) (citation omitted). Finally, Ji notes that the National People's Congress recently passed the National Intelligence Law of the People's Republic of China which, Ji states, "demands that citizens shall support, assist, and cooperate with the state intelligence network in accordance with the law, and keep secrets of the national intelligence work known to the public." (*Id*.)[4]

From this, Ji contends that:

> as a Chinese citizen, when approached by a purported MSS-affiliate, [he] was compelled to provide any and all information, assistance, and support requested or suffer consequences without parallel in the United States. Thus, given the ruse employed by the FBI, [Ji's] statements were necessarily "compelled" by extrinsic considerations attendant to the interrogation, involuntary within the meaning of the relevant United States' constitutional provisions, and thus, must necessarily be suppressed.

(*Id*. at 17.)

As an initial matter, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Ji points to no police coercion. The recordings reflect that the UC did not mention the above-referenced Chinese laws and did not threaten or coerce Ji. The Seventh Circuit's decision in *United States v. Lawal*, 231 F.3d

---

[4] Ji's reply in support of his motion to suppress statements made to the UC goes into significant detail regarding the laws cited, the Chinese authorities' enforcement of these laws, and how various U.S. governmental agencies have interpreted the effect of these laws on Chinese citizens and companies. While the parties dispute whether the cited Chinese laws actually require the extent of the cooperation and assistance that Ji argues they do, the Court assumes for purposes of this motion that Ji's characterization of the stated Chinese laws is accurate; they still do not require an evidentiary hearing.

1045 (7th Cir. 2000), is instructive. In *Lawal*, the defendant argued that statements he made to the police were involuntary and unknowing in part because "he comes from a country where he would have been beaten or tortured if he did not comply with police demands." *Id*. at 1048. The Seventh Circuit upheld the district court's denial of the defendant's motion to suppress, stating:

> [T]here is no factual basis for a finding that Lawal involuntarily incriminated himself. Lawal fails to allege any misconduct, abuse, or physical or mental coercion by the police who questioned him; instead, Lawal builds his entire argument on his unique personal characteristics. Without showing some official coercion, Lawal's argument fails.

*Id*.

Nor has Ji referred to any subjective belief that he was required to respond to the UC, only asserting that he was "terrified upon initially being approached by the undercover agent and learning who he claimed to represent," and that he initially attempted to evade meeting with the UC. The Court concludes that Ji has failed to point to "'definite, specific, detailed, and nonconjectural facts' to establish that there was a disputed issue of material fact as to the voluntariness" of his statements.

Looking at a totality of the circumstances, including Ji's age (26); his advanced education (Masters' Degree in electrical engineering); the lack of any physical coercion or psychological intimidation; the conversational tone of the meetings[5]; Ji's voluntary printing and provision of numerous documents related to his background check and MAVNI application; the time the meetings occurred (midday), and the fact that Ji voluntarily accompanied the UC to the hotel on each occasion, the Court finds Ji's statements to the UC were knowingly and voluntarily made. *See Lawal*, 231 F.3d at 1048 ("A confession is voluntary if the totality of the circumstances demonstrates that it was the product of rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics calculated to overcome the defendant's free will.").

For these reasons, the motion for an evidentiary hearing and motion to suppress are denied.

**Date**: November 16, 2021

_____
**Ronald A. Guzmán**
**United States District Judge**

---

[5] As indicated, on several occasions during their meetings, Ji and the UC were laughing and appeared comfortable and at ease with one another, and Ji appeared eager to share what information he had.