IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | 18 CR 611 |
| | ) | Judge Ronald A. Guzman |
| v. | ) | |
| | ) | |
| JI CHAOQUN | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S CONSLIDATED RESPONSE
TO THE GOVERNMENT'S MOTION FOR A PROTECTIVE ORDER
<u>PERTAINING TO THE UNDERCOVER AGENT</u>**

Defendant, **Ji Chaoqun**, by and through his attorneys, **Cheronis, Parente & Levitt LLC**, pursuant to the Due Process, Effective Assistance of Counsel, and Confrontation Clauses of the Fifth and Sixth Amendments to the Constitution of the United States, as well as other authority cited herein, respectfully submits his response in opposition to the government's motion "for a protective order pertaining to the trial testimony of undercover employee" (Dkt. # 237), and further requests the Court order the government to immediately produce the discovery materials specified herein, as well as order any other just and appropriate relief.

**I.      Objection to the Government's Ex Parte Presentation**

CIPA's "fundamental purpose" is to "protect[ ] and restrict the discovery of classified information in a way that does not impair the defendant's right to a fair trial. *United States v. al-Jayab*, 16 CR 181, Dkt. # 115 (N.D. Ill. 2018) (Ellis, J.) (quoting *United States v. O'Hara*, 301 F.3d 563, 568 (7th Cir. 2002)). As a result, CIPA "creates no new rights of or limits on discovery of a specific area of classified information"; rather, it is merely a procedural statute that "contemplates an application

of the general law of discovery in criminal cases to the classified information area with limitations imposed based on the sensitive nature of the classified information." *United States v. Yunis*, 867 F.2d 617, 621 (D.C. Cir. 1989).

Thus, CIPA § 4 allows the government "to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove."

It *does not*, however, allow the government to withhold otherwise relevant and at-issue discovery, seek to preclude admittedly probative lines of cross examination, and all the while, present the grounds and rationale for its request just as secretly. That is what the government has nonetheless set out to do with respect to the instant motion.

Back on January 29, 2021, undersigned counsel submitted a specific request to the government for any training or similar materials pertaining to this undercover agent that specifically requested the following:

> Any and all training materials and/or other educational or preparational materials provided to any undercover agent or individual utilized or contemplated for use in the course of the investigation into Mr. Ji.

On April 5, 2021 the government provided the following response:

> We are not aware of any preparation materials except for an operations plan, which we do not believe is subject to discovery. We do not believe general training materials for undercover agents or sources are subject to discovery.

In this motion the government now seeks an order that goes well beyond protective measures pertaining directly to disclosure of the undercover agent's identity, but seeks to restrict cross-

2

examination into "the witness's participation in past . . . investigations or undercover operations" and "any FBI undercover programs writ [sic] large to include training and operations." Dkt. # 237 pp. 2-3. Rather than doing so on relevancy grounds litigated through the full, fair, and open adversarial process, the government is attempting to bar relevant cross-examination purely on national security grounds that were not disclosed even to cleared counsel.

CIPA does not create any new limits on the discovery of otherwise relevant information, but provides the government the opportunity to produce the relevant information in a substitute form, admit relevant facts, or otherwise face sanctions. The government has not argued that the undercover agent's training and history lacks relevance, just that it could implicate national security concerns. Regardless, the relevance is obvious—counsel agrees with the government that this witness's personal information is not relevant, but his/her contacts and communications with Mr. Ji are—and specifically, the identity that he feigned to have in order to exploit Mr. Ji and extract information in the course of a false-flag role player operation. Counsel has challenged the voluntariness of those statements in the course of pretrial litigation and intends to do so largely in a similar fashion because it heavily bears upon what weight the jury should give those statements. *See, e.g.,* Tenth Circuit Pattern Jury Instruction No. 1.25 (instructing jurors to consider factors that weigh on voluntariness of contested statement).

The government's request, in summary then, amounts to an attempt to not only limit relevant cross-examination of a critical trial witness, but for the Court to sanitize the nondisclosure of pertinent and discoverable material that CIPA itself demands be produced, at a minimum, in an alternative format. Therefore, counsel initially requests the following: that (1) the classified materials submitted *ex parte* be disclosed to cleared counsel or the motion be stricken; (2) the government be

3

ordered to produce any and all training, educational, and preparational material (including discovery regarding operational plans) provided to or utilized by the undercover agent in relation to the meetings with Mr. Ji; or (3) the government be barred from calling the undercover agent as a witness and presenting any other evidence or testimony pertaining to the undercover meetings.

II. **Objections to Specific Protective Order Requests**

Mr. Ji, through counsel, sets forth his responses to each of the government's specific requests below. The defense expressly reserves the right to put forth an objection at a later time depending on the actual procedures and methods the government intends to employ given the limited amount of information included in its motion.

1. **The Witness may testify at trial using pseudonym without publicly disclosing his/her true identity.**

This request is unobjectionable as written and so long as the jury is not informed that the witness is doing so.

2. **The defense shall be prohibited from asking any questions seeking personal identifying information from the witness, including true name, address, or date of birth.**

This request is unobjectionable with the caveat that this information should be supplied to defense counsel and subject to the terms of the previously existing protective order. There is no objection to it being made on an "attorneys eyes only" basis.

Withholding it entirely from counsel would contravene basic and fundamental constitutional protections. As the Supreme Court noted over half a century ago in overturning a conviction after the trial court precluded the defendant from learning the true name of a state's witness:

> [W]hen the credibility of a witness is in issue, the very starting point in exposing falsehood and bringing out the truth through cross-examination must necessarily be

4

to ask the witness who he is and where he lives. The witness' name and address open countless avenues of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself.

*Smith v. Illinois*, 390 U.S. 129, 131 (1968).

> 3. **The defense shall be prohibited from asking any questions about the witness's participation in past or pending investigations or operations.**
>
> 4. **The defense shall be prohibited from asking any questions regarding any FBI undercover programs writ large [sic] to include training and operations.**

Counsel and Mr. Ji object to government requests # 3 and 4. These requests go well beyond the others insofar as they affirmatively seek to bar cross-examination of relevant and critically important topics.[1]

Recall that the defense moved to suppress any and all statements made during the course of his meetings and involvement with an undercover agent, including meetings that occurred on April 25, 2018, May 17, 2018, and September 25, 2018.

Those pertained to a FBI-led "false flag" or "role player" operation, sent an undercover agent to engage Mr. Ji by posing as a long-term overseas asset of the Ministry of State Security ("MSS"), the intelligence, security, and secret police agency of the People's Republic of China ("PRC")—a country that high ranking U.S. officials have publicly denounced as a grossly authoritarian, oppressive, and abusive government on many occasions. On three separate occasions, through the ruse of acting on behalf of Chinese intelligence, the undercover agent recorded conversations with Mr. Ji that he or she is expected to testify about at trial.

---

[1] Initially, it is fair to note that not all of the undercover agent's general training or experience may be relevant to his participation in the false-flag operation that occurred during the investigation of this case. It is just as correct, however, to recognize that such information could conceivably prove relevant in a number of respects, and defense counsel is best situated to make those judgment calls.

5

The government turned to this tactic only after a careful, thorough, and years' long investigation from multiple federal agencies produced no evidence of Mr. Ji engaging in a qualifying criminal "act" as an unregistered foreign agent, or any other crime for that matter, in the approximate five year period he resided in the United States from 2013 to 2018. Nonetheless, and undeterred, to elicit the statements contained on the recordings, the undercover agent utilized the imprimatur of the Chinese government and tacitly if not explicitly relied on Chinese legal doctrines requiring Mr. Ji to speak to members of the Chinese government. Chinese law is clear that when questioned by representatives of its government, its citizens, regardless of territorial location, are required to answer questions without exception. This is true, *a fortiori*, when the subject matter of questioning is the successful culmination of an international plan by one of its chief rivals to lure an alleged high-ranking intelligence official into Belgium and have him extradited to face criminal charges; that is, one carrying international significance of the highest order.

As captured on the disputed recordings, the undercover agent used a number of techniques—subtle perhaps but clear in implication—to threaten, intimidate, and ensure that Mr. Ji would respond to questioning. Undoubtedly, in such a situation, an individual like Mr. Ji as a Chinese citizen does not have the right to voluntarily refuse questioning as the United States Constitution guarantees. By employing this ruse and utilizing the imprimatur of a government it publicly condemns as brutal and authoritarian in an attempt to extract information from Mr. Ji, and by directing veiled threats at Mr. Ji, his answers to those questions were not voluntary and should be accorded no weight by the jury.

Even though the Court denied the motion to suppress, these statements remain critically important evidence. And just as importantly, the voluntariness analysis remains equally important

6

and a matter for which the defense is entitled to present evidence and make its case to the jury. In this sense, the undercover agent's training and experience remain as vital now as ever. In fact, counsel specifically listed as an example of the large number of what they considered materially disputed facts: "the government's meticulous planning and strategizing of this operation included extensive investigation, consideration, and utilization of Mr. Ji's individual psychological characteristics, personality, etc., and that the undercover agent's interactions with Mr. Ji were specifically structured to take advantage of or "exploit" Mr. Ji's personal psychological characteristics."

No matter how ardently the government has objected to the weight and merit this defense deserves, it has yet to challenge the relevance of this potential evidence and did not do so in the course of the instant motion either. Instead, it relied exclusively on the ostensible danger and national security risks allowing such cross-examination would, in its view, create—in a presentation made secretly and on an *ex parte* basis no less.

To the extent it has commented on the dangers and national security risks its motion seeks to obviate, the government stated that public disclosure of the witness's true name and identity, or even just physical appearance, "would . . . pose a risk of danger to the witness and his/her family." Dkt. # 237 p. 1. It went on to state that "[p]ublic disclosure of personal information about the witness, such as name and address, will compromise his/her safety and that of his/her family." *Id.* at p. 7. The government discussed concerns about individuals covertly photographing the witness during court proceedings, and even stated that it requests the Court find that "the witness and his/her family face a real and substantial danger if the true identity is disclosed." Dkt. # 237 pp. 11-12.

Initially, it is contradictory for the government to now make these claims given the prior positions it has taken regarding the nature of the PRC government and the extra-legal, coercive, and even violent means through which it will carry out its objectives. Specifically, recall how when it suited its arguments, the government relied upon a document widely repudiated in this country as CCP propaganda, "The Chen and Fang Affidavit," which specifically notes, among other claims, that Chinese national security laws contain "a safeguard that discharges individuals and organizations from providing support, assistance and cooperation to the national intelligence agencies that would contradict their legitimate rights and interests, let alone where doing so would violate the laws of another country." In fact, as noted in the government's cited affidavit, it specifically went on to explain that "Article 8 provides that national intelligence work 'shall . . . respect [ ] and safeguard [ ] human rights, and safeguard [ ] the legitimate rights and interests of individuals and organizations.'" *Id.* at ¶ 71. It further stated that, "[l]ikewise, Article 19 provides that '[a] National Intelligence Work Agency and its staff members shall not . . . infringe upon the legitimate rights and interests of citizens and organizations.' Should the national intelligence agencies and their staff infringe on the legitimate rights and interests of citizens and organizations, Article 31 provides that such actions are to be disciplined by the law, including subject to criminal prosecution." *Id.* At a minimum, the fact that the government's prior arguments now contradict their current claims should carry some significance and impact the Court's assessment.

Furthermore, a more careful review of the government's representations about previous court orders ruling upon similar motions should also raise skepticism regarding its arguments. One such example involved a similar motion presented to Judge Sharon Johnson Coleman in *United States v. Daoud*, 12 CR 723, Dkt. # 155. In the current motion, the government stated that it

8

"requested the same protective measures it is now requesting for the UC's testimony in that case." Dkt. # 237 p. 13. It went on to state that Judge Coleman "granted the government's motion and ordered the following protective measures: she would close her courtroom during the testimony, allow the UC to testify using the pseudonym that the defendant knew him as, that his/her appearance should match how the UC appeared to the defendant during the undercover operation, that any light disguise should be applied by a professional makeup artist, and that the UC could enter the courtroom through a non-public entrance." *Id*. It failed to note, however, that Judge Coleman's order addressed this motion and a defense motion for disclosure pertaining to the UC in tandem. 12 CR 723 Dkt. # 155 p. 3. In ruling, she specifically stated and relied upon the fact that "[t]he government has provided the training record and curriculum vitae for the UCE (with identifying information redacted) – in other words, defense counsel has ample information to conduct a meaningful cross-examination." *Id*. As set forth above, the government has not provided such discovery here, even with respect to this investigation itself.

The government also cited to *United States v. Mohamed Osman Mohamud*, 10 CR 475 Dkt. # 341 (D. Ore.), stating that, "[w]ith the permission of the judge, the undercover employees testified pursuant to the same protective measures as proposed here." In reality, none of the ten conditions ordered in that case included the disputed restrictions regarding the undercover agent's training at issue now.

Furthermore, though it made a citation to *United States v. Osmakac*, 12 CR 45, Dkt. # 217 (M.D. Fla. 2012), it did not mention the fact that the trial court deferred ruling "on the issue of the extent to which Defendant can cross-examine the UCE about his prior work activity, prior undercover activity, education, and training" until after a subsequent status hearing when the parties

9

articulate the precise questions to be asked and sought to be precluded. The government later filed a motion *in limine* on the issue, and in an order that does not appear to be available on the docket, nonetheless indicates the government's motion was granted in part and denied in part. Osmakac Dkt. # 286.

And finally, it is important to note that, with limited exception, the government cited to cases involving allegations of terrorism. There is no comparable statute for failing to register as a terrorist because allegations of terrorism are undeniably more serious and virtually always violent in nature. Congress certainly thinks so—it prescribed a maximum possible sentence of 20 years for material support (18 U.S.C. § 2339B), which escalates from there, and no more than 10 years for a violation of 18 U.S.C. § 951 under any set of circumstances.

5. **Only the Court, essential courtroom personnel, the jury, the defendant and his/her counsel, the defendant's immediate family members, and the government's trial team shall be present in the courtroom when the witnesses testify;**

6. **The government shall be allowed to digitally obscure the facial images of the witness on any recorded video footage played over the CCTV feed during court proceedings.**

It is important to note that "[t]he right to [a] *public* trial also concerns the right to a *fair* trial." *Walton v. Briley*, 361 F.3d 431, 434 (7th Cir. 2004); *United States v. Ochoa-Vasquez*, 428 F.3e 1015, 1029 (11th Cir. 2005) ("[p]ublic trials and judicial proceedings are rooted in the principle that justice cannot survive behind walls of silence, and in the traditional Anglo American distrust for secret trials"). However, counsel and Mr. Ji take no position on these requests.

7. **No public disclosure of any audio recording, or similar reproduction of the voices or visual images of the witness while testifying, shall be permitted;**

LR 83.1 already prohibits these activities and the government has not provided any argument as to why this additional measure would be anything other than duplicative. It is therefore moot,

and in the interest of equal treatment, as it has done with all such defense motions, the Court should deny this request.

8. **The witness shall be permitted to use a non-public entrance/exit to the courthouse and the courtroom (outside the presence of the jury); and**

9. **The Protective Order sought by this motion may only be modified through a written superseding order issued by the Court.**

There is no objection to these requests.

**III.  Conclusion**

Based on the foregoing, Mr. Ji, through counsel, respectfully requests the Court deny the government's motion in part as specified herein.

Respectfully submitted,

s/ Damon M. Cheronis
**Damon M. Cheronis**

s/ Ryan J. Levitt
**Ryan J. Levitt**

s/ Christopher V. Parente
**Christopher V. Parente**
Attorneys for Defendant

**Cheronis, Parente & Levitt LLC**
140 S. Dearborn Street Suite 404
Chicago, IL 60603
(312) 663-4644
damon@cheronislaw.com
ryan@cheronislaw.com
cparente@cheronislaw.com

**CERTIFICATE OF SERVICE**

I, Damon M. Cheronis hereby certify that on May 2, 2022, I electronically filed the foregoing **Response** with the Clerk of the U.S. District Court for the Northern District of Illinois, Eastern Division by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

                                                s/ Damon M. Cheronis
                                                Damon M. Cheronis
                                                Law Office of Damon M. Cheronis
                                                140 South Dearborn Street, Ste. 404
                                                Chicago, Illinois 60603
                                                damon@cheronislaw.com