# EXHIBIT A

# CPL  Cheronis, Parente & Levitt LLC

140 South Dearborn Suite 404  
Chicago, Illinois 60603

p 312.663.4644  
f 312.277.1920  
www.cheronislaw.com

May 16, 2022

**Via Electronic Delivery**

Mr. Barry Jonas  
Mr. Vikas Didwania  
United States Attorney's Office  
219 S. Dearborn Street, 5th Floor  
Chicago, Illinois 60604  
Vikas.Didwania@usdoj.gov  
Barry.Jonas@usdoj.gov

**Re: United States v. Ji 18 CR 611**

Dear Mr. Jonas and Mr. Didwania,

We are writing in reference to our client, Ji Chaoqun, and in accordance with Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure.

**Professor Donald Clarke**

Mr. Ji, through counsel, may call Professor Donald Clarke at trial in this matter pursuant to Rule 702 of the Federal Rules of Evidence.

Professor Clarke's CV has previously been disclosed to you as part of an exhibit to Defendant's Reply in Support of his Motion to Suppress Statements Made to an Undercover Agent. *See* Dkt. # 194-2.

His potential testimony at trial is expected to be largely consistent with the opinions set forth in his declaration. It is further expected that his testimony will be based upon his training and experience and not upon his review of any case-specific material.

More specifically, he is expected to testify to the following opinions:

- Chinese law, specifically the National Intelligence Law, obliges Chinese citizens to cooperate with intelligence work.

- This obligation is not subject to territorial boundaries.

**Damon M. Cheronis** | damon@cheronislaw.com

- Despite the reality of actual enforceability, the law does not spell out a specific sanctioning mechanism for violations of this obligation.

- Despite the absence of a specific sanctioning mechanism, the Chinese state can in practice enforce this obligation through a variety of explicit and implicit threats. Because the Chinese state is not constrained by Chinese law, those threats can be carried out even if they lack a legal basis, and citizens know this. A citizen is not in a position to cite the absence of a legally stipulated sanctioning mechanism as a reason for not complying with a request to cooperate. Therefore, to place great weight on the distinction between legal and extra-legal enforcement mechanisms for the obligation to cooperate is to misunderstand the nature of the Chinese state.

Professor Clarke is expected to elaborate by stating that the key question is not what Chinese *law* says about the ability of the Chinese government to require citizens to provide information and assist in intelligence gathering. The question is what the Chinese government can *actually require.*

Furthermore, the Chinese government is not meaningfully constrained by Chinese law. Where Chinese law might appear to provide a basis for resisting government demands, that basis is illusory and unenforceable in the Chinese legal system.

Professor Clarke is expected to testify that the Chinese political system is essentially Leninist, and recognizes no limits on government power, even as a matter of form. The Chinese Party-state is not meaningfully constrained by Chinese law. This is particularly so in matters deemed relevant to national security. The notion that Chinese citizens, if asked to do things by the Chinese security agencies for which those agencies had no legal mandate, could politely decline and suffer no consequences, is fanciful.

Nevertheless, Professor Clarke is expected to testify that the relevant laws are still instructive. Those include sections of the National Intelligence Law, which read:

> **Article 7:** Any organization or citizen shall, in accordance with the law, support, assist and cooperate with national intelligence work, and keep confidential the secrets of national intelligence work that come to its or his/her knowledge.
>
> The state shall protect individuals and organizations that support, assist and cooperate with national intelligence work.
>
> **Article 14:** A National Intelligence Work Agency may, when carrying out intelligence work pursuant to the law, require relevant organs, organizations and citizens to provide necessary support, assistance and cooperation.

As discussed in his declaration in the context of Huawei and the Zhong Lun Declaration, the reference to protecting "legitimate rights and interests" is essentially meaningless boilerplate. It is inconceivable that a Great Wall of resistance to Chinese state authority could be built upon such a

flimsy linguistic foundation. Professor Clarke is expected to state that no Chinese authority to his knowledge has ever acknowledged that the interest of Chinese companies and individuals in doing business and making money trumps the state's interest in national security. Furthermore, it is impossible to believe that the Chinese state would consider the prospect of punishment under foreign law as a valid reason for refusing an otherwise valid demand to cooperate. The United States recognizes no such general exemption, still less does China.

Professor Clarke is also expected to explain that the National Intelligence Law by its terms covers the obligations of Chinese citizens, and there is no indication that such obligations cease at the water's edge. Furthermore, obligations under the National Intelligence Law do not come with an accompanying enforcement mechanism. The National Intelligence Law does not by its terms create new administrative or criminal penalties. Nor can the mere failure to cooperate in intelligence collection be found as a crime in China's Criminal Law, the only statute in which crimes are defined. Professor Clarke is not aware of any other law or regulation in which the failure to cooperate in intelligence collection is defined as a punishable offense.

Nevertheless, it is his opinion that there is no question that the obligation to cooperate under the National Intelligence Law is enforceable as a practical matter by the Chinese state. The Chinese state is not meaningfully constrained by law, and therefore state agents may credibly threaten a wide variety of consequences to those who do not cooperate when asked. Such consequences could extend beyond the person in question to relatives, for example, so even Chinese citizens with permanent residence abroad but with relatives in China are vulnerable.

Therefore, according to Professor Clarke, on the issue of whether a particular Chinese citizen was compelled to cooperate, it would be a mistake, and a fundamental misunderstanding of the way the Chinese state functions, to place great weight on the question of whether cooperation was, as a matter of formal law, compelled. That would assume the Chinese state is constrained by law. The better question is whether the Chinese state has the actual power to compel cooperation by punishing non-cooperation. He is expected to state, in his opinion, that it does.

**Mr. Nick Lewin**

Nick Lewin is a partner at the law firm of Krieger Kim and Lewin LLP. Mr. Lewin currently specializes in national security law, including alleged violations of the Foreign Corrupt Practices Act and Foreign Agents Registration Act.

Mr. Lewin has previously served as the Special Counsel for former FBI Directors Robert S. Mueller, III and James B. Comey. In that capacity, Mr. Lewin acted as each Director's national security advisor on policy, strategic, legal and operational issues. Mr. Lewin also served for more than a decade as an Assistant United States Attorney in the Southern District of New York. During his tenure, Mr. Lewin investigated and prosecuted among the most important national security cases in the United States since 9/11. As Deputy Chief of the Criminal Division Mr. Lewin supervised a variety of cases, including the Office's national security cases.

It is expected Mr. Lewin will testify, based on his years of experience specializing in national security law, including investigations of alleged violations of 18 U.S.C. § 951, that the purchasing of the commercial background reports that are at issue in this case would reasonably qualify as legal commercial transactions under 18 U.S.C. § 951(d)(4), further defined by 28 C.F.R. § 73.1.

Mr. Lewin will testify that a potential claim of a violation of the terms of service associated with the commercial websites at issue would not alter his opinion regarding the legality of the commercial transactions at issue in this case for purposes of 18 U.S.C. § 951(d)(4).

Mr. Lewin will testify that the circumstances surrounding the transfer of the background reports, such as the alleged disguising of the true nature of the background reports for purposes of transferring the reports by electronic mail, would not alter his opinion regarding the legality of the commercial transactions at issue in this case for purposes of 18 U.S.C. § 951(d)(4).

\*\*\*

If and when counsel identifies any additional experts that may be called in Mr. Ji's case-in-chief we will notify you promptly.

If you have any questions, please do not hesitate to contact us.

Sincerely,

/s/ Damon M. Cheronis
Damon M. Cheronis

/s/ Ryan J. Levitt
Ryan J. Levitt

/s/ Christopher V. Parente
Christopher V. Parente

# Nicholas J. Lewin

212.390.9559 | Nick.Lewin@KKLllp.com

Nick Lewin, co-founder of the firm, is an accomplished trial and appellate lawyer and counsellor.  He represents clients – domestically and abroad – in high-stakes U.S. and cross-border regulatory and criminal enforcement actions, investigations, and complex commercial litigation.

Nick has counseled and represented corporate and individual clients in significant and high-profile matters involving allegations of securities and financial frauds, money laundering, foreign interference in U.S. elections, and violations of the Foreign Corrupt Practices Act (FCPA) and Foreign Agents Registration Act (FARA).

Nick co-founded the firm after serving for more than a decade as a federal prosecutor with the U.S. Department of Justice (DOJ) and a senior FBI official — including as the Special Counsel to former FBI Directors Robert S. Mueller III and James B. Comey, and then as Deputy Chief of the Criminal Division in the U.S. Attorney's Office for the Southern District of New York.

Nick has conducted the jury trial of a dozen federal cases, including some of the country's most complex and significant national security trials. Nick also has briefed and argued multiple appeals before the U.S. Court of Appeals for the Second Circuit.

## EDUCATION:

J.D., Yale Law School

M.P.A., University of North Carolina at Chapel Hill

B.A., Binghamton University (SUNY)

## CLERKSHIPS:

Hon. Dennis Jacobs, Chief Judge, U.S. Court of Appeals for the Second Circuit

Hon. Charles S. Haight, Jr., U.S. District Judge, SDNY

## GOVERNMENT SERVICE:

Assistant United States Attorney, U.S. Attorney's Office, SDNY

- Deputy Chief, Criminal Division

Special Counsel to FBI Directors Robert S. Mueller III and James B. Comey

Guantánamo Detainee Review Task Force

Associate Director, White House Council on Youth Violence

Presidential Management Fellow, U.S. Department of Justice

## ADMISSIONS:

New York

U.S. District Court, SDNY

U.S. District Court, EDNY

U.S. Court of Appeals, Second Circuit

## EXPERIENCE

Nick served for more than a decade as an Assistant United States Attorney in the Southern District of New York. During his tenure, Nick investigated and prosecuted among the most important national security cases in the United States since 9/11. He served as trial counsel in United States of America v. Usama bin Laden et al., and conducted the jury trials of:

- The senior-most al Qaeda leader prosecuted in any court, Usama bin Laden's son-in-law (U.S. v. Sulaiman Abu Ghayth);
- The founding al Qaeda member who led its terrorist training camp in Afghanistan and its cell in East Africa (U.S. v. Khalid al Fawwaz); and
- The only former Guantánamo Bay and CIA black site detainee to be transferred to federal court, where he was tried for his role in the August 7, 1998 bombings of the U.S. Embassies in Kenya and Tanzania (U.S. v. Ahmad Ghailani).

Nick also helped lead the investigations into a variety of extremely sensitive cases, including: the theft and leak of highly-classified CIA cyber-operations information; the investigation and prosecution of a private banker involved in an international bank fraud; one of the first national security cyber cases brought in the SDNY; the September 2016 bombings

in New York and New Jersey; and the apprehension and prosecution of one of the FBI's most-wanted terrorists, who was captured abroad in a coordinated operation conducted by U.S. Special Operations Forces. He was also responsible for leading myriad other classified investigations involving espionage, counterintelligence, FARA, sanctions violations, international bank fraud, money laundering, and cybercrime.

As Deputy Chief of the Criminal Division, Nick was responsible for the supervision of multiple units in the Criminal Division, and helped oversee a variety of criminal and national security investigations. He also served as the U.S. Attorney's Office's coordinator for international and cross-border investigations.

Nick also served as the Special Counsel for former FBI Directors Robert S. Mueller, III and James B. Comey. In that capacity, Nick acted as each Director's national security advisor on policy, strategic, legal and operational issues. He regularly represented the FBI at executive-level White House National Security Council meetings, and prepared the Director, Attorney General and other senior FBI and Justice Department executives for testimony before Congress.

In 2009, Nick served as a member of the interagency Guantánamo Review Task Force, which was established by President Obama to assess, among other things, which Guantánamo Bay detainees could feasibly be prosecuted in an Article III court.

Nick has received awards and recognitions from foreign governments as well as from various agencies in the U.S. government, including: the Federal Bureau of Investigation, the Director of National Intelligence, the Central Intelligence Agency, the National Security Agency, the Department of Defense's Joint Special Operations Command, and the DOJ, including twice winning the Director's Award for superior litigation, as well as the Attorney General's Distinguished Service Award – the Justice Department's second-highest honor.

Nick has lectured at universities and law schools, including the United States Military Academy at West Point, NYU School of Law and Columbia Law School, and served as an Adjunct Professor of Law at the Benjamin N. Cardozo School of Law, where he taught the Federal Criminal Litigation seminar.

Nick has written various articles and presented nationally regarding FARA. He presently serves as a member of the American Bar Association's ("ABA") FARA Task Force.

Prior to joining the U.S. Attorney's Office, Nick practiced at Lankler Siffert & Wohl LLP, where he represented clients in civil and criminal litigation, including obtaining summary judgment in favor of a consortium of major banks in litigation regarding a $2 billion credit facility.

Nick served as a law clerk to the Honorable Dennis Jacobs, Chief Judge of the U.S. Court of Appeals for the Second Circuit, and the Honorable Charles S. Haight, Jr., Senior U.S. District Judge for the Southern District of New York. Prior to law school, Nick was selected as a Presidential Management Fellow, and worked in the U.S. Department of Justice, and as an Associate Director of the White House Domestic Policy Council.