IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **United States of America,** | ) | |
| **Plaintiff,** | ) | |
| | ) | No. 18 CR 611 |
| v. | ) | |
| | ) | Judge Ronald A. Guzmán |
| **Ji Chaoqun,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, the government's motion to exclude the testimony of Defendant's experts [289] is granted.

## STATEMENT

Defendant served his expert disclosures on May 16, 2022, identifying two experts, Nicholas J. Lewin and Professor Donald Clarke. The government seeks to exclude the testimony of both Lewin and Clarke.

**Nicholas Lewin**

The government seeks to exclude the testimony of Nicholas Lewin, a partner at the law firm of Krieger Kim and Lewin LLP who specializes in national security law, including violations of the Foreign Corrupt Practices Act and the Foreign Agents Registration Act. Lewin served as the Special Counsel for former FBI Directors Robert S. Mueller III and James B. Comey. In that capacity, Lewin acted as each Director's national security advisor on policy, strategic, legal, and operational issues. Lewin also served for more than a decade as an Assistant United States Attorney in the Southern District of New York, during which time he investigated and prosecuted national security cases. As Deputy Chief of the Criminal Division, Lewin supervised a variety of cases, including the Office's national security cases.

Defendant's disclosure states that Lewin is expected to testify that:

- Purchases of the commercial background reports that are at issue in this case would reasonably qualify as legal commercial transactions under 18 U.S.C. § 951(d)(4), as further defined by 28 C.F.R. § 73.1.
- A potential claim of a violation of the terms of service associated with the commercial websites at issue would not alter his opinion regarding the legality of the commercial transactions at issue in this case for purposes of 18 U.S.C. § 951(d)(4).

- The circumstances surrounding the transfer of the background reports, such as the alleged disguising of the true nature of the background reports for purposes of transferring the reports by electronic mail, would not alter his opinion regarding the legality of the commercial transactions at issue in this case for purposes of 18 U.S.C. § 951(d)(4).

(Gov't's Mot. Exclude, Ex. A, Dkt. # 289-1, at 3-4.)

The government seeks to exclude Lewin's testimony on the ground that it invades the province of the jury because he will be opining on the proper interpretation of a federal law and accompanying regulations. *Scottsdale Ins. Co. v. City of Waukegan*, 689 F. Supp. 2d 1018, 1022 (N.D. Ill. 2010) ("Although experts may provide opinions as to the ultimate factual issues in a case, [*United States*] v. *Pansier,* 576 F.3d 726, 738 (7th Cir. 2009), they may not testify 'as to legal conclusions that will determine the outcome of the case' under Rule 702.") (quoting *Good Shepherd Manor Found. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003) (excluding expert testimony that consisted of legal conclusions), and citing *In re Ocean Bank,* 481 F. Supp. 2d 892, 898 (N.D. Ill. 2007) ("Expert testimony as to legal conclusions that will determine the outcome of a case is inadmissible.")).

Defendant contends as follows:

> Mr. Lewin's opinions are not purely legal in nature, and to the extent they are at all "interpretive," it is only insofar as they are applying complex legal provisions to the specific facts of the case, and in particular, to the commercial background report-related evidence. Put differently, Mr. Lewin is not going to be asked to simply interpret the legal commercial transaction exception for the jury. Instead, he is going to be asked whether certain forms of alleged conduct—violating purely corporate terms of service, for example—fall within or outside that exception.
>
> . . . [H]e is going to be asked to assume the truth of the government's evidence regarding the purchase and transfer of background reports. . . . [and] is then going to be asked whether he is aware of a federal or state law that it conceivably violates, which he is expected to answer in the negative.
> . . .
>
> . . . Mr. Lewin's testimony in this case will be focused on using his years and years of experience to apply the assumed facts of the case primarily to his knowledge of each and every criminal provision of the United States Code, as well as criminal laws of the United States, to straightforwardly note that those allegations do not implicate any separate offense.

(Def.'s Sur-Reply, Dkt. # 294, at 2, 4.) The resulting implication is that if the purchase of background reports is not illegal, as opined by Lewin, then it must be legal, and therefore Defendant's conduct satisfies the legal commercial transaction exception under § 951(a). (*Id*. at

2

6.)[1]  According to Defendant, because such testimony is "helpful" under Federal Rule of Evidence 702, it is admissible. (*Id*.)

In support of his position that legal expert conclusions are admissible, Defendant relies heavily on the court's ruling in *Richman v. Sheahan*, 415 F. Supp. 2d 929 (N.D. Ill. 2006), a § 1983 case alleging excessive force and failure to train. The plaintiff challenged the admissibility of the defendants' expert opinions regarding the reasonableness of the force that the officer used. The *Richman* court discussed Rule 704(a), which provides that the "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). "Rule 704 does not define 'ultimate issue,' but it is generally thought that ultimate issues under the Rule must be factual and not legal." *Id*. at 944-45. The *Richman* court stated that the "admissibility of opinion testimony that may involve legal conclusions ultimately rests . . . not on labels, but 'upon whether the testimony helps the jury resolve the fact issues in the case.'" *Id*. at 945. Accordingly, "[t]he inquiry should focus on whether the opinion is phrased in terms that employ legal criteria that the jury does not understand based upon its own experiences in life." *Id*. The *Richman* court noted with approval a statement from the Fourth Circuit that "'[t]o determine when a question posed to an expert witness calls for an improper legal conclusion, the district court should consider first whether the question tracks the language of the legal principle at issue or of the applicable statute, and second, whether any terms employed have specialized legal meaning.'" *Id*. at 947 (citation omitted). Defendant contends that Lewin will not be employing any specialized terminology or invoking a standard of care or mental state, and "beyond the plain definition of a legal commercial transaction as one that does not violate any independent state or federal law, he will not even be touching upon a statutorily defined term." (Def.'s Sur-Reply, Dkt. # 294, at 6.) The Court is not persuaded.

"There is a fine line between legal opinions that impermissibly intrude on the jury's role and those that assist the jury in reaching its decision." *Chi. Teachers Union, Local 1 v. Bd. of Educ. of Chi.*, 12 C 10311, 2020 WL 914881, at *12 (N.D. Ill. Feb. 25, 2020). Here, Lewin's testimony crosses that line because he will opine as to the meaning of a specific legal term with an implementing regulation that defines the legal term. *See* 28 C.F.R. § 73.1(f) ("The term legal commercial transaction, for the purpose of 18 U.S.C. 951(d)(4), means any exchange, transfer, purchase or sale, of any commodity, service or property of any kind, including information or intellectual property, not prohibited by federal or state legislation or implementing regulations."); *see also Chi. Teachers Union, Local 1,* 2020 WL 914881, at *12 ("The Court agrees that Blanchflower cannot opine on whether Plaintiffs suffered an adverse employment action. Adverse action has a specific legal definition and expert testimony as to whether class members suffered an adverse action would qualify as an impermissible legal conclusion."). The "'meaning of statutes, regulations, and contract terms is a subject for the court, not for testimonial experts. The

---

[1] It is worth noting here that, according to the government, Defendant is not entitled to assert a legal-commercial-transaction affirmative defense at trial because "[t]he exception allows certain kinds of agency relationships, such as a lawyer acting on behalf of a foreign agent, and not actions the defendant surreptitiously takes as a spy for a foreign government." (Gov't's Reply, Dkt. # 293, at 3 n.1) (citing Gov't's Resp. Mot. Dismiss Indictment, Dkt. # 179, at 2). If the Court precludes Defendant from raising the defense, an issue that is not currently before the Court, then a determination as to the admissibility of Lewin's testimony will be unnecessary.

3

only legal expert in a federal courtroom is the judge.'" *United States v. Bloom*, 846 F.3d 243, 255 (7th Cir. 2017) (citations and certain internal quotation marks omitted). Contrary to Defendant's contention, Lewin's opinion that the "purchase and transfer of the background reports appear to constitute 'legal commercial transactions,'" (Def.'s Sur-Reply, Dkt. # 294, at 6), clearly embodies a legal conclusion and improperly impedes on the province of the Court.

Moreover, "allowing a witness to testify as to a legal conclusion may cause the jury to accord too much weight to that testimony, and may [imply] that the jury should look to that witness for legal guidance." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006). This is particularly true where, as here, Defendant is using a lawyer's expert testimony to address Defendant's self-admitted "difficult situation of ruling out any potential illegality," pursuant to his interpretation of the affirmative defense. (Def.'s Resp., Dkt. # 291, at 24.) As the government notes, Defendant cannot rely on Lewin's testimony to "salvage" an insufficient presentation by essentially telling the jury that Defendant has met the requirements of the legal-commercial-transaction defense. *United States v. Garcia*, 919 F.3d 489, 502 (7th Cir. 2019) (citation, internal quotation marks and parenthetical omitted). For these reasons, the Court finds Lewin's testimony inadmissible.

**Donald Clarke**

Defendant provides the following qualifications for his second expert, Professor Donald Clarke, who will be called to testify in support of Defendant's position that he "had no rational ability to refuse to answer the undercover agent's questions" based on Chinese laws and "the practical way [the People's Republic of China ("PRC")] exercises power." The information is taken from a declaration by Clarke, (Clarke Decl., Dkt. # 192-4), his curriculum vitae, (Dkt. # 192-4, at Pages 7 to 28), and Defendant's response to the government's motion to exclude, (Def.'s Resp., Dkt. # 291, at 2-3).[2] Clarke is currently a Professor of Law and the David A. Weaver Research Professor at the George Washington University Law School. He obtained his Bachelor of Arts degree *cum laude* in 1977 from Princeton University. From 1977 to 1979, Clarke attended Beijing University and Nanjing University as part of an academic exchange program. In 1983, Clarke earned a graduate degree in the Government and Politics of China from the University of London's School of Oriental and African Studies. He received his Juris Doctor degree *cum laude* from Harvard Law School in 1987. While at Harvard, Clarke served as a member of the Harvard Law Review editorial board as well as the Harvard International Law Journal. As a lecturer, Clarke taught a class on the commercial law of the Far East for the University of London School of Oriental and African Studies, Department of Law, from September 1985 until July 1988. He was a professor at the University of Washington School of Law from 1988 to 2004, and an attorney with Paul, Weiss, Rifkind, Wharton & Garrison ("Paul, Weiss") in New York from September 1995 to August 1998. While at Paul, Weiss, Clarke visited China and Hong Kong approximately twice a year for work related to China. He has also served as a visiting professor at the University of California at Los Angeles School of Law, Duke Law School, and New York University Law School.

---

[2] Clarke's curriculum vitae is lengthy; only portions of it are recited here.

Clarke has served as adviser or consultant on Chinese law matters to several bodies, including the Asian Development Bank, the Agency for International Development, and the World Bank's Financial Sector Reform and Strengthening Initiative. He has testified on aspects of the Chinese legal system before the Congressional-Executive Commission on China and the United States-China Economic and Security Review Commission. In 2005, he was appointed to the Academic Advisory Group to the US-China Working Group of the United States Congress.

Clarke's curriculum vitae shows that, throughout his professional life, he has written extensively on topics related to the Chinese state and law, including publishing a book in 2008 entitled *China's Legal System: New Developments, New Challenges*. He recently authored an article entitled *Order and Law in China*, which is expected to be published in the University of Illinois Law Review this year. He is fluent in Mandarin.

According to Defendant, Clarke will testify as follows[3]:

- Chinese law, specifically the National Intelligence Law, obliges Chinese citizens to cooperate with intelligence work. This obligation is not subject to territorial boundaries.
- Obligations under the National Intelligence Law do not come with an accompanying enforcement mechanism, and Clarke is not aware of any law or regulation in which the failure to cooperate in intelligence collection is defined as a punishable offense. Nevertheless, it is his opinion that there is no question that the obligation to cooperate under the National Intelligence Law is enforceable as a practical matter by the Chinese state.
- Despite the reality of actual enforceability, the law does not spell out a specific sanctioning mechanism for violations of this obligation to cooperate with intelligence work.
- Although no specific sanctioning mechanism exists, the Chinese state can in practice enforce the obligation to cooperate through a variety of explicit and implicit threats, including by threatening relatives. Because the Chinese state is not constrained by Chinese law, those threats can be carried out even if they lack a legal basis, and citizens know this.

(Def.'s Resp., Dkt. # 291, at 2.)

Defendant states that Professor Clarke is also expected to opine that:

- The key question is not what Chinese law says about the ability of the Chinese government to require citizens to provide information and assist in intelligence gathering, but what the Chinese government can actually require.

---

[3] While the Court has paraphrased Defendant's description of Clarke's opinions, it believes it has accurately captured the essence of his opinions.

5

- The Chinese government is not meaningfully constrained by Chinese law, particularly in matters related to national security. Chinese law might appear to provide a basis for resisting government demands, but that basis is illusory and unenforceable in the Chinese legal system.
- The Chinese political system recognizes no limits on government power.
- The notion that Chinese citizens could decline requests by Chinese security agencies and suffer no consequences is "fanciful."

(*Id*., at 4-6.) Further, according to Clarke, the Chinese state would not consider the prospect of punishment under foreign law a valid reason for refusing a demand to cooperate. (*Id*.)

According to Defendant, his "argument is going to be that the same circumstances that make the statements involuntary, i.e., compelled, make them untruthful[,] and statements that the jury should disregard." (Def.'s Resp., Dkt. # 294, at 13.) Pointing to *United States v. Mamah*, 332 F.3d 475 (7th Cir. 2003), the government argues that Clarke's testimony is inadmissible in this regard. In *Mamah*, a Ghanian immigrant charged with possession with intent to distribute heroin sought to introduce at trial the testimony of an expert who would testify that "behaviors adopted by Ghanaians in response to living under a military regime could lead them to make false confessions when confronted by law enforcement authorities." *Id*. at 476. The district court concluded the testimony was unreliable and thus inadmissible because the expert was not "a clinical psychologist qualified to assess [the defendant's] susceptibility to the interrogation techniques used by the FBI"; the defendant "had been living in the United States since 1984, [which was] more than enough time to have learned the difference between Ghanaian and American law-enforcement practices"; and "since [the defendant] claimed that he had been detained and beaten while still living in Ghana, the court viewed the relevance of [the expert's] testimony as dependent upon similarities between this incident and the FBI agents' interview of [the defendant]," which did not exist. *Id*. at 476-77. On appeal, the defendant claimed that the expert's testimony was improperly excluded.

In addressing the defendant's contention, the Seventh Circuit stated that "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *Id*. at 478. In affirming the district court's exclusion of the expert's testimony, the *Mamah* court found that "the problem [with the expert's testimony] [was] the absence of an empirical link between [her] research and the opinion that [the defendant] likely gave a false confession." *Id*. Because the expert witness's "expertise is limited to the cultural practices of Ghanaian nationals living in Ghana; she has no basis for extrapolating this conclusion to [the defendant], a Ghanaian expatriot." *Id*. In other words, the expert's "testimony may have been useful in answering questions about how a repressive military regime shapes Ghanaian behavioral patterns, but those questions were not pertinent here because the interrogation in this case did not occur in Ghana and [the defendant] has not lived in Ghana since 1984." *Id*.

According to the government, Clarke's testimony must be excluded because he points to no facts or data linking the culture of the Chinese government and the practices of the MSS to the purported "false" testimony of Defendant. (Gov't's Sur-Reply, Dkt. # 298, at 9) ("Taken to its logical conclusion, Professor Clarke's opinion would mean that any statement made by any

Chinese citizen . . . to any government official would be involuntary."). Defendant responds that unlike the expert in *Mamah*, "Professor Clarke is not a mere sociologist who will be asked to volunteer opinions about Chinese culture generally; rather, he will be asked questions regarding the obligations and requirements of Chinese citizens to answer questions and cooperate with national intelligence authorities when requested to do so, which is a subject comfortably within his area of expertise." (Def.'s Resp., Dkt. # 291, at 15.) Defendant also asserts that unlike in *Mamah*, where the Seventh Circuit noted that the United States did not utilize Ghanian tactics during the interrogation of the defendant, here "the government intentionally assumed and utilized the imprimatur of the PRC government for [the United States'] 'false flag' 'role player' operation." (*Id*. at 15-16.)

Defendant's position, however, continues to ignore that Clarke fails to offer any tie between Clarke's opinions on Chinese citizens' purported obligations to answer questions by intelligence officials and whether *Defendant* made false or unreliable statements. Notably, Defendant's disclosure regarding Clarke's proposed testimony does not include an opinion that Defendant made a false statement, and Clarke specifically states in his declaration that he "express[es] no opinion on whether, or to what degree, any compulsion existed in this particular case." The probative value of Defendant's expert in this regard is questionable. As the government points out, there will be no testimony as to how these generalized concepts of Chinese laws and culture requiring citizens to aid their intelligence agencies affected Defendant. Defendant points to no factual base of reference in the expert's report from which he (or a trier of fact) can draw a reasonable conclusion as to how Chinese law or the FBI undercover agent's use of certain words or phrases would have affected Defendant. While the jury is allowed to draw reasonable inferences from the evidence, it is not allowed to speculate. Clarke's opinions are based solely on his conclusions about the general effect of Chinese laws on a large and diverse population. From this generality, and this alone, Defendant will ask the jury to conclude that he was intimidated and therefore fabricated information about his attempts to obtain confidential information on behalf of the PRC. There are far too many inferences and unknown variables for such a conclusion to be sound.

Furthermore, the evidence proffered by the government makes clear that Defendant is not an average Chinese citizen. He holds a bachelor's degree in engineering from Beihang University of Aeronautics and Astronautics and a master's degree in electrical engineering from the Illinois Institute of Technology. He is sufficiently proficient in English to have studied for an advanced degree in the United States, attended basic military training here, and been admitted to the United States Army.[4] The government will also present evidence that Defendant carried an unsigned card pledging his loyalty to the MSS and participated in dinners and meetings and exchanged messages with more than one MSS agent. The government proffers evidence that Defendant voluntarily started his relationship with the MSS while still studying in China, and that he received money from the MSS for his efforts on its behalf, a portion of which he sent to his parents, who supported his endeavors and reminded him to be careful. According to the government, Defendant agreed with MSS officers when they provided him with a false narrative for his girlfriend so that she would not learn of his relationship with the MSS. These pieces of evidence strongly imply that Defendant voluntarily entered into a confidential relationship with the MSS.

---

[4] The government states Defendant is fluent in English.

Clarke's opinions do not address the effect of Chinese intelligence laws on Chinese individuals who are already working for the MSS and have agreed to be Chinese sleeper agents like Defendant is alleged to be. Clarke does not address how Chinese intelligence agencies approach an individual who has already committed to actively supplying them with intelligence while living in the United States and whose potential to provide future intelligence as a member of the United States Army and future United States citizen is significant. There is no indication that Clarke would be qualified to give such opinions. His opinions regarding the general effect of Chinese law, therefore, lack a sufficient connection to the facts and circumstances of this case. Because Defendant points to no connection between Clarke's opinions and Defendant, in particular, Clarke's testimony is inadmissible.

There is an additional concern. The government argues that Clarke's testimony should be excluded as unduly prejudicial under Rule 403 because the jury could "be led to believe wrongly that the defendant is asserting a sort of coercion defense—even though he is not and the jury will not receive an instruction on the parameters of the defense." (Gov't's Mot. Exclude, Dkt. # 289, at 11.) Defendant contends that the government's claims of prejudice are speculative and unfounded given that the jury will be instructed not to speculate and that it should base its decision only on the evidence presented in court, may make reasonable inferences based on the testimony, and must find Defendant guilty of the offenses for which all elements have been proven beyond a reasonable doubt. (Def.'s Resp., Dkt. # 291, at 17.) Defendant asserts that the government may propose an instruction that the jury may consider Clarke's testimony only as to the voluntariness of Defendant's alleged statement and not to negate any element of the offense. Yet in his sur-reply, Defendant states he is going to argue that he "had no intent, interest, or willingness" to act as an "insider and . . . willing participant," and that he only made the statements at issue to the undercover agent because he was "scared" and "threatened." (Def.'s Sur-Reply, Dkt. # 294, at 13.) To the extent Defendant seeks to use Clarke to bolster his argument to the jury regarding his intent, beliefs, or emotions, such testimony is undoubtedly unduly prejudicial for two reasons: it not only substitutes a law professor's testimony for that of Defendant, but it in turn also deprives the government of an opportunity to cross-examine Defendant (who may elect not to testify) about his "intent, interest, or willingness" and the reasons he felt "scared" and "threatened." Moreover, by offering expert testimony to imply Defendant's state of mind at the time he gave incriminating statements, Defendant seeks to bootstrap a coercion defense from evidence ostensibly offered to prove the "involuntariness" of his incriminating statements, and to do so in a case in which the coercion defense has not been raised. Such an argument is clearly unduly prejudicial.

For these reasons, the Court grants the government's motion to exclude the testimony of Defendant's experts.

Date: August 3, 2022

*Ronald A. Guzmán*
**Ronald A. Guzmán**
**United States District Judge**