IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **United States of America,** | ) | |
| **Plaintiff,** | ) | |
| | ) | No. 18 CR 611 |
| v. | ) | |
| | ) | Judge Ronald A. Guzmán |
| Ji Chaoqun, | ) | |
| | ) | |
| **Defendant.** | ) | |

# ORDER

The Court assumes knowledge of the facts of and prior rulings in this case. Count Two of the superseding indictment charges Defendant with violating 18 U.S.C. § 951, which makes it a crime to act in the United States as an agent of a foreign government without prior notification to the Attorney General. The statute defines the term "agent of a foreign government" as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official, except that such term does not include … any person engaged in a legal commercial transaction." 18 U.S.C. § 951(d)(4). Defendant contends that the act he is alleged to have engaged in, the purchase of background reports on potential recruits for the MSS, constitutes a legal commercial transaction, which would put him outside the relevant statutory definition of foreign agent. The government seeks to bar Defendant from making this argument, asserting that the statute does not exempt from the definition of an "unregistered foreign agent" an individual engaged in "spying activities" on behalf of a foreign government, even if those activities involve otherwise legal commercial transactions. Defendant contests the government's interpretation of the defense and asserts that he is entitled to present the defense to the jury for a determination as to whether the defense applies.

Defendant is correct that the Court's first tool in interpreting a statute is to read its plain language. (Def.'s Resp., Dkt. # 334, at 3) (citing *Bostock v. Clayton Cty*., 140 S. Ct. 1731, 1749 (2020) ("This Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end.")). But, as the Supreme Court has noted, "[w]hether a statutory term is unambiguous 'is determined [not only] by reference to the language itself, [but also by] the specific context in which that language is used, and the broader context of the statute as a whole.'" *Yates v. United States*, 574 U.S. 528, 528-29 (2015) (alterations in *Yates*).

*Yates* is instructive in interpreting the legal-commercial-transaction exception in § 951. In *Yates*, "a commercial fisherman . . . caught undersized red grouper in federal waters in the Gulf of Mexico" and "[t]o prevent federal authorities from confirming that he had harvested undersized fish, Yates ordered a crew member to toss the suspect catch into the sea." *Id*. at 531. The government charged Yates with a violation of 18 U.S.C. § 1519, which is part of the Sarbanes-Oxley Act of 2002 and provides:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter . . . shall be fined under this title, imprisoned not more than 20 years, or both.

*Id.* at 531. Specifically, the government charged Yates with destroying, concealing, and covering up undersized fish to impede a federal investigation. *Id.* at 534. At the end of the government's case at trial, Yates moved for a judgment of acquittal, arguing that § 1519 "sets forth 'a documents offense' and that its reference to 'tangible object[s]' subsumes 'computer hard drives, logbooks, [and] things of that nature,' not fish." *Id.* The government asserted that a 'tangible object' within § 1519's compass is 'simply something other than a document or record.'" *Id.*

In addressing the interpretation of the term "tangible object" in § 1519, the Supreme Court acknowledged that the dictionary definition of the term "tangible object" could favor a broad meaning but concluded that "the context of § 1519 tugs strongly in favor of a narrower reading." *Id.* at 539 (plurality opinion). The Supreme Court looked at the caption of the statute, the surrounding terms in the relevant list, and the section's position within the chapter to find that

> it would cut § 1519 loose from its financial-fraud mooring to hold that it encompasses any and all objects, whatever their size or significance, destroyed with obstructive intent. Mindful that in Sarbanes–Oxley, Congress trained its attention on corporate and accounting deception and coverups, we conclude that a matching construction of § 1519 is in order: A tangible object captured by § 1519, we hold, must be one used to record or preserve information.

*Id.* at 532 (plurality opinion).

Here, the original version of § 951 was enacted in 1917, in part, in response to German intelligence operators legally purchasing U.S. media organizations during World War I and using them to attempt to influence American opinion of Germany during the war. While the purchases of media outlets were legal transactions, Congress perceived this conduct, among other clandestine activities, as a national-security threat. As one commentator explains, then-Attorney General Thomas Watt Gregory included in his 1916 Annual Report to Congress a proposal called "Changes in Laws Affecting Neutrality and Foreign Relations." David Aaron, <u>18 U.S.C. Section 951 and the Non-Traditional Intelligence Actor Threat from the First World War to the Present Day</u>, 45 Seton Hall Legis. J. 1, 15-16 (2021) (hereinafter, "the Aaron Article"). Watts noted that "'[m]any acts committed in the U.S. in serious violation of its sovereignty and against the peace and safety of its citizens are not now punishable by any Federal criminal law; others are punishable only under unsatisfactory statutes passed in relation to conditions altogether different from those now prevailing.'" *Id.* at 16 (citation omitted). One part of Watts's 1916 proposal eventually became § 951. *Id.*

A 1984 amendment added the legal-commercial-transaction exception. *See* Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, Title II, § 1209, 98 Stat. 1976, 2164. The amendment was debated at a 1982 Congressional hearing entitled "Communist Bloc Intelligence Gathering Activities on Capitol Hill," during which a State Department witness testified that "agent of a foreign power" should except "American lawyers who represent foreign governments in American courts and individuals involved in routine commercial activities. . . ." *Communist Bloc Intelligence Gathering Activities on Capitol Hill: Hearing on S. 1959 and S. 1963 Before the Subcomm. On Sec. and Terrorism of the Comm. on the Judiciary*, 97th Cong., Ser. No. J-97-116, at 38 (1982). In addition, a Senate Report on the exceptions to § 951 states that

> [t]he proposed Act is not intended to cover those individuals in routine commercial matters but is intended to cover individuals who represent foreign governments in political activities that may or may not come within the scope of the Foreign Agent[s] Registration Act. By excluding from the notification requirement several classes of individuals who are presently covered, the proposal also limits the coverage of the statute by focusing only on those in whom the United States Government has a necessary interest.

S. Rep. No. 98-225 at 415.[1]

Based on Congress' intent in enacting both the statute and the subsequent legal-commercial-transaction exception, the Court can discern no basis on which to conclude that the phrase "any individual engaging in a legal commercial transaction" exempts from the reach of the offense individuals who have anything other than a strict commercial relationship with the foreign nation. As in *Yates*, to interpret the exception solely based on its plain language divorced from its context and legislative history would wholly gut the purpose of statute and allow an individual who is alleged to have engaged in (and is subsequently convicted of engaging in) acts against the interests of the United States to escape conviction simply by cloaking any one of the alleged acts in the protective cover of a "legal commercial transaction." Such an interpretation is counter to the purposes of the statute and leads to an absurd result. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 326-27 (7th Cir. 1995) ("We look beyond the express language of a statute . . . where a literal interpretation would lead to absurd results or thwart the goals of the statutory scheme.").

---

[1] The information gathering Defendant is alleged to have engaged in is one of the main activities targeted by the statute and in which the U.S. government has a "necessary interest." According to the Aaron Article, "[a] review of indictments and plea agreements in other cases in which the DOJ charged violations of Section 951 in roughly the first ten years of this century reveals that most fall into one of two categories: information-gathering and procurement or sanctions evasion." Aaron, supra, at 28-29; *see also United States v. Alshahhi*, 21-CR-371 (BMC), 2022 WL 2239624, at *11 (E.D.N.Y. June 22, 2022) (citing the Aaron Article and stating that "[i]nformation-gathering and perception management are exactly the activities in which defendants are alleged to have engaged here. Therefore, defendants cannot fairly argue that their conduct is not the sort plainly targeted by Section 951, or that they lacked notice."). Defendant's contention that the activities he is alleged to have engaged in are not "political" and therefore not the focus of § 951 is unpersuasive.

3

Even assuming arguendo that Defendant's interpretation of the term "legal commercial transaction" is accurate, Defendant's alleged criminal conduct is not restricted to the purchase of background information. The superseding indictment alleges that Defendant engaged in certain acts in furtherance of his purported agreement to act as an undisclosed agent of the PRC, namely that Defendant travelled between Chicago and Beijing, China on multiple occasions; met Intelligence Officer A on December 18, 2013 and January 10, 2014; exchanged text messages with Intelligence Officer A; purchased background reports for certain individuals from Companies A, B, and C on August 30, 2015 and made background-check information available to Intelligence Officer A by email on August 30, 2015; and purchased background reports from Company A on September 18, 2015 and made background-check information available to Intelligence Officer A by email on September 18, 2015.[2] Given these allegations, Defendant's purported relationship with the PRC extended beyond that of engaging in a legal commercial transaction and would be sufficient to convict him if the jury concludes that the government has met its burden with respect to proving that Defendant engaged in these acts. *See United States v. Latchin*, 554 F.3d 709, 715 (7th Cir. 2009) ("In addition to receiving sums of money from IIS personnel at international locations, [the defendant] placed 39 phone calls to IIS agent "Khalil" . . . in Baghdad between June 2001 and May 2004. . . . Whether Latchin actually spied on Iraqi Christians in the United States may be another matter altogether. But the jury did not have to find that he did to convict him under § 951. It was enough for the jury to conclude that Latchin took acts of *some kind* on behalf of Iraq without first registering as a foreign agent.") (emphasis in original).[3]

---

[2] In its reply in support of its motion to exclude the defense, the government also asserts that Defendant sent messages "to his acquaintance Yu Wenzhi, [in which he] explained how he surreptitiously took pictures of his MSS agreement, received cash from the MSS for 'operational' funds, and asked Yu to help him recruit scientists as part of his work for the MSS." (Gov't's Reply, Dkt. # 329, at 10.) The government futher points to Defendant's application to the FBI honors internship program as evidence against Defendant that does not implicate Defendant's interpretation of the legal-commercial-transaction exception. *Id*.

[3] Defendant contends that he is entitled to offer a partial affirmative defense, at least as to the allegation that he purchased background reports at the direction of the PRC. Defendant analogizes § 951 to RICO cases, in which "the Seventh Circuit has recognized that partial affirmative defenses can be put forth to 'knock out' specific predicate acts, even when other predicates remain viable." (Def.'s Supp. Resp., Dkt. # 366, at 2.) The Court finds the analogy inapt. First, for the reasons already stated, the Court disagrees that analyzing a § 951 charge on an act-by-act basis is appropriate. Even assuming arguendo that such an approach is proper, in a RICO case, the government must show in part a pattern of racketeering activity, which requires two predicate acts in a ten-year period. *United States v. Farmer*, 38 F.4th 591, 602 (7th Cir. 2022). Thus, rebutting predicate acts individually can subvert the government's case. Here, however, § 951 does not require the government to show a particular number of acts, and Defendant does not point to any evidence undermining the other acts supporting the § 951 charge in this case. Accordingly, eliminating only the purchase of background reports as an act does not assist Defendant in defeating the § 951 charge. *See United States v. Grapp*, 653 F.2d 189, 194-95 (5th Cir. 1981) ("The rule governing the refusal to charge the jury on a theory of defense is well-settled. Reversible error occurs when there is an evidentiary foundation for the defense and the defense would be legally sufficient to warrant an

      As the record currently stands, Defendant points to no legal or factual basis for asserting that he is wholly excepted from the definition of "agent of a foreign government." Accordingly, the government's motion to exclude the legal-commercial-transaction affirmative defense [329] is granted.

**Date**: September 22, 2022

*[signature: Ronald A. Guzmán]*

**Ronald A. Guzmán**
**United States District Judge**

---

acquittal if believed by the jury. Examining the requisites in reverse order we find that no such defense was presented in this case. Assuming the jury believed that Thatcher did not meet Malo in Chicago on or about May 27, 1977, Thatcher would still be vulnerable to the RICO charges. The alibi defense related to only one of the many predicate offenses underlying the RICO charge. A RICO conviction requires proof of two predicate crimes. A failure of proof on any additional predicate offenses would eliminate only a surplus finding, it would not change the resultant conviction.") (internal citation omitted).