# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

CHAOQUN JI,

      Defendant.

18 CR 611

Judge Ronald A. Guzman

**DEFENDANT'S CLARIFICATIONS AND OBJECTIONS TO THE
PRESENTENCE INVESTIGATION REPORT; AND POSITION PAPER
<u>AND COMMENTARY ON SENTENCING FACTORS</u>**

# TABLE OF CONTENTS

I. Introduction ................................................................................................ 1-2

II. Clarifications and Objections to the Presentence Investigation Report .................. 2-5

    A. Clarification and Objection Regarding the Offense Level Computation,
    PSR pp. 12-14 ................................................................................... 2-5

III. Position Paper and Commentary on Sentencing Factors ..................................... 5-43

    A. Introduction .................................................................................... 5-7

    B. The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1)) ....... 7-19

       i. Concerns Regarding the Scope of the Conspiracy .................................... 7-11

       ii. Limiting Culpability to Mr. Ji's Specific Role in the Offense Conduct ... 11-14

       iii. Additional Considerations Regarding the Offense Conduct ................. 14-15

       iv. Mr. Ji's Other Activities During the Alleged Conspiracy Period ............ 15-18

       v. Intentional Missed Opportunities ............................................................ 18-19

    C. The History and Characteristics of the Defendant
    (18 U.S.C. § 3553(a)(1)) ................................................................... 20-23

    D. A Sentence of Time Considered Served Will be Sufficient to Comply
    With the Factors Set Forth in 18 U.S.C. § 3553(a)(2) ................................ 24-26

    E. A Sentence of Time Considered Served Will be Sufficient to Comply
    With the Factors Set Forth in 18 U.S.C. § 3553(a)(6) ................................ 26-43

IV. Conclusion ................................................................................................ 43

# TABLE OF AUTHORITIES

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007)
.................................................................................................................1, 24

*Kimbrough v. United States*, 552 U.S. 85 (2007)
.................................................................................................................1

*Nelson v. United States*, 555 U.S. 350 (2009)
.................................................................................................................1

*Rita v. United States*, 551 U.S. 338 (2007)
.................................................................................................................1

*United States v. Baker*, 445 F.3d 987 (7th Cir. 2006)
.................................................................................................................22, 26

*United States v. Booker*, 543 U.S. 220 (2005)
.................................................................................................................1, 26

*United States v. Poke*, 793 F.3d 759 (7th Cir. 2015)
.................................................................................................................25

*United States v. Presley*, 790 F.3d 699 (7th Cir. 2015)
.................................................................................................................25

**Guidelines**

U.S.S.G. § 1B1.3 ...........................................................................................10-11

U.S.S.G. § 2B1.1 ...........................................................................................4

U.S.S.G. § 2M3.3 ...........................................................................................2-3, 5

U.S.S.G. § 2X5.1 ...........................................................................................3

**Rules**

Fed. R. Crim. P. 32 .......................................................................................1

**Statutes**

8 U.S.C. § 1227 *et seq*...........................................................................................26

18 U.S.C. § 3553(a)..........................................................................................passim

## DEFENDANT'S CLARIFICATIONS AND OBJECTIONS TO THE PRESENCE INVESTIGATION REPORT; AND POSITION PAPER AND COMMENTARY ON SENTENCING FACTORS

Defendant, **Chaoqun Ji**, by and through his attorneys, **Cheronis, Parente & Levitt**, pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, the opinions of the United States Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), *Rita v. United States*, 551 U.S. 338 (2007), *Gall v. United States*, 552 U.S. 38 (2007), *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Nelson v. United States*, 555 U.S. 350 (2009), as well as 18 U.S.C. § 3553(a), respectfully submits Defendant's Clarifications and Objections to the Presence Investigation Report; and Position Paper and Commentary on Sentencing Factors. For the reasons that follow, Mr. Ji, through counsel, respectfully requests that the Court impose a sentence of time considered served.

## I.      Introduction

After his initial arrest on September 25, 2018, on May 19, 2022, the grand jury returned a five count superseding indictment charging Mr. Ji with one count of engaging in a conspiracy to violate the laws of the United States in violation of 18 U.S.C. § 371, one count of failing to register as a foreign agent in violation of 18 U.S.C. § 951(a), two counts of wire fraud in violation of 18 U.S.C. § 1343, and one count of making a false statement in violation of 18 U.S.C. § 1001(a)(2). Trial in this matter commenced on September 12, 2022. At its conclusion, on Monday, September 26, 2022, the jury returned a verdict of not guilty as to the wire fraud counts, counts three and four, and a guilty verdict as to counts one, two, and five.

Mr. Ji fully understands and appreciates the serious nature of the offense and the fact that he now stands convicted. He has remained respectful and humble at all times during the proceedings. He has been incarcerated at the Metropolitan Correctional Center ever since his arrest,

and most significantly, he has already paid a significant price for the conduct at issue. After review

of the entire set of circumstances relevant to this sentencing hearing, counsel suggests that a sentence

of time considered served is sufficient but no greater than necessary to effectuate the goals of 18

U.S.C. § 3553(a).

## II. Clarifications and Objections to the Presentence Investigation Report

### A. Clarification and Objection Regarding the Offense Level Computation, PSR pp. 12-14.

The government took the position in its version of the offense that "there is no analogous

guideline to account for [Mr. Ji's] conduct of acting as a foreign agent," and therefore, the 18 U.S.C.

§ 3553(a) factors are controlling. PSR p. 12. ¶ 47; Government's Version pp. 58-59. The probation

office agreed as to counts one and two. The court should be aware, however, that since the inception

of the case, the government's position was markedly different.

Its first anticipated calculation—which admittedly was not binding—was submitted on

November 14, 2018, prior to the return of the indictment. At that time, the government believed

that U.S.S.G. § 2M3.3 controlled, and the offense level was 24, resulting in an advisory guidelines

range of 51 to 63 months' imprisonment.

The government took the same position in a letter dated March 5, 2019. Then, in discussions

in the weeks leading up to trial in September of 2022, the government confirmed to counsel that its

position had not changed. While the government has seemingly backed away from this position, it

is unclear whether the change will affect their ultimate recommendation.

That said, § 2M3.3 was the controlling guideline provision under their initial proposed

calculation. That is the offense guideline for willful transmission of defense information, primarily

covering violations of 18 U.S.C. § 793—a much more serious offense that would have required Mr.

Ji to have *actually* transmitted national defense information ("NDI") or classified information, which he did not.[1] The applicable note to the guidelines commentary expressly states that this provision applies only when a defendant actually transmits national defense information or classified information. In its words, it proscribes "willfully transmitting or communicating to a person not entitled to receive it a document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense." U.S.S.G. § 2M3.3 Background cmt.

In the defendant's version of the offense and again now, counsel submits that if the government wished to rely on this calculation, so be it—while it is flawed, it is not without some utility as a sentencing metric. Namely, this overly-harsh provision calls for an advisory range of 51-63 months' imprisonment. Despite the important factual differences this case presents, even if Mr. Ji received a sentence at the low end of that range, the appropriate sentence is still no greater than what counsel requests—a sentence of time considered served.

The probation office rejected this guideline provision *specifically because* Mr. Ji's conduct was less serious than provided in § 2M3.3 and did not involve the actual transmission of classified information. PSR p. 13 ¶ 49.

The parties maintain agreement, however, that 18 U.S.C. § 951 does not have a guideline provision, and pursuant to § 2X5.1, the most analogous guideline provision should be applied; otherwise, the § 3553(a) factors control. *See* PSR p. 12. ¶ 46.

---

[1] The government itself stated in rebuttal argument at trial: "you'll see that [Mr. Ji] is not charged with stealing secrets form the Army, stealing classified information. He isn't. He's charged with acting as an MSS agent." Tr. 1865.

The defense position nonetheless remains that the most analogous guideline is U.S.S.G. § 2B1.1, given that Mr. Ji was in fact charged with wire fraud for conduct that overlapped significantly with the conspiracy.[2] The degree of overlap is presumably not in dispute, but the point is well illustrated by referring to the government's closing arguments to the jury:

- "[the charged false statement] was a lie to the Army so the Army would accept him. So he can get citizenship. So he can stay in the country and work for the MSS. That was an overt act in furtherance of the conspiracy." Tr. 1807.
- "[H]e lied to the Army so they would take him, so he could . . . continue to be an MSS agent in the United States." Tr. 1808.
- "[T]he benefit of the Army is multiple fold for the MSS. It's not only citizenship. As he told the undercover agent, he can get quick access to places in the United States that tend to have limited access to Chinese people." *Id.*
- "Sergeant Crandall told you about the form regarding contacts with certain organizations. . . . [O]ne specific portion of that form identifies the Ministry of State Security. . . . [I]t's checked no." Tr. 1813.
- "Clearly he was joining the Army to help the MSS to get his citizenship, to get access to bases, to get a security clearance he can use later." Tr. 1814.
- "Did [Mr. Ji] do this with the intent to defraud the Army? It's common sense. Of course he did. He was lying to them. He lied about his status. He lied about the MSS. Of course he did it to defraud them. Could have told them the truth, but he didn't because that would blow his cover." Tr. 1815.

Turning then to the offense level calculation, pursuant to § 2B1.1(a)(2), the base offense level is six. No points are added pursuant to § 2B1.1(a) because the loss amount was less than $6,500. No other enhancements or reductions apply.

Mr. Ji has no criminal history and is placed in criminal history category I. The offense level of six, when combined with a criminal history category of I, results in an advisory guidelines range of 0-6 months' imprisonment.

---

[2] The fact that the government did not submit any calculation under the fraud chapter yet expressly referenced the acquitted conduct as offense conduct and/or aggravating evidence in its version of the offense amounts to a legally inconsistent position. Namely, it would be improper for the government, on the one hand, to ignore the sentencing factor that ensures uniformity for the very same conduct—a factor that demands a sentence of time considered served—while at the same time using the underlying conduct to advocate for a higher sentence.

The probation office disagreed with this calculation on the grounds that "anchoring the offense level computation on acquitted conduct would not be utilizing the guideline most analogous to the offenses of conviction." PSR p. 13 ¶ 50. Instead, it reasoned, that counts one and two centered on Mr. Ji's various "interactions with Intelligence Officer A, including, but not limited to, meetings and exchange of emails and text messages, obtaining background reports for multiple people, at the direction of Intelligence Officer A, and receiving payment from Intelligence Officer A as compensation and reimbursement of expenses." PSR p. 13 ¶ 50. It further reasoned that "[n]one of the acts charged in Counts 1 and 2 refer to [Mr. Ji's] enlistment with the United States Army using false information." *Id.* For those reasons, the probation office found that there is no analogous guideline provision for counts one and two, and the false statement conviction results in an undisputed offense level of 6, which ultimately leads to an advisory guidelines range of 0-6 months' imprisonment.

Counsel agrees that the 51-63 month-range calculated under § 2M3.3 is too severe given that it is has never been alleged that Mr. Ji transmitted classified information or NDI. If there is no sufficiently analogous guideline, and the 0-6 months range does not encapsulate the entirety of the offense conduct, whereas 51-63 months applies to conduct *more severe* than what is at issue, these various ranges still provide useful floors and ceilings.

III.    **Position Paper & Commentary on Sentencing Factors**

A.  **Introduction**

Mr. Ji has been in custody awaiting resolution of this case since his arrest in September of 2018. Much has happened during that time. All the while, Mr. Ji's entire family and the vast majority of his friends have been located on the other side of the world. He has been unable to experience

the personal contact that sustains most inmates through the darkest hours of incarceration. He has dealt with the immense difficulty caused by the pandemic and endured overt racism based on his Chinese ethnicity. Mr. Ji has been blamed for "causing" the pandemic that forced illness, lockdowns, and all manner of stress and difficulties. This type of behavior has been mirrored in the world at large, as racism against Asian communities has sky rocketed since the pandemic.

When considering the request for a sentence of time served, it is important to note that this is still a longer sentence than what the guidelines call for, and it is appreciably longer than the vast majority of convicted foreign agents ever receive—even ones who engage in significantly more detrimental or harmful conduct than that for which Mr. Ji stands convicted.

This case did of course take a long time to get to trial. It was a complicated case with uncommon charges, novel theories of prosecution and defense, extensive motion practice, and an enormous amount of discovery. Add in the logistical difficulties of an unheralded global pandemic, and the progress of the case lasted about as long as could be expected. Xu Yanjun himself was arrested some six months prior to Mr. Ji was only finally sentenced in December of 2022, and in a less-hectic district than our own. Xiaoqing Zheng, a GE insider threat, was likewise indicted in 2018 and only just sentenced earlier this month in New York.[3] The point is that the case proceeded as promptly as could be expected, with the best efforts of all, and Mr. Ji understands that. There is no need to have the sentence imposed serve as a justification for events that do not require independent justification.

In any event, Chaoqun Ji is a young man with no criminal history. He is well educated and comes from a loving and working class family. The conduct he has been convicted of and will be

---

[3] Mr. Zheng was sentenced 24 months' imprisonment after trial, no less, as will be discussed further herein along with other relevant § 951 and espionage-related prosecutions.

sentenced for is no doubt serious. But upon considering all the relevant circumstances—the offense conduct, Mr. Ji's history and characteristics, and everything else required, counsel is requesting a sentence of time considered served.

**B. The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))**

**i. Concerns Regarding the Scope of the Conspiracy**

It appears necessary to raise as an initial point of concern the fact that the portrayal of the offense in the government's version risks greatly expanding the scope of the alleged conspiracy well past reasonable bounds. The government has provided an extensive overview of contemporary economic espionage carried out by the People's Republic of China on a national and international level. The vast majority of actions discussed were not undertaken with Mr. Ji's involvement or knowledge. He had no involvement whatsoever in the alleged activities underlying Mr. Xu's Ohio case, for example, the 2009 Chinese hacking of data from Lockheed Martin (Mr. Ji would have only turned 18 in February of 2009), the C919 "JSSD success," or any other espionage efforts discussed in the government's version or the thousands of pages of exhibits it included.

§ 951 prosecutions are rare, and counsel does not dispute that having a better understanding of how economic espionage functions on an international level can have some minimal level of relevance. To the extent that the government is offering this as background or context, its position is more understandable. Hopefully, in any event, the government it is not advocating for a position that holds Mr. Ji accountable for everything the PRC—a country of over 1.4 billion individuals—has done, rather than his own specific actions.

And on that point, it is important to recall that Mr. Ji was present here in the United States for approximately five years prior to his arrest, from August 28, 2013 through September of 2018.

With the exception of purchasing the consumer background reports Mr. Ji was not charged with performing additional actions on behalf of the PRC while in the United States *i.e.* in his capacity as an alleged foreign agent.

The government did introduce the January 2014 text message conversation Mr. Ji had with his friend, Yu Wenzhi, in which Mr. Ji asked his friend to recruit students from his aviation program for him. This was proven to be a one-off conversation between friends who spoke to each other on a regular basis over these entire five years. There was no evidence of follow-up or active solicitation. No actual exchange of funds to further the alleged purpose. No pressure, continued efforts, or anything further on this. And this is true despite the fact that the government introduced evidence that the two remained friends at least up until November of 2019 and were in regular contact throughout those five-plus years. That is not to say the Court cannot properly find this conversation to be troubling, but like so much of the government's evidence, it consists of words without corresponding action.

As for joining the Army, that was not a tasking Mr. Ji received from the MSS. In fact, it is undisputed that he did not even tell any alleged MSS officer prior to doing so. Case Agent Nguyen testified to this point before the grand jury, and the agents who were asked about it at trial all acknowledged this fact as well. There was no evidence that Mr. Ji took any actions on behalf of the PRC while he was in the Army. Even during the meetings with the undercover agent, Mr. Ji was repeatedly asked whether he sent anything to China that was classified or if individuals in China had ever asked for classified information. Mr. Ji responded in the negative and there was no evidence presented to the contrary.

Beyond that, the universe of Mr. Ji's conduct allegedly undertaken on behalf of the PRC

included the 2013 purchase of some Estee Lauder retail cosmetics for one of the officer's sisters. The government did not present evidence of this at trial.

It is also important to remain cognizant of the fact that the conspiracy charge was a specific one. It was not a conspiracy to commit economic espionage. It was not a conspiracy without an object. It was defined and limited to a conspiracy to violate § 951. The government has acknowledged that point. *See* Dkt. # 241 p. 2 (referring to the § 371 conspiracy as an "offense clause" conspiracy).

In fact, in its *Santiago* Proffer—where the government was required to "proffer" and set forth and establish the parameters of the at-issue conspiracy and its proof thereof (without any concern of cross-examination or other rebuttal)—it alleged specific membership in the conspiracy for only four named individuals: Mr. Ji, Mr. Xu, Geng Zhengjun, and Zha Rong. *Id.* at p. 3. It further alleged that, as part of the conspiracy, the co-conspirators would discuss matters pertaining to the conspiracy, "including [Mr.] Ji acting as an [sic] MSS agent while living in the United States," and it went on to detail the background reports purchase and transfer as an act in furtherance of the conspiracy. *Id.* at pp. 3-4.

> At trial, the government's evidence will establish that Xu and defendant Ji Chaoqun conspired with each other and others within the MSS, including Geng and Zha, to violate 18 U.S.C. § 951.

Also telling was the fact that during litigation over the government's *Santiago* Proffer, after defense counsel contested whether Mr. Xu's daily calendar entries during the relevant time (given that only one of over 1100 entries made any reference to Mr. Ji), communications Mr. Xu made with academics in furtherance of his efforts to recruit American scientists (without any claimed involvement of Mr. Ji's), a recording of Mr. Xu's meeting with representatives of the Aviation

Industry Corporation of China, and Mr. Xu's conversations with a NUAA professor. When counsel challenged whether these statements were a part of and in furtherance of the claimed conspiracy involving Mr. Ji (*see* Dkt. # 263), the government conceded that these items present a "close[ ] question" as to admissibility and asked the Court to defer ruling. Dkt. # 274. With the exception of the single entry from the Xu calendar referencing Mr. Ji, it elected not to admit any of these items at trial given their attenuated relevancy.

In open court, on May 4, 2022, the government acknowledged that Mr. Xu's "Ohio case concerned different charges related to different conduct." 5/4/22 Transcript p. 12. There was an extended discussion that same hearing between the Court and the prosecutor in which the Court itself extensively questioned this broad theory. *See id.* at pp. 30-34.

In any event, outside of the extremely broad allegation that all of these actions implicate Chinese national interests and intelligence efforts, Mr. Xu's recruitment of the GE employee had nothing to do with Mr. Ji. Neither did foreign hackers[4] efforts to access U.S. weapons systems that the government opened its version of the offense with. Whatever helpful context this information provides, it risks shifting the focus off of Mr. Ji's own alleged conduct.

Even if Mr. Ji and these countless other unspecified individuals were working towards a common national interest, that does not make Mr. Ji accountable for those actions at his sentencing. Those limits are primarily governed by U.S.S.G. § 1B1.3, which at least for guidelines purposes, restricts consideration to:

> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

---

[4] In support of this claim the government cited a Commission Report that, in turn, cites to a 2013 Washington Post article discussing a separate confidential report that was the original source of this information. None of these publicly available materials discuss who these foreign hackers in fact were, outside of the fact that they were associated with the Chinese government.

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—

    (i) within the scope of the jointly undertaken criminal activity,

    (ii) in furtherance of that criminal activity, and

    (iii) reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

And as the very first Application Note to § 1B1.3 makes clear, "the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator."

### ii. Limiting Culpability to Mr. Ji's Specific Role in the Offense Conduct

The foregoing is not at all meant to suggest that the crimes for which Mr. Ji was convicted are not serious. All § 951 prosecutions are, and that point is not in dispute. But focusing now on Mr. Ji's specific role in the offense as ought to be the case, according to government expert James Olson, he was a "co-optee," an individual who gets tasked by an intelligence officer or "operator." Co-optees[5] like Mr. Ji are essentially expendable. The point is perhaps best illustrated by the fact that after Mr. Xu's arrest in April of 2018, Mr. Ji would have been exposed and vulnerable to foreign authorities. The only contact he received from a Chinese emissary was in fact the undercover agent

---

[5] One point that deserves clarification is the government's quotation of Mr. Xu in its version of the offense, where he referenced how officers have to "take the risk" and travel outside China to "flip" scientists and others, and Mr. Ji did just that. Of course, number one, there is no allegation that Mr. Ji "flipped" any scientist. And two, again, Mr. Ji was a mere "co-optee"—he is the one the intelligence officers convinced to "take the risk" so that more important and valuable individuals to the MSS did not have to.

working on behalf of the United States government.

In the espionage world, beyond recruiting co-optees, the job of the operator includes lying, deceiving, and manipulating. As James Olson has written and re-affirmed during his testimony:

> I consider myself a moral person, at least I hope I am. But I lied, cheated, manipulated, and deceived every day of my CIA career. I stole foreign country's secrets whenever I could and undermined unfriendly governments. I induced foreign officials to commit treason against their own countries. I saw and exploited the dark side of human nature more than I care to remember. I believed then and still do that all these actions were in the service of a noble cause but no one could have had the kind of career I did without at least some second thoughts. 9/15/22 Tr. pp. 547-548.

He acknowledged that recruiting co-optees "can be a dirty business." *Id.* at 558. He agreed that manipulating potential recruits or targets can be an important part of recruitment, and coercion and deception can be a part of it too. *Id.* at 559-561.

While the government presented evidence that at some point Mr. Ji became aware of who he was dealing with, manipulation was indisputably part of his own recruitment. Starting with the undergraduate career fair at which Mr. Ji first met Mr. Zha in or around the winter of 2012/2013, Mr. Zha did not identify himself as a powerful figure recruiting for the MSS. This point was made in the criminal complaint, where the government cited the transcript from the second undercover meeting:

> UC    So you contacted him. Then Mr. Geng contacted Mr. Xu?
>
> JI    Correct. That's because the three of them were in the same group.
>
> UC    Yeah.
>
> JI    This is what I observed. They did not explain that to me. Nor did I ask them about it. Initially when I met Mr. Zha, it was during a recruitment fair in the IM [PH] school. There was not much advertising. They were asking if anyone was interested in joining the organization. They said it was a confidential unit but they did not elaborate. Therefore, I went there and met Mr. Zha. Afterwards, Mr. Zha asked Mr. Geng to contact me in Beijing because Mr.

> Geng was in Beijing during that period of time. It was during my Nanjing trip that I met Mr. Xu for the first time when he was together with Mr. Zha. Afterward, while I was back in Beijing, no, not that. It was when I was in Beijing I contacted Mr. Geng for a few times. I often dined with him. He told me stories such as Long-Tan-San-Jie the three covert CPC agents inside KMT. Afterwards, I went to Nanjing to look for and meet Mr. Xu. Afterwards, when I first left China, it was Mr. Geng who contacted me using my undergraduate name and my newly registered email address.

UC    Mr. Geng?

JI    Yes.

UC    So you have not directly contacted Mr. Xu before?

JI    Not a lot. Actually, I contacted Mr. Geng more at that time. Initially, it was Mr. Geng whom I had more contact with. That was when I was in the undergraduate school in Beijing.

UC    Mr. Geng was in Beijing?

JI    At that time in Beijing.

UC    Afterwards, you started contacting Mr. Xu?

JI    Yes, because according to Mr. Xu, Mr. Geng was transferred to a different department.

And the fact is, operators and officers target young, impressionable college kids like Mr. Ji. They try to "get their hooks in them." *Id.* at 578. While Mr. Olson found the view a bit cynical, as referenced during his cross-examination, Christopher Kimmins, a former counterintelligence officer with the Department of Defense has noted the following:

> People are most pliable in their late teens and early 20s when they're young and inexperienced. It's easy for someone trained in the art of manipulation to steer them in a direction in the art of manipulation to steer them in a direction they're already inclined or to help convince them it's what they intended all along.

This leads to situations where actual experienced and capable spies manipulate individuals in their early 20s by wining and dining them so that they can get their hooks in them for their own purposes.

While this is not an attempt at minimizing the conduct for which Mr. Ji was alleged to have committed and was convicted of, it is important context when looking at his alleged overall role.

Counsel and Mr. Ji also recognize that these points have been repeatedly raised and argued both prior to and during trial. While counsel and Mr. Ji respect the fact that the Court, for example, found that the undercover ruse did not make his statements involuntary within the meaning of the Constitutional Due Process analysis, they nonetheless remain relevant considerations for purposes of sentencing.

### iii. Additional Considerations Regarding the Offense Conduct

It is next important to acknowledge that while in the United States, Mr. Ji's alleged actions on behalf of the PRC were limited. It has never been disputed that he in fact sent the commercially available background reports to Mr. Xu in the fall of 2015. In that situation Mr. Xu contacted Mr. Ji out of the blue, sent him a list of names, with websites to search, and the individual's employer and other basic identifiers, and asked him to pull these reports as a "favor," even if it was in actuality a tasking. Mr. Ji complied with this straightforward request. It likewise remains uncontested, however, that Mr. Xu later asked him to take notes on the efficiency of the various websites, but Mr. Ji never did so.

It must also be noted that Mr. Xu could have obtained the reports himself. As the corporate representatives testified, these websites are accessible in China. *See* 9/16/22 Tr. pp. 682-84. They are targeted to the online dating community and people looking for long-lost relatives. *See* Tr. 679. This and related points were elicited on cross-examination and not rebutted at any point.

Much of the ostensibly aggravating information in this case comes by way of statements Mr. Ji made to the undercover about what his potential future plans were including obtaining top secret

clearance and sharing information with China. As the Court explained in its order granting in part and denying in part the government's *Santiago* proffer, in reference to what Mr. Ji claimed to the agent he wanted to do in the future, "[Mr. Ji] was not specifically tasked to do any of these activities, and thus no larger conspiracy was formed merely by [his] self-created aspirations to assist the MSS."

The fact is that Mr. Ji did not do any of those things. The statements were made under circumstances where Mr. Ji thought he was being investigated by the PRC and whether they were heartfelt or in response to pressure, they never materialized.

### iv. Mr. Ji's Other Activities During the Alleged Conspiracy Period

Meanwhile, it should be noted they during his time in the United States, Mr. Ji was living his life day in and day out as a typical college student. He took an interest in the LDS Church and went so far as to get baptized in or around November 2015, which is right around the time of the background reports purchase:



He frequently traveled to Salt Lake City and made numerous donations to the Church, proof of which were introduced into evidence at trial. He even went to Temple:



He went to Youth Group events in Hyde Park:



He would fly his ex-girlfriend and his family out here and travel the country:



**From:** cji6@hawk.iit.edu
**Subject:**
**Date:** March 2, 2014 at 4:37 PM
**To:** cji6@hawk.iit.edu

**From:** cji6@hawk.iit.edu
**Subject:**
**Date:** October 9, 2013 at 11:07 AM
**To:** jcq202109@126.com

**From:** **TheLINQ@elevatedigital.com** TheLINQ@elevateDIGITAL.com
**Subject:** View your photo from The LINQ
**Date:** August 6, 2014 at 3:03 AM
**To:** buaajcq@gmail.com

Introducing a fresh perspective--with a mix of entertainment, dining, bars, nightlife, and retail--The LINQ provides a place to revel in the search and discovery, whether you are exploring the street or taking in all of Las Vegas from atop the 550-foot-tall High Roller. Stay connected to the latest events, happenings, and news by following us on Facebook and Twitter.

**From:** **St. Patrick's Cathedral, NYC** loual.puliafito@saintpatrickscathedral.org
**Subject:** St. Patrick's Cathedral I Greetings
**Date:** August 22, 2014 at 9:51 AM
**To:** Chaoqun buaajcq@gmail.com

Is this email not displaying correctly?
View it in your browser.

ST.PATRICK'S
CATHEDRAL

Dear Chaoqun,

Thank you for signing up on our guest book.

It is a particularly exciting time at St. Patrick's Cathedral.

At the Cathedral you can see and hear the sights and sounds of the ongoing restoration: the scaffolding towers over most of the nave, stairs ascend to the top for the workers, netting and wiring are interlaced with a busy hum—and sometimes large clang—of activity! We pause during the noon mass as the workers break for

StPatricksCathedralNYC

@StPatsNYC

Watch Mass Live

**Join us Sunday at 10:15 EST**
www.saintpatrickscathedral.org/live/

The photo at the Linq was taken in August of 2014—eight months after the Nanjing trip in which the government alleged Mr. Ji was presented with the MSS registration form—and it carries the added utility of showing just how very young Mr. Ji was at the time.

### v. Intentional Missed Opportunities

The fact that any actual action in the United States on behalf of the MSS was limited even in allegation to the purchase of the background reports and one off-the-cuff conversation with a close friend was not for a lack of opportunity during the five years Mr. Ji was present in this country.

This starts with the job opportunity at Motorola Mr. Ji received in the summer of 2015. This offer came up during the course of trial. To summarize, Mr. Ji received a job offer from Motorola in and around May of 2015. He chose to decline the offer and back out just prior to the start date. A month later or so, in that following June after being out of contact with Mr. Xu for many months, and in fact being unemployed, he lied to Mr. Xu and told him that he was working at Motorola.

James Olson, who was not given the emails demonstrating that Mr. Ji never actually worked for Motorola[6], stated that Mr. Ji's communication with Mr. Xu (which Mr. Olson believed to be truthful) was important "because Motorola is a high-tech company, and I believe that the MSS would be very interested in having one of its assets associated with Motorola." Tr. 631.

In 2016 Mr. Ji also had the inside track for a position with Qualcomm. In fact, the company actually reached out to him about an opportunity based on a referral an acquaintance made for him:

---

[6] They were introduced at trial during the cross-examination of other witnesses.

**From:** referral.apps@qualcomm.com
**Subject:** Qualcomm Employment Referral
**Date:** March 13, 2016 at 4:45 AM
**To:** buaajcq@gmail.com
**Cc:** referral.apps@qualcomm.com

R

Hello Chaoqun,

We recently received your name and resume as a referral from Shanguo Chen, an employee at the Qualcomm family of companies ("Qualcomm"). We have set up a preliminary Profile for you in our Qualcomm Careers site. Please click here to choose a new password and complete your Profile.

Please note that this link will expire in 7 days. If the webpage expires and you are unable to change your password, please use our 'Forgot Password' tool.

Once you complete your Profile, we encourage you to apply for open positions that may be of interest. Our postings are updated periodically, so check back regularly to our Qualcomm Careers site at http://www.qualcomm.com/careers.

Thank you for your interest in Qualcomm.

Sincerely,

Qualcomm Staffing

Qualcomm is an Equal Opportunity Employer

Qualcomm, of course, is the self-described "world's leading wireless technology innovator," a chief competitor of Huawei[7], and most importantly, a defense contractor.[8] The government sent a subpoena to Qualcomm and received negative results, i.e. a "no records response"—Mr. Ji never pursued it.

### C. The History and Characteristics of the Defendant (§ 3553(a)(1))

In determining the sentence to be imposed, the Court must also consider the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

Chaoqun Ji was born on February 11, 1991, in Dongying, Shandong, PRC. PSR p. 15 ¶ 70. He was the only child born to his parents, Hongming Ji, now 59, and Lanhua Zhang, age 55. *Id.* His father worked as an accountant with the state tax bureau, and his mother teaches math to elementary school age children. *Id.*

---

[7] *See* https://www.itbusinessedge.com/it-management/qualcomm-vs-huawei-is-this-a-battle-between-companies-or-countries/
[8] https://www.qualcomm.com/news/releases/2018/01/04/department-defense-awards-innovative-contract-qualcomm-pilot-actionless

Life was not easy growing up in Dongying. Although Mr. Ji was always provided food and clothing, the family lived in a "collective building" with many other families and in poor conditions. *Id.* at ¶ 71. The building lacked running water and all of the families had to share a bathroom. It was not until 1998 that they were able to relocate to their own two-bedroom apartment. *Id.* Then, in 2006, Mr. Ji moved to Shanghai to attend boarding school. As he was the only individual at the school from the northern province of Shandong, he was treated by others as an "outsider." *Id.* He experience a significant degree of prejudice and lived alone in a dormitory. *Id.* In 2009 he transitioned to another school in Beijing, closer to his family, where he remained through 2013.

Even so, he did not see his parents frequently, and did not have a close relationship with them. *Id.* at ¶ 72. After first coming to the United States in August of 2013, he maintained contact with his parents by phone roughly once every couple of weeks.

Although he is practically always pleasant and enjoyable to be around, things have not always been as bright internally, as Mr. Ji has experienced significant mental health struggles. Though some appeared earlier in life, his detention at the MCC has proven exceptionally difficult. PSR p. 17 ¶ 83. Mr. Ji began experiencing suicidal ideation after another inmate at the MCC committed suicide in October of 2019. Things worsened a few months later in March of 2020 when the pandemic hit. At its most serious, Mr. Ji prepared a rope and tape in preparation for a suicide attempt, but did not follow through with it.

Most inmates manage the stress and difficulties of detention and a pending federal case primarily through family contact. That contact keeps up their will to fight through such difficult times. Mr. Ji, as a citizen of China, has no family here, and as a result, received very few social visits.

But after the pandemic hit his ability to have telephonic contact became even more limited than usual.

It was during this time that he also experienced racism and verbal abuse from both staff and inmates. This seemed to have occurred as a result of others blaming China and by extension him as a Chinese person for the pandemic and the massive dangers and interruptions it brought to everyone's life. Suffice to say, it is widely understood how difficult life in jail is under normal circumstances. It does not take much imagination to understand how quickly other inmates would turn against someone in Mr. Ji's shoes when looking for a scapegoat for the health fears, extreme privilege restrictions, and case delays everyone experienced as a result of the pandemic.

Mr. Ji also suffers from physical health issues, namely, various conditions that affect his eyesight. The Court may recall a number of requests to hand off new glasses at status hearings over the years. This stemmed from the fact that he has a limited visual field due to an underdeveloped optic nerve that occurred at birth. PSR p. 17 ¶ 80. He suffers from glaucoma and experiences "floaters" in both eyes, and has been since approximately April of 2021. His father spoke about this in his letter to the Court as well, as Mr. Ji spoke to his family extensively about his health problems over the years.

It is also important to remain cognizant of the fact that Mr. Ji has never been in any sort of serious trouble here or elsewhere. As a first-time offender, a sentence of imprisonment is undoubtedly more difficult than it is for most repeat offenders, or even those who have prior contact with the criminal justice system. *See United States v. Baker*, 445 F.3d 987, 992 (7th Cir. 2006) (affirming below guidelines sentence where sentencing court found "that a prison term would mean more to [this defendant] than to a defendant who previously had been imprisoned" and stating that

"[c]onsideration of this factor is consistent with **§** 3553's directive that the sentence reflect the need for just punishment and adequate deterrence").

As to his personality, counsel is submitting a number of translated character letters that have been received from his family and friends. Notable among them is a letter from his mother, Lanhua Zheng. She echoes a lot of the details about their family life growing up as Chaoqun reported to the probation officer. She explained how life was difficult and the family suffered from poverty at times. Lanhua gave the example of a time period where the family did not have running water, and Chaoqun would have to go fetch it regularly from a nearby source. She explains how this instilled in him a dream to earn money and do better for his family.

Lanhua also explained how difficult life has been in Chaoqun's absence. He is always one to put others first, whether its cooking and caring for his own family, and just the same when it comes to the poor in his neighborhood. Given his character and how important he is to the family, Lanhua explained their current suffering in tragic detail. She, as others had as well, noted the physical ailments her husband has endured since a severe car accident in 2007. She herself has spent the past four-plus years working during the day, and having to stay up at night to be able to talk to Chaoqun due to the time zone difference. This schedule, along with all the stress and fear and anxiety of her son's foreign incarceration, has led to her developing diabetes, heart disease, emphysema, vision issues, and even her hair falling out. Lanhua noted how Chaoqun's grandmother passed away two years ago while he was incarcerated and unable to be present for the funeral ceremonies—let alone any other yearly holidays and other celebrations and events.

Hongming Ji, Chaoqun's father, also wrote a letter expressing similar sentiments. He described how after his accident it became his teenage son's responsibility to take care of the family,

including purchasing daily necessities, running other errands, and all the while rising to his various academic challenges and demands. In his absence, Hongming describes how "there's no more laughter or happiness in our family. The holidays and vacations when families were to reunite happily are the saddest days of our family. Every time we think of our child being imprisoned in a foreign prison, our hearts would ache and our tears would pour." He explained how when his mother passed two years ago, with Chaoqun in jail halfway across the world, she could only yearn for her grandson and call out his name. Tragically, the family has not previously informed Chaoqun about his grandmother's passing out of concern for how it would affect him as he endured his time in an American jail awaiting resolution of his case.

Chaoqun's aunt, Wenxin Ji, wrote to express many similar sentiments. She too spoke of the passing of Chaoqun's grandmother, and how his grandfather is now 95-years-old, and the family prays he will not similarly pass before having the chance to be reunited with Chaoqun.

In any event, for all of these reasons, and as expressed more fully in the entirety of the character letters, Mr. Ji's personal history and characteristics militate against imposition of a sentence carrying any additional term of imprisonment.

### D. A Sentence of Time Considered Served Will be Sufficient to Comply with the Factors Set Forth in 18 U.S.C. § 3553(a)(2).

After considering the nature and circumstances of the offense and the history and characteristics of the defendant, the Court is charged with fashioning a sentence that is sufficient, but not greater than necessary—taking into account the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, and protect the public from further crimes of the defendant, and provide

defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D).

With respect to this factor, it is first important to acknowledge, as the Supreme Court has, that overly harsh sentences "may work to promote not respect but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54. Given the relevant guidelines provisions and the degree of punishment defendants sentenced for violations of § 951 and similar offenses typically face, any additional length of imprisonment may do just that.

But as to deterrence, the government's extensive discussion of the contours and prevalence of contemporary economic espionage efforts carried out by the PRC is presumably to emphasize the increasing need for deterrence, and counsel does not intend to offer significant factual dispute on the point.

But the reality is that China is not the only country that engages in espionage as several government witnesses proclaimed. Moreover, Mr. Olson has publicly described in a recent podcast that Chinese espionage, unlike Russian espionage, which is personal, spiteful, and intent on causing harm and destruction, is simply "business." That is, China is focused on increasing its own science and technology capabilities as opposed to weakening its competitors. This is not to say, in any way, that because everyone is doing it, Mr. Ji should go unpunished. Rather, it is relevant that the government's own witnesses spoke to the prevalence of similar conduct by all countries, including the United States, and that too, is relevant context.

Finally, so much of the government's articles and commentary focus on China's rising industrial strength and increasing ability to challenge western hegemony in many industries. We

may not like it, but that in and of itself is not a crime. Neither is "brain drain," or licit technology transfers as were discussed at trial by Mr. McReynolds.[9] The focus instead, should remain fixed on the conduct that the jury convicted Mr. Ji of, and Mr. Ji alone.

As to this factor, the Court should consider the arguments put forward by Judge Posner in *United States v. Presley*, 790 F.3d 699 (7th Cir. 2015). In *Presley*, Judge Posner cast serious doubt on the additional deterrence value provided by lengthy sentences, and ultimately advocated against the general imposition of lengthy sentences. More specifically, Judge Posner relied on emerging academic literature in the field of economics, citing what economists call the "discount rate." *Id.* at 701. According to that theory, "[c]riminals . . . tend to have what economists call a 'high discount rate'—that is, they weight future consequences less heavily than a normal, sensible, law-abiding person would." *Id.* In other words, the length of a sentence has less of a deterrent effect on such an individual than "the likelihood that he will be caught, imprisoned, and convicted." *Id.* Thus, "[a]n increase in the length of a sentence may therefore add little additional deterrence, since every sentence increment is an increment in future, not present, punishment." *Id.*; *see also United States v. Poke*, 793 F.3d 759, 761 (7th Cir. 2015) (reiterating the *Pressley* opinion's concern with the limited added deterrence effect of a lengthy sentence in light of the "discount rate"). This is especially true given the way he was arrested out-of-the-blue while present in a foreign country, and has essentially been wrested out of his daily life without any semblance of normalcy since that day.

Finally, it should be noted that specific deterrence is a non-consideration given that Mr. Ji will almost certainly be subject to deportation. *See* 8 U.S.C. § 1227 *et seq.* This remains a consideration at sentencing primarily insofar as it removes specific deterrence as a consideration,

---

[9] This point was discussed even more fully by James Mulvenon, a government expert at Mr. Xu's trial, whose transcript was attached to the government's version as an exhibit for this sentencing.

but also because Mr. Ji will be unable to take advantage of many of the rehabilitative programs that other BOP inmates are capable of enrolling in. *See United States v. Baker*, *supra* at 992.

### E. A Sentence of Time Considered Served Will be Sufficient to Comply With the Factors Set Forth in 18 U.S.C. § 3553(a)(6).

18 U.S.C. § 3553(a)(6) mandates that "[t]he court, in determining the particular sentence to be imposed, shall consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In fact, as the Supreme Court noted in *Booker*, Congress' "basic statutory goal" in enacting the guidelines was to implement "a system that diminishes sentencing disparity." *Booker*, 542 U.S. at 250.

Relevant to this factor, as well as to § 3553(a)(2) and this sentencing hearing generally, is the fact that there are a discrete and identifiable number of § 951 prosecutions across the country. Upon reviewing the facts and details of these cases, it becomes abundantly clear that foreign agents who commit far, far more dangerous and harmful actions routinely get less time than Mr. Ji has already accumulated in the course of his pretrial custody. In fact, cases in which defendants received a sentence longer than Mr. Ji will already be given credit for, practically without exception, involve one of two factors: the actual theft and transmission of NDI or classified materials, or highly expensive trade secrets or proprietary information.

Below is a table containing basic information about numerous § 951 and espionage-related prosecutions that counsel has been able to locate, and information regarding those cases and their disposition:

| Case Title | Charges | Trial/Plea | § 5K1.1 | Guidelines | Sentence | Facts/Notes |
|---|---|---|---|---|---|---|
| United States v. Baimadajie Angwang 20 CR 422 (E.D.N.Y. | 951 1001 1343 1512 | | | | | Case Pending |
| | | | | | | |
| United States v Chen, 14 CR 149 (S.D. Ohio) | 641 1030 1001 | | | | | Dismissed |
| United States v. Craig, 19 CR 125 (D.D.C.) | 1001 612 618 | | | | | Acquitted |
| United States v. Flynn, 17 CR 232 (D.D.C.) | 1001 | | | | | Dismissed |
| United States v. Hu, 20 CR 21 (E.D. Tenn.) | 1001 1343 | | | | | Acquitted |
| United States v. Guan Lei, 20 CR 127 (C.D. Cal.) | 1519 | | | | | Charges Dismissed: https://www.latimes.com/politics/story/2021-09-16/why-trump-china-initiative-unraveling |
| United States v. Ma, 20 CR 83 (D. Haw.) | 794 | | | | | Case Pending |
| United States v. Rafiekian 18 CR 457 (E.D. Va.) | 371 951 1001 | T | | | | Case Pending |
| United States v. Tang, 20 CR 134 (E.D. Cal.) | 1546 1001 | | | | | Charges Dismissed: https://apnews.com/article/government-and-politics-5630f8fda6cbf10a5f07ce4ed9116095 |

| United States v. Ye Yanqing, 20 CR 10021 | 1546 1001 951 371 | | | | | Case Pending |
|---|---|---|---|---|---|---|
| United States v. Zaidi et al., 20 CR 181 (D.D.C.) | 371 951 1701-06 1956 | | | | | Case Pending |
| United States v. Kaikai Zhao, 20 CR 187 (S.D. Ind.) | 1546 | | | | | Charges Dismissed: https://www.washingtonpost.com/national-security/us-drops-cases-against-five-researchers-accused-of-hiding-ties-to-chinese-military/2021/07/23/54a8b268-ec04-11eb-8950-d73b3e93ff7f_story.html |
| United States v. Mingqing Xiao, 21 CR 40039 (S.D. Ill) | 1343 tax charges | T | | 10-16 months | Probation | Mathematics professor accused of concealing ties to Chinese government and universities in obtaining NSF funding. Defendant received 24K a year from Shenzhen University starting 2016. |
| United States v. Leung | Tax Charges False statement | P | | | Three Years' Probation | FBI Source for over 20 years paid $1.7 million. Working for the MSS all along. Infiltrated United States Counterintelligence on behalf of China. |
| United States v. Meng, 18 CR 457 (E.D.N.Y.) | | | | | Deferred Prosecution | Huawei CFO. Concealed Huawei's relationship with PRC government as part of scheme to defraud a global financial institution |
| United States v. Ying Lin, 15 CR 601 (E.D.N.Y.) | 951 | P | | | 60 mo. probation | Defendant smuggled items while working for an airline onto plans, or allowed them on, on behalf of PRC officials. The government argued for a 48-month sentence. |
| United States v. Zheng, 20 CR 10015 (D. Mass.) | 554 1001 | P | | 0-6 | 3 mo. | Defendant tried to smuggle cancer research material he came into possession of as a student researcher back to China and lied about it when confronted by law enforcement. |

| | | | | | | |
|---|---|---|---|---|---|---|
| United States v. Ben Israel, 13 CR 572 (Bucklo, J.) | 951 | P | | 10-16 | 7 mo. | Lobbying activities on behalf of Robert Mugabe's regime in Zimbabwe. Consulting agreement paid defendant $3.4 million. Attempted to lobby U.S. politicians to lift sanctions against genocidal government meant to curb human rights violations. |
| United States v. Zhang, 19 CR 80056 (S.D. Fla) | 1752 1001 | P | | 0-6 | 8 mo. | Defendant lied to federal agents during and after an effort to gain access to Mar-a-Lago. |
| United States v. Cabelly, 09 CR 278 (D.D.C.) | 371 1701-06 1956 1542 1001 | P | UNK | | 8 mo. | DC Lobbyist indicted for conspiring to violate Sudanese sanctions and to act as illegal Sudanese agent. Sudan was listed as a state sponsor of terror at the time. Provided the government with sensitive and controlled information, and affirmatively lied about his relationship. Paid over $180,000 by a foreign oil company that he concealed in an offshore account. |
| United States v. Zhongsan Liu, 19 CR 804 (S.D.N.Y.) | 371 (conspiracy to commit visa fraud) | T | | | 10 mo. | Government argued purpose of visa fraud conspiracy was to enable conspirators to work in the US for the Chinese government improperly and against research program restrictions. Tried to get visas for others. Government asked for within guidelines' sentence. Government and probation argued for aggravating role enhancement. Specific arguments that scheme was for and in coordination with PRC government. "More serious international impact." Sophisticated and lasted years. |
| United States v. Yui Mak, 05 CR | 951 1001 exporting offenses | P | | | 11 mo. | Defendants were guilty of theft of sensitive military technology for China. This defendant pled |

| Case | Statute | P/T | | Range | Sentence | Description |
|---|---|---|---|---|---|---|
| 293 (C.D. Cal.) | | | | | | guilty and had a minor role in the offense. |
| United States v. Qianli, 18 CR 10035 (S.D. Fla.) | 795 (photographing defense) | P | | 0-6 | 12 mo. | Defendant, a Chinese national, photographed a Florida military installation without permission. |
| United States v. Yeo, 20 CR 87 (D.D.C.) | 951 | P | | | 14 mo. | Sought citizens with access to information to write reports to send to "clients" in PRC who in fact were his PRCIS handlers. |
| United States v. Turner, 13 CR 572 (Bucklo, J.) | 951 371 | T | | 15-21 | 15 mo. | Lobbying activities on behalf of Robert Mugabe's regime in Zimbabwe. Co-defendant of Ben-Israel. |
| United States v. Butina, 16 CR 218 (D.C.) | 951 371 | P | | 0-6 | 18 mo. | Russian Gun Rights Activist; high profile case. Involved attempts to influence United States politics and elections. |
| United States v. Kang, 08 CR 210 (E.D. Va.) | 951 | P | | 30-37 | 18 mo. | Provided a Chinese government official with sensitive U.S. government information including national defense information classified as "secret." |
| United States v. Al-Awadi, 07 CR 20314 (E.D. Mich.) | 951 | P | | 51-63 / 57-71 | 18 mo. | Defendant pled guilty to reporting to Iraqi intelligence about Iraqi opposition groups in the U.S. and Canada. The parties stipulated that the sentence should not exceed 51 months. Defendant provided information on the number of refugees in certain locations, members and addresses of political party members, the activities of Muslim student groups, etc. |
| United States v. Zhang, 15 CR 106 (N.D. Cal.) | 1831 1832 | T | | 41-51 | 18 mo. | Defendant and his co-conspirators stole business technology trade secrets and intended to start a Chinese company and compete with U.S. companies. $476,000 in restitution ordered. Technology related to radio frequency filters |

| Case | Statutes | | | | Sentence | Description |
|---|---|---|---|---|---|---|
| | | | | | | for mobile phones. Conspiracy lasted five years. |
| United States v. Souied, 11 CR 494 (E.D. Va.) | 951 371 922 924 1001 | P | | | 18 mo. | Defendant conducted surveillance on dissidents for the Syrian government. Collected video and audio recordings of those individuals and provided to Syrian intelligence in order to silence, intimidate, and potentially harm the protestors. Paid by the Syrian government, given a laptop for communication that he later destroyed, and destroyed documents after being approached by the FBI. Met with President al-Assad as part of his activities. |
| United States v. Yu, 16 CR 23 (S.D. Fla.) | 951 371 554 305 1956 1001 | P | Yes | | 21 mo. | Defendant ran a business from her home in the U.S. and illegally exported materials to a former professor/employer affiliated with the Chinese government. Smuggled goods, laundered money, and made false statements to USCIS. Lasted 12 years and involved obtaining components for submersible marine vehicles. |
| United States v. Xiaoqing Zheng, 19 CR 156 (N.D.N.Y) | Conspiracy to commit economic espionage | T | | 78-97 (per government) | 24 mo. | This case is extensively discussed in the article cited by the government, Exhibit B-11 to its version of the offense. It notes that this defendant was one of Xu Yanjun's insiders alongside Ji. His sentencing held on 1/3/23. He was a former GE employee who, in the government's view, conspired to steal trade secrets related to engine turbines "far in excess" of $3.5 million in value. The government requested 97 month sentence and $500,000 fine. The conspiracy was described as "years-long" and "international" in nature. |

| United States v. Maionica, 07 CR 20999 (S.D. Fla.) | 951 | P | | | 24 mo. | Defendant pled guilty to a § 951 offense as well as conspiracy charges for assisting Venezuelan officials in hiding and moving cash out of Venezuela. Also received $25,000 fine. Co-defendant of Franklin Duran. |
|---|---|---|---|---|---|---|
| United States v. Chun, 16 CR 518 (S.D.N.Y.) | 951 | P | | 21-27 | 24 mo. | Defendant was an FBI agent of nine years who worked for a Chinese company, and one individual who he knew to be affiliated with the Chinese government. He performed researching/consulting tasks on their behalf and took steps to conceal these relationships from the FBI. Held a TS clearance. Was in contact with PRC officials between 1998 and his arrest in 2016. Lied on SF 86 about connections. Made admissions to FBI undercover and after his arrest. Admitted to collecting highly sensitive FBI information (e.g. regarding storage of classified information and surveillance infrastructure) in response to taskings. Defendant also possessed unregistered handgun and rifle discovered during search warrant. |
| United States v. Qin, 18 CR 10205 (D. Mass.) | 1705 1546 981-82 | P | | 87-108 per government; 12-18 per defense | 24 mo. | Unlawful export of marine tech gov including to Chinese military as customer; visa fraud; lying to agents. Over $100,000 worth of goods exported. |
| United States v. Buryakov, 15 CR 73 (S.D.N.Y.) | 951 | P | | n/a | 30 mo. | Recruiting intelligence sources and gathering publicly available information on behalf of Russia. Parties agreed 30 months was appropriate sentence. Had served as a Russian agent for five years in South Africa previously. Taskings related to sensitive |

| | | | | | | financial information about stock exchanges, sanctions, etc. Held clandestine meetings and communicated in code with Russian handlers. |
|---|---|---|---|---|---|---|
| United States v. Li Chen, 19 CR 163 (S.D. Ohio) | 1832 1349 1343 | P | | 97-121 (Government and PSI) | 30 mo. | 11(c)(1)(C) to 24 – 84; government sought 52 months. Defendant was hospital researcher who stole at least five trade secrets related to exosome research from Nationwide Children's Hospital. Received benefits from the Chinese government. Scheme lasted several years. Husband Yu Zhou co-defendant. $2.6 million ordered in restitution. |
| United States v. Majid Ghorbani, 18 CR 255 (D.D.C.) | 371 951 1701-06 | P | | | 30 mo. | Defendant conducted covert surveillance on Israeli and Jewish facilities in the U.S. on behalf of Iran. His co-defendant, Dootstdar received 38 months' incarceration. |
| United States v. Long, 16 CR 229 (D. Conn.) | 1831 | P | | 57-71 | 30 mo. | Time served (appx. 2.5 years) for stealing military research from an American company and taking it to China. Government argued his actions caused actual national security harm. Conduct lasted approximately six years. |
| United States v. Yu Zhou, 19 CR 163 (S.D. Ohio) | 1832 1349 1343 | P | | 78-97 (Government & PSI) | 33 mo. | Defendant was hospital researcher who stole at least five trade secrets related to exosome research from Nationwide Children's Hospital. Received benefits from the Chinese government. Scheme lasted several years. Wife Li Chen was co-defendant. $2.6 million ordered in restitution. |
| United States v. Elsa Alvarez, 506 F. Supp. 2d 1285 (S.D. Fla. 2007) | 951 371 misprision of a felony | P | | | 36 mo. | Defendants pled guilty to charges pertaining to spying on the southern Florida Cuban community for many years, including sending information to Cuba on groups and |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | individuals opposing the Castro government. |
| United States v. Rebecca Chiu, 05 CR 293 (C.D. Cal.) | 951 | P | | 11(c)(1)(C) | 36 mo. | Pled guilty to theft of sensitive military technology for China. Many codefendants listed herein, including husband Chu Mak. Government would have sought a higher sentence but-for defendant's agreement to have citizenship revoked. |
| United States v. Huang | 371 | P | | 37-46 | 37 mo. | Visa fraud relevant to this case – owner and operator of Findream et al. |
| United States v. Song Guo Zheng | 1001 | P | | 37-46 (Government) | 37 mo. | Lied about talent program connections in grant application. |
| United States v. Doostdar, 18 CR 255 (D.D.C.) | 371 951 1701-06 | P | | 57-71 | 38 mo. | Defendant conducted covert surveillance on Israeli and Jewish facilities in the U.S. on behalf of Iran. His co-defendant, Majid Ghorbani, received 30 months' incarceration. |
| United States v. Abouammo, 19 CR 621 (N.D. Cal.) | 951 1519 | T | | 70-87 (PSR); 87-108 (Government) | 42 mo. | Former manager of Twitter spied on behalf of Saudi Arabia. He was recruited by a close adviser to the country's Crown Prince and tasked with using his access and knowledge of Twitter to dig up personal information on Saudi dissidents. He received at least $320,000 in compensation and hid and laundered the money overseas. Government referred to him as turning twitter into a "covert surveillance tool." Lied to the FBI and falsified a document to obstruct justice. Government argued that defendant should have been aware his actions would put dissidents in danger for their personal safety and force them to leave country. One victim of instant conspiracy was even arrested, detained, and tortured |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | because of satirical twitter posts, and remains detained to this day. |
| United States v. Dumeisi, 03 CR 664 (Conlon, J.) | 951 371 Perjury 1001 | T | | | 46 mo. | Defendant acted as an agent of Saddam Hussein's regime in Iraq, including by publishing articles in a free newspaper (funded by money received from Iraq) that favored the Iraqi regime. Found to have committed perjury as well. |
| United States v. Aquino, 05 CR 719 (D.N.J.) | 951 | P | | | 46 mo. | Defendant pled guilty to possessing classified national defense documents. Transferred it to government officials in Philippines in effort to destabilize government. Some of the information was top secret. |
| United States v. Manafort 18 CR 83 (E.D. Va.) | 951 | T | | | 47 mo. | Defendant was Paul Manafort, former chair of Trump campaign. High profile prosecution. |
| United States v. Duran, 07 CR 20999 (S.D. Fla.) | 951 | T | | | 48 mo. | Defendant entered the United States on behalf of the Venezuelan government with the intent to cover up an alleged bribery scheme involving an Argentinian presidential candidate. |
| United States v. Latchin, 04 CR 661 | 951 371 1001 immigration | T | | 63-78 | 48 mo. | Defendant acted as a "sleeper" spy for Sadam Hussein's government. |
| United States v. Peng, 19 CR 589 (N.D. Cal.) | 951 | P | Possible | 97-121 (Government's calculation) | 48 mo. | Defendant acted as a courier for the MSS over a three-year period. Defendant entered into a binding Rule 11(c)(1)(C) where the parties agreed to the four-year term. |
| United States v. Amirnazmi, 0 8 CR 429 (E.D. Penn.) | 371 1705 371 951 | T | | | 48 mo. | Defendant conducted business with Iranian government in violation of U.S. law. |
| United States v. | 793 | P | Yes | | 48 mo. | American student spotted by MSS. Paid $30,000 to take U.S. |

| | | | | | | |
|---|---|---|---|---|---|---|
| Glenn Duffie Shriver 10 CR 227 (E.D. Va.) | | | | | | Foreign Service Exam twice. After failing instructed by PRC intelligence to apply to CIA. Paid an additional $40,000. Arrested in Washington traveling for final processing. Lied about intelligence contacts to the CIA. |
| United States v. Jiaqiang Xu, 16 CR 10 (N.Y.S.D.) | 1832 (Trade Secrets) | P | | 108-135 | 60 mo. | Theft of IBM Software. |
| United States v. Ali, 06 CR 632 (E.D. Cal.) | 371 951 641 2278 | P | | | 60 mo. | Defendant conspired to obtain military equipment and defense information on behalf of Yemen. Sentence agreed upon pursuant to plea agreement. |
| United States v. Carlos Alvarez, 506 F. Supp. 2d 1285 (S.D. Fla. 2007) | 951 371 | P | | n/a | 60 mo. | Defendants pled guilty to charges pertaining to spying on the southern Florida Cuban community for many years, including sending information to Cuba on groups and individuals opposing the Castro government. |
| United States v. Park, 05 CR 59 (S.D.N.Y.) | 371 | T | Yes | 57-60 | 60 mo. (reduced to 35 mo.) | Defendant accused of acting as a foreign agent in effort to get sanctions against Iraqi government lifted. Sentence reduced pursuant to Rule 35 based on defendant's post-trial cooperation. |
| United States v. Jiaqiang Xu, 16 CR 10 (S.D.N.Y.) | 1831 1832 | P | | 87-108 | 60 mo. | Defendant stole trade secrets from a major technology company to sell/provide to Chinese entities. |
| United States v. Justice 19 CR 163 (C.D. Cal.) | 1831 2778 | P | | 70-87 (Government's position) | 60 mo. | Case involved a California engineer selling or attempting to sell satellite secrets to Russians |
| United States v. Karim Bartov, 17 | 1030 1831 1832 1028 1029 | P | | | 60 mo. | Aided Russian hacking efforts of Yahoo. Hacked thousands of accounts over a seven year period. |

| Case | Statute | P/T | | Range | Sentence | Notes |
|---|---|---|---|---|---|---|
| CR 103 (N.D. Cal.) | | | | | | |
| United States v. German 19 CR 69 (S.D. Ga.) | 1832 | P | | 70-87 | 70 mo. | Defendant conspired to steal trade secret from aircraft company; crime was exacerbated by the fact that after cooperating the defendant lied about his conduct up to and including testifying falsely at his sentencing hearing |
| United States v. Benjamin Bishop 14 CR 329 (D. Haw.) | 793 | P | Yes | | 84 mo. | Civilian contractor with Top Secret/SCI access related to Pacific Command's efforts to counter WMDs, nuclear deterrence, and missile defense, stole such documents and passed some onto China. |
| United States v. Nicholson, 19 CR 40 (D. Ore.) | 371 951 1956 | P | | 360 – Life | 96 mo. (60 months for § 951 offense; additional 36 for money laundering) | Agreed upon sentence consecutive to defendant's 1997 espionage conviction. Defendant was a former CIA officer twice convicted for spying on behalf of Russia. |
| United States v. Tai Wang Mak, 05 CR 293 (C.D. Cal.) | 951 1001 exporting offenses | T | | 292-365 | 120 mo. | Defendant was found guilty at trial of theft of sensitive military technology for China, including enormous technical details of next-generation navy warships. Defendant lied and obstructed justice. Was the individual responsible for transporting the stolen technology back to China. |
| United States v. You, 19 CR 14 (E.D. Tenn.) | 1832 | T | | Life | 168 mo. | Defendant stole trade secrets regarding BPA liners. $120 million value. Intended to set up her own company in China. Received grants and funding from Talents' Programs to do it. Government recommended 240 months' imprisonment. Argued lead role in multi-year conspiracy. |
| United States v. Chung, 08 | 951 371 | T | | 121-151 | 188 mo. | Defendant downloaded and possessed thousands of sensitive documents through |

| Case | Charge | Plea/Trial | | Guideline Range | Sentence | Description |
|---|---|---|---|---|---|---|
| CR 24 (S.D. Cal.) | 1831 (economic espionage) 1001 | | | | | his employment at Boeing, gave presentations on this material in China, etc. |
| United States v. Jerry Lee | 793 794 | P | | 262-327 | 228 mo. | Defendant conspired to provide PRC officials with NDI. Defendant was employed with the CIA and did so for his own pecuniary gain. |
| United States v. Chi Mak, 05 CR 293 (C.D. Cal.) | 951 1001 exporting offenses | T | | | 293 mo. | Defendants were guilty of theft of sensitive military technology for China. This defendant was the leader of the conspiracy. |
| United States v. Kourani, 17 CR 417 (S.D.N.Y.) | Terrorism Charges 371 | T | | 360 – Life | 480 mo. | Defendant acted as a sleeper agent in the United States for Hezbollah. |
| **Multi-Defendant Cases (Individual Information Not Available)** | | | | | | |
| United States v. Campa, 529 F.3d 980 (11th Cir. 2008) | 951 Espionage conspiracy to commit murder | T | | | 42 mo. 60 mo. 60 mo. 120 mo. | The defendants pled guilty to acting as secret agents of the Cuban Intelligence Agency for many years and engaged in numerous illegal activities, including infiltrating and reporting to the Cuban government on anti-Castro individuals and groups, attempting to penetrate the Miami offices of the U.S. Southern Command, and providing information to the Cuban government which ultimately led to the Cuban air force shooting down civilian aircraft, killing their crews. |

To reiterate, given the government's version of the offense, which has the potential to substantially broaden the parameters and put at issue the PRC's country-wide intelligence efforts, these cases take on added importance. As noted above, individuals convicted of far more serious actions—including the actual theft or misappropriation and transfer of classified information—

consistently and repeatedly receive sentences shorter than the approximate 51 months Mr. Ji has already been held in custody and will receive credit for.

In particular, as noted above, Xiaoqing Zheng was a long-tenured engineer with GE—precisely the type of person the government was concerned that Mr. Ji would help Mr. Xu recruit. The fact is, however, that he was reportedly recruited by Mr. Xu independent of Mr. Ji, and Mr. Xu did so during the same time period relevant to this case (his indictment charged the more serious offense of conspiracy to commit economic espionage from March 2016 through August 2018). Government Version Exhibit B-11 contains an "Intelligence Report" from the "Crowdstrike Global Intelligence Team." That report includes a graphic listing both Mr. Zheng and Mr. Ji right below each other with the notation "tasked" in reference to Mr. Xu. The article goes on to explain:

> Over the course of several years, Xu would recruit both an insider at LEAP-X manufacturer General Electric (GE), Zheng Xiaoqing, and a Chinese-born Army Reservist, Ji Chaoqun. Zheng's background appears to have made him uniquely qualified to accurately assess turbine engine schematics, and it was clear from his indictment that he had received coaching on which sensitive information on GE's turbine technology to access and how to use steganography in an attempt to exfiltrate the information.

He did in fact set up companies in China and smuggle turbine engine data out of the country. He caused a loss to GE of "far over" $3.5 million according to the government's estimate. Largely for those reasons, after he was found guilty of various counts at trial, the government requested that he receive a sentence of 97 months' imprisonment, which was at the high end of the guidelines range as the government and probation officer found it. He was nonetheless sentenced on January 4, 2023 to only 24 months' imprisonment.

Katrina Leung was a MSS double agent for over two decades. She successfully received over $1.7 million working as a "FBI source" and received a sentence of probation.

Ying Lin was an individual who worked her way into a position of authority with an international air carrier. She abused those privileges in order to smuggle packages on behalf of Chinese military officials—packages the PLA did not want subject to security measures. She passed SIM cards between PRC officials on opposite sides of security checkpoints; came into work outside of scheduled hours; falsified travel records to conceal the packages and received significant compensation for her work. In fact, she likely received cash in an amount likely in excess of $100,000, and on top of that, she structured the deposits and held much of them in foreign bank accounts. With her compensation she was able to lease luxury cars, owned multiple residences, and carried large amounts of cash. She actively encouraged other airline employees to assist PRC military officers. After-the-fact, she helped a "confederate" flee justice, as well as obstructed the investigation into her own offense. Despite all of that she received a sentence of probation.

Zoasong Zheng was a medical / cancer researcher who attempted to smuggle DNA expression vectors, a tool used to insert a string of DNA into a gene, out of the country and back to China. He was stopped, and even though the theft would have proved minimal after analysis, he received a sentence of three months' probation.

Qian Li actually went ahead and photographed a United States military installation with the intent of passing the photos to the PRC. This is similar conduct the government was concerned that Mr. Ji might engage in at some future date—recall the trial testimony and evidence regarding his CAC card and how it gave him access to military bases. Qian Li received a sentence of 12 months' imprisonment.

Jun Wei Yeo worked under the direction and control of Chinese intelligence officers for over a four year period. Similar but worse than Mr. Ji's alleged conduct, this defendant was tasked

with obtaining non-public information of value on U.S. citizens, including related to matters of economic, military, and political importance. This defendant actively and personally reached out to the individuals he identified or spotted, and encouraged them to write reports beneficial to China. He successfully provided his intelligence handlers reports on a U.S. military aircraft program, the withdrawal of U.S. troops from Afghanistan, and the religious affiliation of a member of the Cabinet of the United States. He was sentenced to 14 months' imprisonment.

Yu Xin Kang regularly acted as a cut out for a PRC intelligence officer to communicate with a PRC agent, and supported the agent's efforts with "near-complete knowledge." She actively participated in the transmission of documents that came from the Department of Defense to the PRC, obviously concerned military matters, and in fact contained classified national defense information. She conveyed information "on at least eight occasions" altogether. She received a sentence of 18 months' imprisonment.

Hao Zhang was an individual who again accomplished the types of activities the government feared Mr. Ji himself would possibly conspire to achieve: the theft of trade secrets, in that case, related to radio frequency filters that took one of the companies over 20 years to develop the patented technology for. The value amounted to $476,000. After trial, the government requested a sentence of 41 months' imprisonment, and the defendant received a sentence of 18 months' imprisonment.

Amin Yu was yet another individual who accomplished the type of actions the government feared Mr. Ji would one day complete himself. She illegally set up businesses for the purpose of exporting and smuggling items to China on behalf of and at the request of a Chinese official. Not only did she smuggle goods over the course of her 12 year scheme, but on top of that, she made false

statements and engaged in international money laundering. Yu received a sentence of 21 months' imprisonment.

Kun Shan Chun is an individual who did almost unimaginable harm to the United States as a Chinese spy. He worked for the FBI for approximately 20 years, held a top secret clearance, and passed extremely sensitive classified materials to China in response to taskings from his handlers. He was initially charged in a complaint with four separate § 1001 violations, including lying on his SF-86 to the very same question Mr. Ji was convicted of. In addition, agents recovered an unregistered handgun and rifle during a search warrant execution. Despite all of that, he received a sentence of 24 months' imprisonment.

And as one final example, Ahmad Abouammo was sentenced just this past December. He was a manager of twitter and recruited into a conspiracy by a close adviser to Saudi Arabia's Crown Prince. He was tasked to use his insider access and knowledge to dig up personal information on Saudi dissidents. Mr. Abouammo did just that, despite the fact that doing so would jeopardize their personal safety. Tragically, one such individual who he passed information on was arrested, tortured, and remains detained to this day, all as a result of making satirical posts on twitter about the Saudi government. On top of all that, he received over $300,000 and a $20,000 luxury watch in compensation. He laundered the funds through overseas relatives, and when the FBI came and knocked at his door, he lied and even falsified documents to obstruct justice. For these actions he received a sentence of 42 months' imprisonment.

## IV.    Conclusion

Mr. Ji is a positive young man who has a good future ahead of him and a lot of meaningful contributions to make to the world at large. For the reasons described herein, he is deserving of

compassion and leniency from this Court. After considering the guidelines as a "starting point" and "initial benchmark," the Presentence Investigation Report, the information adduced at the sentencing hearing, and everything else this Court is required to consider, counsel submits that a sentence of time considered served is the just and appropriate sentence.

Respectfully submitted,

/s/ Damon M. Cheronis
**Damon M. Cheronis**

/s/Ryan J. Levitt
**Ryan J. Levitt,**

/s/ Christopher V. Parente
**Christopher V. Parente,**
Attorneys for Defendant.

**Cheronis, Parente & Levitt LLC**
140 S. Dearborn Street Suite 404
Chicago, IL 60603
(312) 663-4644
damon@cheronislaw.com
ryan@cheronislaw.com

<u>**CERTIFICATE OF SERVICE**</u>

I, Damon M. Cheronis hereby certify that on January 12, 2023, I electronically filed the foregoing **Defendant's Objections and Clarifications to the Presentence Investigation Report; and Position Paper and Commentary on Sentencing Factors** with the Clerk of the U.S. District Court for the Northern District of Illinois, Eastern Division, by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<div align="right">

s/ Damon M. Cheronis
Damon M. Cheronis
Cheronis, Parente & Levitt
140 S. Dearborn Street Suite 404
Chicago, Illinois 60603
(312) 663-4644
damon@cheronislaw.com

</div>