UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JI CHAOQUN | No. 18 CR 611<br><br>Judge Ronald A. Guzman |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Ji Chaoqun has had extraordinary privileges extended to him—the privilege of attending a premier university in China; the privilege of coming to this country; the privilege of attending one of our great universities; and the privilege of serving in our military. He used these privileges not to do good but to attack our economic and national security. Instead of using his premier aviation education in China to help that country innovate, he used it to enlist with the Ministry of State Security (MSS) to steal American aviation technology. Instead of using his privilege of studying here to learn important skills that could benefit his fellow citizens, he used it to sneak into this country as a spy and deceptively remain long after he was required to leave. Instead of serving the United States with pride alongside our soldiers as a member of the U.S. Army, he intended to use that access as an avenue to steal our secrets on behalf of a foreign nation. Ji's severe abuse of the privileges this country extended him only to turn around and conspire to attack our economic and national security deserves our strongest condemnation. The Court must impose a substantial sentence to deter others considering entering the United States to do the same.

A substantial sentence is warranted due to Ji's malicious conduct and the need for general deterrence. Therefore, the government recommends a sentence of approximately 63 months' imprisonment. This sentence is consistent with other cases that, although not directly comparable, involve 18 U.S.C. § 951 violations, and also consistent with somewhat relevant Guidelines provisions.

## APPLICABLE SENTENCING GUIDELINES

As the government explained in the Government's Version, and as Probation concurred, there are no applicable Sentencing Guidelines for Counts One and Two and no analogous Guidelines provisions. The government agrees with the Guidelines calculation for Count Five in the Presentence Investigation Report ("PSR"). *See* PSR ¶ 60. As noted in the Defendant's Version, Guideline § 2M3.3 covers conduct related to unauthorized disclosure of classified information to a foreign government. Under this Guideline, Ji's Guidelines range is 51-63 months' imprisonment. Although this Guideline is not analogous, because it does not cover the conduct at issue, it does help inform the range of appropriate sentences.[1]

---

[1] Ji argues that the wire fraud Guidelines, § 2B1.1, apply. But Ji was acquitted of wire fraud, apparently because, as the defense argued, Ji did not defraud the Army to obtain property. Given the jury's decision on the other counts, it appears to have concluded that Ji lied to the Army as part of his efforts on behalf of the MSS, not to obtain property. Ji's sentencing memo contains a bulleted list of facts that support the conclusion that he was trying to quickly obtain citizenship through the Army so he could steal secrets, as he informed the undercover agent. (Def. Memo. at 4.) Ji's conduct relating to the Army is not "acquitted conduct"; it concerns his acting as an unregistered agent for the MSS in the United States.

## ARGUMENT

### I. NATURE AND CIRCUMSTANCES OF THE OFFENSE

Ji trained to be a spy; he committed to being a spy; he executed being a spy; and he bragged about being a spy. He snuck into this country, infiltrated our military, and sought to use his unique access to help a foreign nation steal our secrets. The Court must impose a substantial sentence to show that Ji's serious and malicious conduct is deserving of our strongest moral condemnation. *See United States v. Moose*, 893 F.3d 951, 958 (7th Cir. 2018) (noting the "important retributive notions such as . . . punishment of the offenders according to their just deserts" and "the importance of longer prison terms that respond to public concern for fairness" to address the "sentencing goals of retribution and respect for the rule of law") (quotations omitted).

Ji's conduct was malicious. Ji thought about whether he wanted to devote his life to stealing American secrets, agreed to do it, planned it out, and successfully implemented it. For example, in July 2013, Ji debated whether to join the MSS bureau that was "in charge of surveillance, investigation and arrest of foreign spies." Ex. 314-T.[2] Ji found the job description "[v]ery interesting" but wondered if it was a "good" job. In August 2014, as he explained to his former girlfriend, he learned that he would be working for the MSS overseas.[3] Ex. 315-T. He pledged, out of his own

---

[2] The referenced exhibits can be found on the thumb drive enclosed with the Government's Version. Exhibit labels that are three- or four-digit numbers are from the *Ji* trial and are in the folder labeled, "JI trial exhibits."

[3] Throughout this case, Ji has insisted that he was "manipulated" into joining the MSS. (Def. Memo. at 12-13.) His evidence appears to be his statement that the MSS did not reveal its

"free will," to work for the MSS and devote the rest of his life to state security. Ex. 312-T.

During this time, he coordinated with the MSS. He had meetings with MSS officers. He developed the plan to enter the United States through a student visa, which he successfully obtained. He later explained that the lack of gaps in his resume would mean that he would go undetected in the United States. He then implemented the rest of his plan to help steal secrets for the MSS. He received training from the MSS on science and technology intelligence, meaning stealing American science and technology secrets. He helped target American scientists, joined the U.S. military, applied for accelerated citizenship, applied for a security clearance, and sought to obtain a job at the FBI.

Not only was Ji's offense willful, but it was also incredibly serious, as Ji sought to strike at the heart of our economic security—and by extension, our national security. Chinese economic espionage presents one of the gravest threats to the national and economic security of the United States. *See* 18 U.S.C. § 3553(a)(1) (directing courts to consider not only the nature of the offense but also its "circumstances," such as the social context). That is not simply the opinion of this office but the considered conclusion of (a) the Executive Branch, across

---

true name at a college recruitment fair and that he was wined and dined by them during recruitment. The evidence makes clear the opposite is true. Wining and dining a recruit is a sign of *lack* of manipulation; it is evidence that the recruit exercises free will and must be persuaded. And, as noted above, Ji's own contemporaneous statements to his girlfriend show that he was well-informed, contemplative, and made an affirmative decision to join the MSS.

administrations; (b) members of Congress across the political spectrum; (c) non-governmental organizations; and (d) entities across the private sector.[4]

This widespread conclusion is founded on the reality that the Chinese government has used a whole-of-government approach to *actually* steal U.S. technology to *actually* challenge the U.S.'s technological and military superiority. The Government's Version detailed how the Chinese government had repeatedly and voraciously stolen technology related to advanced American military technologies, including aircraft designs, which had "the potential to degrade core U.S. operational and technological advantages." China also repeatedly has stolen advanced American commercial technologies, resulting in the loss of American jobs and one of the largest transfers of wealth in human history.

The effects of this wholesale theft go beyond just our national security. These thefts victimize the American engineers—many of whom are immigrants themselves—who used their brilliance and hard work to create next generation technologies, all to have it simply be stolen. The thefts create disincentives for innovation, resulting in a downward spiral of reduced innovation.

---

[4] *See, e.g.*, *Cyber Espionage and the Theft of U.S. Intellectual Property and Technology*, No. 113-67, Hr'g before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, U.S. House of Representatives (July 9, 2013), available at https://www.govinfo.gov/content/pkg/CHRG-113hhrg86391/html/CHRG-113hhrg86391.htm (containing statements of Congressional members across the political spectrum, members of congressionally mandated commissions, organizations, and private entities); Office of Trade & Manufacturing Policy, *How China's Economic Aggression Threatens the Technologies and Intellectual Property of the United States and the World*, available at https://trumpwhitehouse.archives.gov/briefings-statements/office-trade-manufacturing-policy-report-chinas-economic-aggression-threatens-technologies-intellectual-property-united-states-world/; and the many lengthy reports cited in the Government's Version.

None of this has been accidental. As detailed during trial and in the Government's Version, the Chinese government has in place an elaborate structure that facilitates the theft of sensitive American information and technologies. Here, the Chinese government saw a desire to steal American technologies related to civilian and military aircrafts. So, the MSS, including MSS officer Xu Yanjun, devoted themselves to stealing aircraft and related technologies. So did Ji, who was trained at an aviation school in China. Ji took on the task, pursuant to directions from Xu, of gathering information about American aviation scientists. These brilliant scientists, all of Chinese or Taiwanese descent, were developing next-generation aviation technologies in this country, including satellite communications and navigation technologies that could be used in enemy territory. But Ji also took initiative. He began reaching out to confidantes like Yu Wenzhi to identify future American aviation scientists who could help the MSS steal aviation technologies.[5] Ex. 302-T.

To be clear, Ji was but one part of this wholesale attack and is not singularly responsible for it. But he was an important part, and his willful role should not be minimized. Ji successfully snuck into this country to serve as an overseas agent of the MSS while pretending to be a foreign student. This was a tremendous achievement. MSS officers are too afraid to come to the United States, as explained

---

[5] Ji argued in his memo that he had opportunities at Motorola and Qualcomm that he did not pursue. The argument appears to be that he wasn't really committed to stealing secrets. As a foreign citizen, Ji was unlikely to have access to sensitive information at these companies. He was already receiving thousands of dollars from the MSS and had the inside track at the Army, a much better opportunity for an MSS spy.

6

by government expert James Olson and even by Ji's messages. Ji explained that MSS officers "are not able to travel out of the country." Ex. 315-T. Although the MSS officers could not, Ji, in coordination with those same officers, hatched a plan for him to spy inside this country. The fear of getting caught in a foreign country far from home without diplomatic protections did not stop Ji. He was so devoted to the cause of the MSS that he knowingly took on that risk. To Ji, the risk was worth it because he was fulfilling his pledge and receiving thousands of dollars from the MSS. The Court must impose a substantial sentence that makes clear that this risk does not pay off.

Ji's presence in the United States was a boon for the MSS. It opened the door to many potential MSS operations to steal American secrets and technologies. As even Ji explained, he could, while hiding in plain sight, take photos of sensitive government and military installations (which he did, like the FBI building), target American soldiers for recruitment by the MSS, and get jobs that would give him direct access to sensitive information. Consider Ji's willingness to spot and help recruit American soldiers for the MSS. Ji was supposed to join the military to defend this country and to fight alongside his fellow soldiers and protect them. He was supposed to be willing to die for them. Instead, Ji joined the military to attack this country—by planning to disclose its secrets to a foreign power—and to subvert his fellow soldiers into this fight. What a dishonor.

Ji successfully penetrated the U.S. military to set himself on a path to citizenship and a security clearance. Ji applied for citizenship, filled out the forms to

accelerate the process, and applied for a security clearance. In the process, Ji tricked counter-intelligence officers and others whose job it was to secure our secrets. He lied on his background check form; he lied to the Army security interviewer about his affiliation with the MSS; and he lied to the reviewers who interviewed and evaluated his background check applications. Incredibly, Ji lied specifically about being affiliated with the MSS directly to the counterintelligence interviewer without hesitation during a face-to-face interview. That Ji could do this shows how he was well-trained and sophisticated—and just how malevolent he was.

Ji knew what an important achievement his penetration was; he bragged to a confidante about how he was an undercover intelligence operative in the Army. Ex. 501-T. He planned for how to use his successful penetration of our military to steal our secrets. He explained as much to the undercover agent, whom he believed to be a fellow MSS agent. The plan was to obtain a top-secret security clearance, and then "get quick access to those places in the U.S. that tend to have limited access to the Chinese people." Once he obtained his citizenship he would "look for jobs with secret clearance" such as "CIA, FBI jobs, or go to NASA." He would be able to access sensitive databases at FBI, NSA, or NASA. Ji also explained that he would try to work in cybersecurity at one of these agencies. He explained that working in cybersecurity would give him access to all the databases at the agency. Ji also informed the UC that he had access to all military bases with his military ID and volunteered, without prompting, to take pictures of aircraft carriers for the benefit of the MSS. He specified that he was able to freely enter Roosevelt-class, nuclear-

8

powered, aircraft carriers.  The reason Ji did not actually obtain access to our nation's military secrets and pass those secrets onto the MSS was because the FBI spotted him before he completed the process.

What made Ji especially dangerous was that he was a trusted *agent*.  He was not just a robot taking directions and executing tasks.  He was entrusted by the MSS to act on its behalf and to fulfill its mission in the best way he thought fit.  He could use his training and intelligence to formulate plans that would further the mission of the MSS.  And he did exactly that.  For example, as he argued during trial, he was not directed to join the U.S. Army.  He figured that out all on his own.  He knew exactly what he was doing; he bragged to the confidante about being undercover intelligence in the Army.  This kind of thought and planning exemplifies the willful nature of Ji's conduct.  He was not a bumbling fool; he didn't accidentally fall into this well-planned and well-executed scheme against this country.  He, on his own initiative, planned and executed the scheme in service of his pledge to help the MSS steal our secrets.  That made him extremely valuable to the MSS and highly dangerous to the United States.

In fact, Ji prided himself on being a sophisticated and successful spy.  He even mocked other, less capable spies.  One example is his November 28, 2019, email to his confidante, Yu Wenzhi, mocking other spies who had been caught, such as an American sailor who was caught at the airport and, according to Ji, was an idiot for not obfuscating his travel.  Ex. 1100.

The Seventh Circuit has explained that conspiracies are "more dangerous not only because there is more power for harm in a group and hence a greater likelihood that the group will achieve its criminal aim, but also because a group can take advantage of the division of labor, parcelling out tasks in accordance with the skills, preferences, and experience of the individual members, thus enabling it to operate on a larger scale, and conceal its criminal activities more effectively, that would be possible for a lone wolf." *United States v. Shi*, 317 F.3d 715, 717 (7th Cir. 2003). That was what occurred here. This division of labor allowed Ji and the MSS to operate on a global scale and for Ji to use his skills and access to undertake the task of identifying weaknesses in our security systems that he could exploit.

While the evidence does not show that Ji actually stole technology or classified information, this fact is not substantially mitigating for several reasons. First, the fact that Ji was caught before he obtained his clearance or successfully recruited scientists does not diminish his culpability. The evidence is clear about Ji's plans and that he was committed to seeing this plan through. Ji pledged his oath to the MSS. He took concrete steps towards stealing American secrets, including joining the military, applying for citizenship, applying for a security clearance, gathering information about American scientists, seeking out FBI jobs, and explaining to the undercover agent what his plans were. Ji was methodical.

Second, the Seventh Circuit has explained that conspiracies often are punished "as severely even if the conspiracy fails to achieve its aim, because a group having an illegal purpose is more dangerous than an individual who has the same purpose." *See*

*Shi*, 317 F.3d at 717. That is precisely the case here. Ji, with the backing of one of the world's premier spy agencies, was dangerous. He came close to stealing and disclosing our economic and governmental secrets.

Third, Ji would be facing a dramatically different sentence if he had actually stolen classified information. For example, the offense level under Guideline § 2M3.1 for gathering top secret information to aid a foreign government—as Ji said he planned to do once he received his clearance—is 42. The applicable Sentencing Guidelines range is 30 years to life imprisonment. Any sentence substantially below that range already accounts for the fact that Ji did not actually steal information.

Lastly, especially in the context of foreign spies, success cannot be the fulcrum upon which sentences are decided. Entering this country as a spy to steal our secrets on behalf of a foreign country is a significant undertaking, regardless of success. It shows tremendous culpability, regardless of what eventually happens. It also requires companies and government agencies to spend money to harden their defenses, regardless of whether they are actually victimized. Worst of all, it fosters a distrust of foreigners and immigrants. The Court's sentence must be substantial to reflect this culpability, the danger Ji presented, and these serious harms to our national life.

## II.   THE NEED FOR ADEQUATE DETERRENCE

General deterrence also requires a substantial sentence. As the Seventh Circuit has explained, "In determining the importance of deterrence in crafting a sentence, the sentencing court must answer the situation from the perspective of the prospective offender. From that perspective, the likelihood of getting caught depends

11

not simply on the amount of resources that the Government expends on a particular type of crime, but the frequency with which the particular crime is committed and the ease with which it can be committed and go undetected." *United States v. Brown*, 880 F.3d 399 (7th Cir. 2018).

This case is a prime example of the importance of general deterrence. Spies are not easy to catch. They are trained and supported by the resources of a nation, as opposed to an individual or private entity. That is especially relevant here because China is one of the most powerful and wealthy nations in the world with a vast arsenal of resources at its disposal. This brings many advantages to criminals like Ji. Nations can afford to recruit intelligent and dedicated criminals—like Ji, who attended one of the premiere universities in China. Nations can afford to pay handsomely for someone like Ji, which the MSS did. And nations can provide the tools needed to secretly carry out these schemes, such as setting up dead drops in a foreign country, like with Xu in Belgium, or providing funds so that Ji could return to China for sensitive, in-person conversations. Nations, like China, also can block access to evidence for investigators that individuals and private entities cannot. All these factors make the likelihood of the Ji's criminal success high and the chance of detection and prosecution low. Prosecutions of spies are challenging and rare.

As the Seventh Circuit explained, conspiracies are dangerous in part because they take advantage of resources, experience, and division of labor that allow them to conceal their criminal activities more effectively. *See Shi*, 317 F.3d at 717. Similarly, here, the resources and experience of MSS officers, funded by the Chinese

government, facilitated the criminal activity and its concealment for the reasons just described. Crucially, though, the division of labor also facilitates concealment. Ji could claim to be performing seemingly innocuous tasks—gathering publicly available information about Americans or getting to know aviating engineering students or serving this country through the military—that ultimately support the MSS's theft of American secrets. Ji used the openness of our society, of which we pride ourselves on, against us to the detriment of our national security.

MSS officers already are hesitant to come to the United States for fear of being caught and prosecuted. The same must be true of their recruits and agents acting surreptitiously here. They must know that, if caught, they will face the severest of consequences. As noted above, the ability to act within the United States is a boon for the MSS; it allows direct access to valuable people and information. Dissuading these agents, through a substantial sentence, from acting within the United States will reduce the value of the criminal activity. These agents will not be able to do the substantial damage of stealing military and private secrets and sending them to a foreign intelligence agency.

### III. JI'S HISTORY AND CHARACTERISTICS

Ji does not have the kind of history that is typically mitigating. He did not grow up in abject poverty or in an abusive household. He has not been diagnosed with any mental illnesses that led to this offense and is not suffering from drug addiction. It's the exact opposite. He appears to have had a stable, loving, two-parent home. His parents have been and remain supportive. He is well-educated at some of the best universities in the world. He had many career options available to him. For

example, he had internships in college in China at various companies. Ji deliberately chose this path of crime. He thought about this decision ahead of time and willfully decided to commit these crimes. Whether it was greed or a desire to achieve career success in China at the expense of the United States—or both—makes little difference. Either of those motivations is seriously aggravating.[6]

## IV. AVOID UNWARRANTED DISPARITIES

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Each case is unique, and it is difficult to compare cases, especially because § 951 prosecutions are uncommon and § 951 covers such a wide variety of conduct. The defendant's memo includes a chart of various cases involving violations of § 951 or other statutes that Ji appears to contend are comparable. While the Court may take those data points into account, it is difficult to make much out of them. Without detailing every case on defendant's chart, here are some examples:

- Ji cited the case of Jun Wei Yeo who spotted and contacted Americans with access to sensitive information on behalf of Chinese intelligence services. He received 14 months' imprisonment but also cooperated extensively with the government's investigation. Yeo debriefed law enforcement for over 40 hours and provided credible and helpful information that included valuable intelligence and furthered criminal investigations. Ji did the opposite.

- Ji also cited the case of Katrina Leung but left out that her case, including the espionage-related charges, was dismissed due to purported governmental misconduct and she later instead pled guilty to a tax offense and lying to the FBI.

---

[6] Ji notes that he experienced racism in jail due to the pandemic. This racism is abhorrent and may be considered by the Court in mitigation.

14

- In the case of Yu Xin Kang, prosecutors acknowledged that the defendant was a minor participant who did not fully understand she was transmitting secrets. Instead, she was under the control of another man who domineered over her. Again, Ji was the opposite; his conduct was willful, planned, and with the full understanding and support of stealing this country's secrets.

- Ying Lin, an airline worker, pleaded guilty and was more akin to a courier. Her role was to assist the Chinese government in improperly moving packages. Ji, on the other hand, was a registered overseas spy for the MSS. He was entrusted with, and had the intent to, conduct extensive espionage-related activities in the United States.

Ji's case also can be analogized to the cases with more substantial sentences. For example, Jerry Lee conspired to provide Chinese officials with national defense information, which Ji also said he would do once he had access to it. Lee received a sentence of 228 months, although he, unlike Ji, was a CIA officer already with access to such information. Also, defendants who actually stole sensitive information received substantially higher sentences, like Chi Mak who received 293 months. Ultimately, each of the cases defendant cites is distinguishable.

The cases in which defendants received sentences around 60 months appear to be most similar to Ji's case, although most of those also involved less-aggravating circumstances. For example, the case of Ali, 06 CR 632, involved a conspiracy to obtain defense information on behalf of a foreign nation. Ji also sought to obtain military information. The case of Alvarez, 506 F. Supp. 2d 1285, involved gathering information about Cuban nationals to send to the Cuban government, like Ji did about American scientists of Chinese or Taiwanese descent. Ji's conduct, though, also was more aggravating because he went to trial, refused to accept responsibility, had an espionage mission broader than only obtaining defense information, and was

acting on behalf of a foreign government that has a comprehensive approach to stealing American technology.

There are no co-defendants in this case for comparison purposes. The only comparison is to Xu, a co-conspirator. *See United States v. Sanchez*, 989 F.3d 523, 539 (7th Cir. 2021) ("Further, our case law neither precludes nor requires comparison to a parallel conspiracy—whether before the same or different judges—when considering unwarranted disparities under § 3553(a)(6)."). Xu received a sentence of twenty years' imprisonment. In some ways, Xu's conduct is quite different from Ji's. Xu was convicted of theft of trade secrets, not a § 951 violation. Xu's Sentencing Guidelines were driven largely by the loss amount due to the trade secrets he attempted to steal. (The same is true for the economic espionage case of Xiaoqing Zheng that Ji cited, *see* Def. Memo. at 39.) Xu also was an employee of the MSS; it was his job day in and day out to steal aviation technology. Xu also was a supervisor.

In other ways, Xu and Ji's conduct are quite similar. They both pledged to further the mission of the MSS. They both carried out their duties to help steal American technology, including by spotting American scientists who could serve as potential recruits. They both were arrested before completing all of their unlawful objectives.

In still other ways, Ji's conduct is more egregious that Xu's. Xu did not sneak into this country; he did not infiltrate our military; he did not lie to U.S. government officials. Ji did. Ji, not Xu, was so devoted to the cause of stealing American technology that he came to the United States despite the risks. Mr. Olson testified

16

that there's a risk of imprisonment that comes with spying in a country. Ji knowingly took that risk but was caught. He now must be sentenced for his willful conduct.

Although there are no cases that are directly comparable, the government recommends a sentence of approximately 63 months' imprisonment based on the cases discussed above, the somewhat relevant Guideline § 2M3.3, the serious nature of the offense, and the substantial need for deterrence.

## V.   SUPERVISED RELEASE CONDITIONS

The government proposes adding special condition 4 limiting Ji's access to personal information of others because of the nature of his offense involved gathering personal information about others for improper purposes. The government otherwise agrees with the PSR that the specified conditions, with this modification, are necessary to further the objectives of supervised release and can provide additional support if necessary.

>                             Respectfully submitted,
>                             JOHN R. LAUSCH, JR.
>                             United States Attorney
>
> By:    */s/ Vikas Didwania*
>        VIKAS DIDWANIA
>        BARRY JONAS
>        Assistant United States Attorneys
>        219 South Dearborn St., Rm. 500
>        Chicago, Illinois 60604
>        (312) 353-8898

Date: January 3, 2023